Dax R. Watson [No. 020054]
Gregory M. Monaco [No.  023965]
**MACK DRUCKER & WATSON, P.L.C.**
3200 North Central Avenue, Suite 1200
Phoenix, Arizona  85012
Telephone:  (602) 778-9900
Facsimile:   (602) 778-9947

*Attorneys for Plaintiffs*

docket@mackazlaw.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CARL     ANDERSON     and     ROSALIE ANDERSON, individually and as husband and wife; ROBERT F. BARTON and LYNN A. BARTON, individually and as husband and wife; DAVID S. BAUM and JUDY J. BAUM, individually, as husband and wife, and as Trustees of the David S. Baum Living Trust and Judy J. Baum Living Trust; MELISSA A. BAUM, individually and as Co-Trustee of the Melissa A. Baum Irrevocable Trust; KIMBERLY EMERSON, individually and as Co-Trustee of the Kimberly Emerson Irrevocable Trust; TRACY SUE SAPIEN, individually and as Co-Trustee of the Tracy Sue Sapien Irrevocable Trust; LAWRENCE A. BENSON and PHYLLIS E. BENSON, individually and as husband and wife; HOWARD R. BERLIN and JOY M. BERLIN, individually, as husband and wife, and as Trustees of the Howard R. Berlin Separate Property Trust, Joy M. Berlin Separate Property Trust, and Berlin Family Revocable Trust; BARNETT FAMILY PARTNERSHIP I, a Texas general partnership; BARNETT FAMILY PARTNERSHIP II, a Texas general | CASE NO. _____<br><br><br><br>**COMPLAINT** |

1

mdw
mack drucker & watson
Attorneys at Law
3300 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

partnership; CURTIS S. BEYER, as Trustee of the Earl and Evelyn Beyer Family Trust; ALVIN R. BONNETTE, individually and as Trustee of the Alvin R. Bonnette Revocable Trust; ALAN BRAMOWETH, individually and as Beneficiary of the Alan Bramoweth IRA and the Alan Bramoweth SEP; JOHN L. BROAN, individually and as Grantor and Trustee of the John L. Broan 1984 Revocable Trust; TOLIVER J. BROWN, individually; STARLIGHT MANAGEMENT CO., L.L.C., an Ohio limited liability company; SUZETTE CINI, individually; JOHN COTTOM, as Trustee of Cottam Family Limited Trust; JAMES CURRAN, individually and beneficiary of the James F. Curran IRA; MICHAEL DAVIS and NANCY DAVIS, individually, as husband and wife, and as Grantors of the Michael and Nancy Davis Revocable Trust; LISA DEKTOR, individually; GEORGE F. DEMBOW, JR., individually and as Trustee of the Arizona Natural Resources Profit Sharing Plan and Trust, Trustee of George F. Dembow III Family Trust, and Trustee of Ethelanne and George Dembow Family Trust; JAMES DUTSON, individually; ROBERT FALKNER and FAITH FALKNER, individually, as husband and wife, and as Trustees of the Robert and Faith Falkner Trust; WILLIAM BRYAN FARNEY, individually; IRA GAINES, individually; COLIN GASTON, individually; WELDON GEORGE, individually; LAWRENCE GLENN, individually and as Beneficiary of the Lawrence Glenn IRA; RICHARD P. GLIDDEN and JANET B. GLIDDEN, individually and as husband and wife; RONALD GORDON, M.D., and MARILYN GORDON, individually, as husband and wife, as Beneficiaries of Valley Vascular Surgeon SPC Profit Sharing Plan, and

2

1   Marilyn Gordon as Trustee of the Marilyn H.
2   Gordon Revocable Trust; HAROLD
    (HARRY) GRIES, M.D., individually and
3   Trustee of the Harold E. Gries Trust;
4   HAROLD (HANK) GRIES, J.D.,
    individually and as Trustee of the Gries
5   Children's Irrevocable Trust; JERRY
6   GUNN, individually; PHIL HAMMOND
    and COURTNEY HAMMOND,
7   individually, as husband and wife, and as Co-
8   Trustees of the Hammond Revocable Trust;
    PHIBUSCO, L.L.C., an Arizona limited
9   liability company; LEE HENRY and
10  GRETCHEN HENRY, individually, as
    husband and wife, and as Trustees of the Lee
11  and Gretchen Henry Trust; DEAN A.
12  HOGANSON, individually; DAVID
    HOLBROOK, individually; JOHN HOVE,
13  individually; MH INVESTMENTS, L.L.C.,
14  an Arizona limited liability company;
    MALCOLM H. HOWARD, as Trustee of the
15  Diane L. Howard Marital Trust; GREGORY
16  F. HURLEY, individually; SUSAN J.
    JOHNSON, individually; JOHN KLOPP,
17  individually; SWIATOSLAW KUZIW,
18  individually; JOSEPH F. LADRIGAN,
    individually; MARK LEVENTHAL,
19  individually and as Beneficiary of the
20  Bonnybrook Trust; BRIAN E. LEWIS,
    individually; HENRY C. LEWIS III,
21  individually; PETER J. LUMIANSKI and
22  CHRISTINE M. LUMIANSKI, individually,
    as husband and wife, and Trustees of the
23  Peter J. and Christine M. Lumianski
24  Revocable Trust; GEOFFREY C.
    MADDOCK, individually; ARTURO
25  MARTINEZ, individually; E&J
26  PARTNERS, L.P., a Pennsylvania limited
    partnership; JOHN MAULHARDT,
27  individually; JACK MCELLIGOTT,
28  individually; DOUGLAS MCFETTERS and
    DONNA V. MCFETTERS, individually, as
    husband and wife, and Beneficiaries of the

mdw
mack drucker & watson
Attorneys at Law
3300 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

3



Douglas McFetters and Donna McFetters IRAs; IONA CAPITAL, L.L.C., a Nevada limited liability company; MATTHEW J. MANNINO, D.C., individually; Gary Meyer and Deborah Meyer, individually and as husband and wife; V. JEROME MIRKIL, M.D., individually; JULIE ANN MONSON, individually; ARNOLD H. MOSCHIN, individually; GEORGE O'CONNOR, individually; RALPH A. STURGES & CO., L.L.C., a Texas limited liability company; RICK "MAURICE" O'CONNOR, individually and as Trustee of the Irrevocable Trust of Coral B. Clifford; RALPH S. O'CONNOR, individually; RAFAEL PENUNURI and ROSE PENUNURI, individually and as husband and wife; DEAN P. PHYPERS, individually; PHYPERS INVESTMENT CO., L.L.C., a Virginia limited liability company; BRENDA RINGWALD, individually; WAYNE RISH, individually and as Beneficiary of the Nelson Wayne Rish IRA; BOUGAINVILLEA INVESTMENTS, L.P., an Arizona limited partnership; MANNY ROOHANIPUR, M.D., individually and as Trustee of the M. Roohanipur M.D. Pension Trust and the Sean Armani Roohanipur Trust; THE ROOHANIPUR FAMILY LIMITED PARTNERSHIP, a Nevada limited partnership; MANNY AND DOREEN ROOHANIPUR FAMILY PRIVATE FOUNDATION, INC., a California non-profit foundation; STEPHEN ROSS, individually; E. PETER RUDDY, individually; DONALD E. RUTTEN and IRENE G. RUTTEN, individually, as husband and wife, and Trustees of the Donald E. Rutten Revocable Trust; GAREN D. SAILORS and JANICE E. SAILORS, individually and as husband and wife; HUGO SANTIBANEZ, individually; DONALD F. SAVAGE and KATHLEEN R.

4



1   SAVAGE, individually and as husband and
2   wife;   GERALD   J.   SCHLAF   and
    KATHLEEN   SCHLAF,   individually,   as
3   husband and wife, and Gerald J. Schlaf as
4   Grantor and Trustee of the Gerald J. Schlaf
    Living   Trust;   DON   SCHNEEBERGER,
5   individually; FRANK W. SCIACCA and
6   KAREN L. SCIACCA, individually and as
    husband   and   wife;   MARVIN   SILVEY,
7   M.D., individually; DOUGLAS R. SMITH,
8   individual and as Beneficiary of IRA FBO
    Douglas   R.   Smith;   VINCENT   SPICA,
9   individually, as Trustee of the Vincent Spica
10  Living Trust, and as Beneficiary of IRA FBO
    Vincent     P.     Spica;     ROSEMARIE
11  STAEBELL, individually and as Trustee of
12  the John B. & Rosemarie Staebell Trust;
    LISA J. STIMMEL, D.D.S., individually;
13  HUBERTUS     J.     H.     SWEERING,
14  individually;   RONALD   D.   TUCKER,
    individually;     CHARLES     WARNER,
15  individually;     JACK     W.     WILEY,
16  individually;   DEBORAH   L.   WILSON,
    M.D., and VINICIO LLUBERES, M.D.,
17  individually, as husband and wife, and as
18  Beneficiaries of First Trust Company of
    Onaga   accounts;   DAVID   ZINN,   M.D.,
19  individually; MARK A. ZIVIN, individually;
20  and MARGIE M. ZIVIN, individually,

21                       Plaintiffs,

22                          v.

23
24  GREGORY K. MCGRATH, individually;
    JOHN A. ENSIGN, individually; DANIEL
25  P.   BUETTIN,   individually;   THOMAS
26  THISTLETON,   individually;   SEAN   D.
    CURRAN,   individually;   CHARLES   V.
27  SHAMBLEE III, individually; CHRIS A.
28  LEWIS, individually; RONALD J. RAPP,
    individually; JAY HILL, individually; J.
    ROBERT ROUTT, individually; DEWAAY

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

FINANCIAL NETWORK, INC., an Iowa
corporation;   DEWAAY   FINANCIAL
NETWORK, L.L.C., an Iowa limited
liability company; DEWAAY CAPITAL
MANAGEMENT,   INC.,   an   Iowa
corporation;   LAWRENCE   LABINE,
individually; D8 FUNDING I, LLLP, an
Iowa limited liability limited partnership;
D8 FUNDING MANAGEMENT, LLC, an
Iowa limited liability company; D8 NOTE
PURCHASE,   LLLP,   an   Iowa   limited
liability limited partnership; D8 NOTE
PURCHASE MANAGEMENT, LLC, an
Iowa limited liability company; D8
ACQUISITION   CORP.,   a   Delaware
corporation,   LAWRENCE   LABINE,
individually; JOHN AND JANE DOES I–X,
ABC CORPORATIONS I–X; and XYZ
PARTNERSHIPS, I–X,

                         Defendants.

16
17
18
19
20
21
22
23
24
25
26
27
28

    For their Complaint against Defendants, Plaintiffs allege the following upon

personal knowledge as to themselves and their own acts and upon information and belief as

to all other matters.  Plaintiffs' allegations that are based upon information and belief are

supported by investigation, including: (1) review and analysis of:  (a) extensive

correspondence from various Defendants between 2004 and 2009, (b) board presentation

materials for 2007 and 2008, (c) assorted presentation materials prepared by or at the

direction of various Defendants for Plaintiffs and other investors in connection with the

subject securities offerings, (d) private placement memoranda for those offerings, and (e)

financial projections and other financial information for the company on whose behalf

Defendants made those offerings; (2) interviews and conversations with former directors

and officers of the company and other persons with knowledge of the affairs alleged herein; (3) examination of relevant filings, press releases, and other public statements made by the company, various Defendants, and their affiliated companies that were involved with the affairs alleged herein; (4) review and analysis of court filings from the company's bankruptcy, *In Re:  Domin-8 Enterprise Solutions, Inc., et al.*, Case No. 09-35789; and (5) review and analysis of media reports and additional materials.  Many of the facts related to Plaintiffs' allegations are known only by the Defendants named herein and are exclusively within their custody or control.  Plaintiffs believe that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

2. Further, the Court has supplemental jurisdiction over the subject matter of the state law causes of action pursuant to 28 U.S.C. § 1367.

3. Venue of this suit lies in the District of Arizona pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims alleged herein occurred within the District of Arizona, as more specifically described below.

## PARTIES

4. Plaintiffs invested in securities offered by D8 2010 Inc., fka Domin-8 Enterprise Solutions, Inc. ("Domin-8, Inc.") and its predecessor limited liability company, D8 2010 LLC, fka Domin-8 Enterprise Solutions, LLC ("Domin-8, LLC") (sometimes

collectively referred to as, "Domin-8" or the "Company"), whose directors, officers, and brokers directly and / or indirectly targeted investors[1] in Maricopa County, Arizona and elsewhere.

5.    In connection with the acts and conduct alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephonic and electronic communications, to sell securities to Plaintiffs.

6.    Plaintiff Carl Anderson and Rosalie Anderson are Florida residents.  Plaintiff invested a total of $270,200 in the Company, with: (a) $95,200 having been invested in Series A Preferred Stock on or about December 27, 2006; (b) $25,000 having been invested in the 2007 Series A Subordinated Debentures on or about June 27, 2007; (c) $100,000 having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about April 8, 2008; and (d) $50,000 having been invested in the 2008 Series D Senior Subordinated Debentures on or about June 26, 2009.

7.    Plaintiffs Robert F. Barton and Lynn Barton are Arizona residents.  Plaintiffs invested a total of $485,000 in the Company, with: (a) $200,000 having been invested by Plaintiff Robert F. Barton in Series A Preferred Stock on or about February 6, 2007; (b) $175,000 having been invested by Plaintiff Lynn Barton in the 2007 Series C Senior Subordinated Convertible Debentures on or about February 9, 2008; and (c) $110,000

---

[1]    Plaintiffs are also referred to as "Investors" throughout this Complaint.

8

having been invested by Plaintiff Lynn Barton in Common Stock on or about February 25, 2008.

8.      Plaintiffs David S. Baum and Judy J. Baum are Florida residents.  Plaintiffs invested a total of $1.75 M in the Company, with: (a) $1.5 M having been invested in Series A Preferred Stock, with the corresponding number of shares held in the David S. Baum Living Trust, of which Plaintiff David S. Baum is trustee, on or about June 8, 2007; and (b) $250,000 having been invested in Series A Preferred Stock, with the corresponding number of shares held in the Judy J. Baum Living Trust, of which Plaintiff Judy J. Baum is trustee, on or about June 8, 2007.

9.      Plaintiff Melissa A. Baum is a Texas resident.  Plaintiff invested a total of $250,000 in the Company, with said amount having been invested in Series A Preferred Stock, which was held in the Melissa A. Baum Irrevocable Trust, on or about June 8, 2007.

10.      Plaintiff Kimberly Emerson is a South Carolina resident.  Plaintiff invested a total of $250,000 in the Company, with said amount having been invested in Series A Preferred Stock, with the corresponding number of shares held in the Kimberly Emerson Irrevocable Trust, on or about June 8, 2007.

11.      Plaintiff Tracy Sue Sapien is a Texas resident.  Plaintiff invested a total of $250,000 in the Company, with said amount having been invested in Series A Preferred Stock, with the corresponding number of shares held in the Tracy Sue Sapien Irrevocable Trust, on or about June 8, 2007.

12.      Plaintiffs Lawrence A. Benson and Phyllis E. Benson are Arizona residents. Plaintiffs invested a total of $300,000 in the Company, with $200,000 and $100,000,

9

mdw
Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

1  respectively, having been invested in the 2006 Series D Subordinated Convertible

2  Debentures on or about June 12, 2006, and September 21, 2006.  As set forth more fully

3  below, said investments were automatically converted into Common Stock in the Company

4  January 8, 2007.

5

6       13.    Plaintiffs Howard R. Berlin and Joy M. Berlin are Arizona residents.

7  Plaintiffs invested a total of $1 M in the Company, with $500,000 having been separately

8  invested in the amounts of $250,000 each on two separate occasions in the 2005 Series C

9  Subordinated Convertible Debentures, with the corresponding number of units held in the

10  names of the Howard R. Berlin Separate Property Trust and Joy M. Berlin Separate

11  Property Trusts, which are established under the Berlin Family Revocable Trust and of

12  which Plaintiffs Howard R. Berlin and Joy M. Berlin are trustees, on or about May 23,

13  2005 and December 12, 2005, respectively.  As set forth more fully below, said

14  investments were automatically converted into Common Stock in the Company on or about

15  January 8, 2007.

16

17       14.    Plaintiff Barnett Family Partnership I, appearing through manager Laurie

18  Werner, is a Texas general partnership.  Plaintiff invested a total of $528,000 in the

19  Company, with:  (a) $278,000 having been invested in Class B Preferred Units on or about

20  August 31, 2004; (b) $125,000 having been invested in the 2006 Series D Subordinated

21  Convertible Debentures on or about May 10, 2006; and (c) $125,000 having been invested

22  in the 2006 Series D Subordinated Convertible Debentures on or about June 26, 2006.  As

23  set forth more fully below, said investments were automatically converted into Common

24  Stock in the Company on or about January 8, 2007.

10

15.     Plaintiff Barnett Family Partnership II, appearing through manager Laurie Werner, is a Texas general partnership.   Plaintiff invested a total of $653,000 in the Company, with:  (a) $278,000 having been invested in Class B Preferred Units on or about August 31, 2004; (b) $250,000 having been invested in the 2006 Series D Subordinated Convertible Debentures on or about May 10, 2006; and (c) $125,000 having been invested in the 2006 Series D Subordinated Convertible Debentures on or about June 26, 2006.  As set forth more fully below, said investments were automatically converted into Common Stock in the Company January 8, 2007.

16.     Plaintiffs Earl A. Beyer and Evelyn T. Beyer are California residents. Plaintiffs invested a total of $200,000 in the Company, with: (a) $150,000 having been invested in the 2008 Series D Senior Subordinated Debentures, which was held in the Earl and Evelyn Beyer Family Trust, of which Plaintiff Curtis S. Beyer is trustee and who has authority from Plaintiffs Earl A. Beyer and Evelyn T. Beyer to bring this action, on or about October 20, 2008; and (b) $50,000 having been invested in the 2008 Series D Senior Subordinated Debentures, which was held in the Earl and Evelyn Beyer Family Trust, of which Plaintiff Curtis S. Beyer is trustee and who has authority from Plaintiffs Earl A. Beyer and Evelyn T. Beyer to bring this action, on or about April 1, 2008

17.     Plaintiff Alvin R. Bonnette is a New Hampshire resident.  Plaintiff invested a total of $100,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures, with the corresponding number of units held in the Alvin R. Bonnette Revocable Trust, of which Plaintiff Alvin R. Bonnette is trustee, on or about May 12, 2008.

11

18.     Plaintiff Alan Bramoweth is an Arizona resident.  Plaintiff invested a total of $155,600 in the Company, with:  (a) $55,600 having been invested in Class B Preferred Units, with the corresponding number of units held in the Alan Bramoweth IRA, of which Plaintiff Alan Bramoweth is beneficiary, on or about October 28, 2004; (b) $50,000 having been invested in Class B Preferred Units, with the corresponding number of units held in the Alan Bramoweth SEP, of which Plaintiff Alan Bramoweth is beneficiary, on or about October 28, 2004; and (c) $50,000 having been invested in the 2005 Series C Subordinated Convertible Debentures on or about November 15, 2005.  As set forth more fully below, said investments were automatically converted into Common Stock in the Company on or about January 8, 2007.

19.     Plaintiff John L. Broan is an Arizona Resident.  Plaintiff invested a total of $25,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures, which were held in the John L. Broan 1984 Revocable Trust, of which Plaintiff John L. Broan is grantor and trustee, on or about May 1, 2008.

20.     Plaintiff Toliver J. Brown is a Nevada resident.  Plaintiff invested a total of $57,254 in the Company, with:  (a) $7,214 having been invested in Common Units on or about December 9, 2003; and (b) $50,040 having been invested in Class B Preferred Units on or about July 1, 2004.   As set forth more fully below, said investments were automatically converted into Common Stock in the Company on or about January 8, 2007.

21.     Plaintiff Starlight Management Co., L.L.C., appearing through its manager James Chalfie, is an Ohio limited liability company.  Plaintiff invested a total of $200,000

12

in the Company, with:  (a) $100,000 having been invested in Series A Preferred Stock on or about February 9, 2007; and (b) $100,000 having been invested the 2007 Series C Senior Subordinated Convertible Debentures on or about March 28, 2007.

22.     Plaintiff Suzette Cini is a Michigan resident.  Plaintiff invested a total of $75,000 in the company, with:  (a) $25,000 having been invested in the 2007 Series A Subordinated Debentures on or about December 30, 2007; and (b) $50,000 having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about April 14, 2008.

23.     Plaintiff John Cottam, appearing as trustee of the Cottam Family Limited Trust, is a Florida resident.  Plaintiff, as trustee, invested a total of $100,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures, with the corresponding number of units held in the Cottam Family Limited Trust, on or about March 17, 2008.

24.     Plaintiff James Curran, M.D., is a Wisconsin resident.  Plaintiff invested a total of $75,000 in the Company, with: (a) $25,000 having been invested in the 2005 Series C Subordinated Convertible Debentures, with the corresponding number of shares held in an IRA FBO James F. Curran, in or about 2005; (b) $50,000 having been invested in Series A Preferred Stock, with the corresponding number of shares held in an IRA FBO James F. Curran, on or about February 27, 2007.  As set forth more fully below, said investment in the 2005 Series C Subordinated Convertible Debentures was automatically converted into Common Stock in the Company on or about January 8, 2007.

25.     Plaintiffs Michael Davis and Nancy Davis are Iowa residents.   Plaintiffs invested a total of $25,000 in the Company, with said amount having been invested in the 2007 Series B Subordinated Debenture, with the corresponding number of units held in the Michael and Nancy Davis Revocable Trust, of which Plaintiff Michael Davis and Nancy Davis are grantors, on or about October 5, 2007.

26.     Plaintiff Lisa Dektor is an Arizona resident.   Plaintiff invested a total of $125,000 in the Company, with:  (a) $25,000 having been invested in the 2005 Series C Subordinated Convertible Debentures on or about January 6, 2006; and (b) $100,000 having been invested in the 2006 Series D Subordinated Convertible Debentures on or about September 19, 2006.  As set forth more fully below, investments in the 2005 Series C Subordinated Convertible Debentures and the 2006 Series D Subordinated Convertible Debentures were automatically converted into Common Stock in the Company on or about January 8, 2007.

27.     Plaintiff George F. Dembow, Jr. is an Arizona resident.  Plaintiff invested a total of $275,000 in the Company, with:  (a) $50,000 in the 2005 Series C Subordinated Convertible Debentures, with the corresponding number of units held in the Arizona Natural Resources Profit Sharing Plan and Trust, of which Plaintiff George F. Dembow, Jr. is trustee, on or about May 31, 2005; (b) $50,000 in the 2005 Series C Subordinated Convertible Debentures, with the corresponding number of units held in the George F. Dembow III Family Trust, of which Plaintiff George F. Dembow III is trustee, on or about September 12, 2006; (c) $125,000 having been invested in the 2007 Series C Senior Subordinated Convertible Debentures, with the corresponding number of units held in the

14

Ethalanne and George Dembow Family Trust, of which Plaintiff George F. Dembow, Jr. is trustee, on or about April 16, 2008; and (d) $50,000 in the 2007 Series C Senior Subordinated Convertible Debentures, with the corresponding number of units held in the Arizona Natural Resources Profit Sharing Plan and Trust, of which Plaintiff George F. Dembow, Jr. is trustee, on or about April 16, 2008.   As set forth more fully below, investments in the 2005 Series C Subordinated Convertible Debentures were automatically converted into Common Stock in the Company on or about January 8, 2007.

28.     Plaintiff James Dutson is an Arizona resident.  Plaintiff invested a total of $100,000 in the Company, with said amount having been invested in the 2006 Series D Subordinated Convertible Debentures on or about September 19, 2006.  As set forth more fully below, said investments were automatically converted into Common Stock in the Company on or about January 8, 2007.

29.     Plaintiffs Robert Falkner and Faith Falkner are Arizona residents.  Plaintiffs invested a total of $75,000 in the Company, with said amount having been invested in the 2008 Series C Senior Subordinated Convertible Debentures, with the corresponding number of units in the Robert and Faith Falkner Trust, of which Plaintiffs Robert Falkner and Faith Falkner are trustees, on or about May 7, 2008.

30.     Plaintiff William Bryan Farney is a Texas resident.  Plaintiff invested a total of $225,000 in the Company, with:  (a) $75,000 having been invested in Class B Preferred Units on or about October 18, 2004; (b) $50,000 having been invested in the 2006 Series D Subordinated Convertible Debentures on or about June 29, 2006; and (c) $100,000 having been invested in the 2008 Series D Senior Subordinated Debentures, upon information and

mdw

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

15

belief, in or about 2008 or 2009.  As set forth more fully below, investments in Class B Preferred Units and the 2006 Series D Subordinated Convertible Debentures were automatically converted into Common Stock in the Company on or about January 8, 2007.

31.     Plaintiff Ira Gaines is an Arizona resident.  Plaintiff invested a total of $200,000 in the Company, with:  (a) $50,000 having been invested in the 2005 Series C Subordinated Convertible Debentures on or about October 24, 2005; (b) $50,000 having been invested in the 2006 Series D Subordinated Convertible Debentures on or about March 22, 2006; and (c) $100,000 having been invested in Domin-8 Enterprise Inc. Series A Preferred Stock on or about June 1, 2007.  As set forth more fully below, investments in the 2005 Series C Subordinated Convertible Debentures and the 2006 Series D Subordinated Convertible Debentures were automatically converted into Common Stock in the Company on or about January 8, 2007.

32.     Plaintiff Colin Gaston is a British citizen.   Plaintiff invested a total of $50,000 in the Company, with said amount having been in the 2008 Series C Senior Subordinated Convertible Debentures on or about January 13, 2008.

33.     Plaintiff Weldon George is a Texas resident.   Plaintiff invested a total of $50,000 in the Company, with said amount having been invested in the 2008 Series C Senior Subordinated Convertible Debentures on or about January 29, 2008.

34.     Plaintiff Lawrence Glenn is an Arizona resident.  Plaintiff invested a total of $200,000 in the Company, with:  (a) $50,000 having been invested in Domin-8 Enterprise Inc. Series A Preferred Stock on or about February 6, 2007; (b) $50,000 having been invested in the 2008 Series C Senior Subordinated Convertible Debentures on or about

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9600

16

March 17, 2008; and (c) $100,000 having been invested in the 2008 Series D Senior Subordinated Debentures, with the corresponding number of units held in an IRA FBO Lawrence Glenn, on or about November 29, 2008.

35.    Plaintiffs Richard P. Glidden and Janet B. Glidden are Michigan residents. Plaintiffs invested a total of $50,000 in the Company, with said amount having been invested in the 2008 Series C Senior Subordinated Convertible Debentures on or about April 10, 2008.

36.    Plaintiffs Ronald Gordon, M.D., and Marilyn Gordon are Arizona residents. Plaintiffs invested a total of $455,000 in the Company, with:  (a) $100,000 having been invested by Plaintiff Marilyn Gordon, as trustee of the Marilyn H. Gordon Revocable Trust, in the 2006 Series D Subordinated Convertible Debentures on or about March 21, 2006; (b) $200,000 having been separately invested in the amounts of $100,000 each on two separate occasions by Plaintiff Ronald Gordon, M.D., and Plaintiff Marilyn Gordon in the 2006 Series D Subordinated Convertible Debentures on or about June 27, 2006, and October 17, 2006, respectively; (c) $100,000 having been separately invested in the amounts of $50,000 each by Plaintiff Ronald Gordon, M.D., and Plaintiff Marilyn Gordon in Series A Preferred Stock on or about March 21, 2007; and (d) $55,000 having been invested by Valley Vascular Surgeon SPC Profit Sharing Plan, of which Plaintiff Ronald Gordon, M.D., and Plaintiff Marilyn Gordon are beneficiaries, on or about March 21, 2007. As set forth more fully below, investments in the 2006 Series D Subordinated Convertible Debentures were automatically converted into Common Stock in the Company on or about January 8, 2007.

17

37.     Plaintiff Harold (Harry) Gries, M.D. is an Arizona resident.   Plaintiff invested a total of $400,000 in the Company, with:  (a) $100,000 having been invested by Plaintiff Harold (Harry) Gries, M.D., as trustee on behalf of the Harold E. Gries Trust, in the 2006 Series D Subordinated Convertible Debentures on or about October 27, 2006; (b) $200,000 having been invested by Plaintiff Harold (Harry) Gries, M.D., as trustee on behalf of the Harold E. Gries Trust, in the 2007 Series A Subordinated Debentures on or about July 6, 2007; and (c) $100,000 having been invested in the 2008 Series C Senior Subordinated Convertible Debentures on or about January 7, 2008.  As set forth more fully below, investments in the 2006 Series D Subordinated Convertible Debentures were automatically converted into Common Stock in the Company on or about January 8, 2007.

38.     Plaintiff Harold (Hank) Gries, J.D. is an Arizona resident.  Plaintiff invested a total of $100,000 in the Company, with said amount having been invested in the 2008 Series C Senior Subordinated Convertible Debentures, with the corresponding number of units held in the Gries Children's Irrevocable Trust, of which Plaintiff Harold (Hank) Gries, J.D. is trustee, on or about April 7, 2008.

39.     Plaintiff Jerry Gunn is a Texas resident.  Plaintiff invested a total of $57,124 in the Company, with:  (a) $7,124 having been invested in Common Units on or about December 3, 2003; and (b) $50,000 having been invested in the 2005 Series C Subordinated Convertible Debentures on or about May 11, 2005.  As set forth more fully below, said investments were automatically converted into Common Stock in the Company on or about January 8, 2007.

18

40.     Plaintiffs Phil Hammond and Courtney Hammond are Arizona residents. Plaintiffs invested a total of $30,000 in the Company, with:  (a) $10,000 having been invested in the 2006 Series D Subordinated Convertible Debentures, with the corresponding number of units held in the Hammond Revocable Trust, of which Plaintiffs Phil Hammond and Courtney Hammond are co-trustees, on or about September 26, 2006; and (b) $20,000 having been invested in the 2008 Series D Senior Subordinated Debentures, with the corresponding number of units held in the Hammond Revocable Trust, of which Plaintiffs Phil Hammond and Courtney Hammond are co-trustees, on or about November 14, 2008.  As set forth more fully below, investments in the 2006 Series D Subordinated Convertible Debentures were automatically converted into Common Stock in the Company on or about January 8, 2007.

41.     Plaintiff Phibusco, LLC, appearing through its managing member, Phil Hammond, is an Arizona limited liability company.  Plaintiff invested a total of $60,000 in the Company, with:  (a) $25,000 having been invested in the 2005 Series C Subordinated Convertible Debentures on or about December 2, 2005; (b) $10,000 having been invested in the 2006 Series D Subordinated Convertible Debentures on or about September 26, 2006; and (c) $25,000 having been invested in the 2008 Series C Senior Subordinated Convertible Debentures on or about April 13, 2008.  As set forth more fully below, investments in the 2005 Series C Subordinated Convertible Debentures and 2006 Series D Subordinated Convertible Debentures were automatically converted into Common Stock in the Company on or about January 8, 2007.

19

42.     Plaintiffs Lee Henry and Gretchen Henry are Arizona residents. Plaintiffs invested a total of $50,000 in the Company, with:  (a) $25,000 having been invested in the 2008 Series C Senior Subordinated Convertible Debentures, with the corresponding number of units held in the Lee and Gretchen Henry Trust, of which Plaintiffs Lee Henry and Gretchen Henry are trustees, on or about February 15, 2008; and (b) $25,000 having been invested in the 2008 Series D Senior Subordinated Debentures, with the corresponding number of units held in the Lee and Gretchen Henry Trust, of which Plaintiffs Lee Henry and Gretchen Henry are trustees, on or about October 30, 2008.

43.     Plaintiff Dean A. Hoganson is an Iowa resident.  Plaintiff invested a total of $25,000 in the Company, with said amount having been invested in the 2007 Series B Subordinated Debentures, with the corresponding number of units held by TD Ameritrade Cust. FBO Dean A. Hoganson, on or about August 2008.

44.     Plaintiff David Holbrook is a New York resident.  Plaintiff invested a total of $310,000 in the Company, with:  (a) $110,000 having been invested in Common Units on or about September 22, 2004; (b) $100,000 having been invested in the 2005 Series C Subordinated Convertible Debentures on or about June 11, 2005; and (c) $100,000 having been invested in the 2006 Series D Subordinated Convertible Debentures on or about May 2, 2006.  As set forth more fully below, said investments were automatically converted into Common Stock in the Company January 8, 2007.

45.     Plaintiff John Hove is a Florida resident.   Plaintiff invested a total of $250,000 in the Company, with said amount having been invested in the 2008 Series C Senior Subordinated Convertible Debentures on or about March 20, 2008.

20

46.     Plaintiff MH Investments, LLC, appearing through its managing member Malcolm H. Howard, is an Arizona limited liability company.  Plaintiff invested a total of $655,000 in the Company, with:  (a) $350,000 having been invested in Common Stock in Domin-8 Enterprise Solutions, Inc. on or about September 9, 2006; (b) $150,000 having been invested in Series A Preferred Stock on or about December 15, 2006; (c) $50,000 having been invested in the 2008 Series C Senior Subordinated Convertible Debentures on or about February 6, 2008; (d) $55,000 having been invested in Common Stock in Domin-8 Enterprise Solutions, Inc. on or about February 8, 2008; and (e) $50,000 having been invested in the 2008 Series D Senior Subordinated Debentures on or about October 20, 2008.

47.     Plaintiff Malcolm H. Howard is an Arizona resident.  Plaintiff invested a total of $605,000 in the Company, with:  (a) $200,000 having been invested in Common Stock in Domin-8 Enterprise Solutions, Inc., with the corresponding number of shares being held in the Diane L. Howard Marital Trust, of which Plaintiff Malcolm H. Howard is trustee, on or about October 5, 2006; (b) $300,000 having been invested in Series A Preferred Stock, with the corresponding number of shares being held in the Diane L. Howard Marital Trust, of which Plaintiff Malcolm H. Howard is trustee, on or about December 15, 2006; (c) $50,000 having been invested in the 2008 Series C Senior Subordinated Convertible Debentures, with the corresponding number of units being held in the Diane L. Howard Marital Trust, of which Plaintiff Malcolm H. Howard is trustee, on or about February 6, 2008; and (d) $55,000 having been invested in Common Stock in Domin-8 Enterprise Solutions, Inc., with the corresponding number of shares being held in

21

the Diane L. Howard Marital Trust, of which Plaintiff Malcolm H. Howard is trustee, on or about February 8, 2008.

48.     Plaintiff Gregory F. Hurley is a New York resident.  Plaintiff invested a total of $125,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures in or about November 2008.

49.     Plaintiff Susan J. Johnson is a Michigan resident.  Plaintiff invested a total of $75,000 in the Company, with:  (a) $50,000 having been invested in Series A Preferred Stock on or about December 28, 2006; and (b) $25,000 having been invested in Series A Subordinated Debenture-Debt on June 14, 2007.

50.     Plaintiff John Klopp is a Minnesota resident.   Plaintiff invested a total of $25,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about April 11, 2008.

51.     Plaintiff Swiatoslaw Kuziw is a New Jersey resident.  Plaintiff invested a total of $250,000 in the Company, with said amount having been invested in the 2008 Series D Senior Subordinated Debentures on or about March 19, 2008.

52.     Plaintiff Joseph F. Ladrigan is an Arizona resident.  Plaintiff invested a total of $25,000 in the Company, with said amount having been invested in the 2005 Series C Subordinated Convertible Debentures in April 8, 2005.  As set forth more fully below, said investments were automatically converted into Common Stock in the Company on or about January 8, 2007.

53.     Plaintiff Mark Leventhal is a Massachusetts resident.   Plaintiff invested a total of $625,100 in the Company, with:  (a) $325,100 having been invested in the Class B

22

Preferred Units, with the corresponding number of units held in the Bonnybrook Trust, of which Plaintiff Mark Leventhal is beneficiary, on April 2004; and (b) $300,000 having been invested in the 2006 Series D Subordinated Convertible Debentures, with the corresponding number of units held in the Bonnybrook Trust, of which Plaintiff Mark Leventhal is beneficiary, on or about March 1, 2006.  As set forth more fully below, said investments were automatically converted into Common Stock in the Company on or about on or about January 8, 2007.

54.    Plaintiff Brian E. Lewis is a California resident.  Plaintiff invested a total of $50,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about February 2, 2008.

55.    Plaintiff Henry C. Lewis III is a Florida resident.  Plaintiff invested a total of $100,000 in the company, with said amount having been invested in the 2007 Series A Subordinated Debentures on or about August 29, 2007.

56.    Plaintiffs Peter J. Lumianski and Christine M. Lumianski are Arizona residents.  Plaintiffs invested a total of $127,200 in the Company, with:  (a) $22,200 having been invested in the Class B Preferred Units, with the corresponding number of units held in the Peter J. and Christine M. Lumianski Revocable Trust, of which Plaintiffs Peter J. Lumianski and Christine M. Lumianski are trustees, on or about November 29, 2004; (b) $25,000 having been invested in the 2005 Series C Subordinated Convertible Debentures, with the corresponding number of units held in the Peter J. and Christine M. Lumianski Revocable Trust, of which Plaintiffs Peter J. and Christine M. Luminaski are trustees, on or about November 16, 2005; (c) $30,000 having been invested in Series A

23

Preferred Stock, with the corresponding shares held in the Peter J. and Christine M. Lumianski Revocable Trust, of which Plaintiffs Peter J. Lumianski and Christine M. Luminaski are trustees, on or about March 7, 2007; and (d) $50,000 having been invested in the 2007 Series C Senior Subordinated Convertible Debentures, with the corresponding number of units held in the Peter J. and Christine M. Lumianski Revocable Trust, of which Plaintiffs Peter J. Lumianski and Christine M. Luminaski are trustees, on or about February 21, 2008. As set forth more fully below, investments in the Class B Preferred Units and 2005 Series C Subordinated Convertible Debentures were automatically converted into Common Stock in the Company on or about January 8, 2007.

57.     Plaintiff Geoffrey C. Maddock is a citizen of the United Kingdom.  Plaintiff invested a total of $150,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about February 5, 2008.

58.     Plaintiff Arturo Martinez is a California resident.  Plaintiff invested a total of $250,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about June 2, 2008.

59.     Plaintiff E&J Partners, L.P., appearing through Plaintiff Ellis Mathews on behalf of Plaintiff E&J Partners, L.P.'s general partner, the Ellis J. Mathews Amended and Restated Revocable Trust, is a Pennsylvania limited partnership.  Plaintiff invested a total of $48,900 in the Company, with:  (a) $28,900 having been invested in the Class B Preferred Units on or about July 1, 2004; and (b) $20,000 having been invested in the 2006 Series D Subordinated Convertible Debentures on or about June 26, 2006.  As set forth

more fully below, said investments were automatically converted into Common Stock in the Company on or about January 8, 2007.

60.     Plaintiff John Maulhardt is a California resident.  Plaintiff invested a total of $50,000 in the Company, with said investment having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about July 1, 2008.

61.     Plaintiff Jack McElligott is a Texas resident.  Plaintiff invested a total of $310,000 in the Company, with:  (a) $75,000 having been invested in the Class A Preferred Units on or about March 28, 2003; (b) $69,000 having been invested in Common Units on or about November 15, 2003; (c) $66,000 having been invested in Class B Preferred Units on or about April 28, 2004; and (d) $100,000 having been invested in the 2005 Series C Subordinated Convertible Debentures on or about May 23, 2005.  As set forth more fully below, said investments were automatically converted into Common Stock in the Company on or about January 8, 2007.

62.     Plaintiffs Douglas McFetters and Donna V. McFetters are Arizona residents. Plaintiffs invested a total of $150,000.00 in the Company, with:  (a) $135,000 having been invested by Plaintiff Douglas McFetters in the 2005 Series C Subordinated Convertible Debentures, with the corresponding number of units held in the Douglas McFetters IRA, on or about June 1, 2005 and August 29, 2005; and (b) $15,000 having been invested by Plaintiff Donna V. McFetters in the 2005 Series C Subordinated Convertible Debentures, with the corresponding number of units held in the Donna McFetters IRA, on or about June 1, 2005.

. . .

1    63.    Plaintiff Iona Capital, LLC, appearing through its managing member Peter

2    McSorley, is a Nevada limited liability company.  Plaintiff invested a total of $100,000 in

3    the Company, with:  (a) $25,000 having been invested in Series A Preferred Stock on or

4    about December 14, 2006; and (b) $75,000 having been invested in the 2007 Series C

5    Senior Subordinated Convertible Debentures on or about April 15, 2008.

6    64.    Plaintiff Matthew J. Mannino, D.C. is an Arizona resident.  Plaintiff invested

7    a total of $967,000 in the Company, with:  (a) $111,200 having been invested in Domin-8

8    Class B Units on or about October 19, 2004; (b) $305,800 having been invested in Domin-

9    8 Class B Units on or about November 3, 2004; (c) $100,000 having been invested in the

10   2005 Series C Subordinated Convertible Debentures on or about August 6, 2005; (d)

11   $100,000 having been invested in the 2005 Series C Subordinated Convertible Debentures

12   on or about October 30, 2005; (e) $200,000 having been invested in the 2005 Series C

13   Subordinated Convertible Debentures on or about December 29, 2005; (f) $50,000 having

14   been invested in Series A Preferred Stock on or about December 19, 2006; and (g)

15   $100,000 having been invested in the 2007 Series C Senior Subordinated Convertible

16   Debentures on or about February 16, 2008.  As set forth more fully below, said

17   investments, except for investments in Series A Preferred Stock and the 2007 Series C

18   Senior Subordinated Convertible Debentures, were automatically converted into Common

19   Stock in the Company on or about January 8, 2007.

20   65.    Plaintiffs Gary Meyer and Deborah Meyer are Arizona residents.  Plaintiffs

21   invested a total of $305,000 in the Company, with:  (a) $125,000 having been invested in

22   the 2005 Series C Subordinated Convertible Debentures, with corresponding units held by

26

mdw
mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

Entrust Administration FBO Gary W. Meyer IRA #28467 on or about December 28, 2005; (b) $80,000 having been invested in the 2006 Series D Subordinated Convertible Debentures, with corresponding units held by Entrust Administration FBO Deborah L. Meyer IRA #29230 on or about May 22, 2006; and (c) $100,000 having been invested in the 2006 Series D Subordinated Convertible Debentures, with corresponding units held by Plaintiffs Gary Meyer and Deborah Meyer on or about June 22, 2006.  As set forth more fully below, said investments were automatically converted into Common Stock in the Company on or about January 8, 2007.

66.     Plaintiff V. Jerome Mirkil, M.D. is a Nevada resident.  Plaintiff invested a total of $50,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about July 15, 2008.

67.     Plaintiff Julie Ann Monson is an Arizona resident.  Plaintiff invested a total of $100,000 in the Company, with said amount having been invested in the 2005 Series C Subordinated Convertible Debentures on or about August 6, 2005.  As set forth more fully below, said investments were automatically converted into Common Stock in the Company on or about January 8, 2007.

68.     Plaintiff Arnold H. Moschin is an Arizona resident.  Plaintiff invested a total of $75,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures, with corresponding units held by the Arnold H. Moschin IRA, on or about April 3, 2008.

. . .

. . .

27

1

2

3

4

69.    Plaintiff George O'Connor is a Massachusetts resident.  Plaintiff invested a total of $50,000 in the Company, with said amount having been invested in Series A Preferred Stock on or about January 12, 2007.

5

6

7

8

9

10

70.    Plaintiff Ralph A. Sturges & Co., LLC, appearing through George O'Connor, is a Texas limited liability company.  Plaintiff invested a total of $25,000 in the Company, with said amount having been invested in the 2006 Series D Subordinated Convertible Debentures on or about June 9, 2006.  As set forth more fully below, said investments were automatically converted into Common Stock in the Company January 8, 2007.

11

12

13

14

15

16

17

18

19

20

21

22

71.    Plaintiff Rick "Maurice" O'Connor is a Florida resident.   Plaintiff, acting on behalf of the Irrevocable Trust of Coral B. Clifford, of which Plaintiff Rick "Maurice" O'Connor is trustee,  invested a total of $90,000 in the Company, with:  (a) $25,000 having been invested in the Class B Preferred Units on or about August 14, 2004; (b) $40,000 having been invested in Series A Preferred Stock on or about May 21, 2007; and (c) $25,000 having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about July 23, 2008.  As set forth more fully below, investments in the Class B Preferred Units automatically converted into Common Stock in the Company on or about January 8, 2007.

23

24

25

26

27

28

72.    Plaintiff Ralph S. O'Connor is a Texas resident.  Plaintiff invested a total of $353,350 in the Company, with:  (a) $45,000 having been invested in Common Units on or about November 11, 2003; (b) $55,600 having been invested in the Class B Preferred Units on or about May 5, 2004; (c) $100,000 having been invested in the 2005 Series C Subordinated Convertible Debentures on or about July 1, 2005; (d) $100,000 having been

mdw

mack drucker & watson

Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

28

invested in the 2006 Series D Subordinated Convertible Debentures on or about June 9, 2006; and (e) $52,750 having been invested in the 2008 Series D Senior Subordinated Debentures on or about April 1, 2009.  As set forth more fully below, said investments, except for the investment in the 2008 Series D Senior Subordinated Debentures, were automatically converted into Common Stock in the Company on or about January 8, 2007.

73.    Plaintiffs Rafael and Rose Penunuri are California residents.  Plaintiffs invested a total of $100,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about January 28, 2008.

74.    Plaintiff Dean P. Phypers is a Florida resident.  Plaintiff invested a total of $265,000 in the Company, with:  (a) $165,000 having been invested in Class A Preferred Units on or about August 31, 2003; and (b) $100,000 having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about October 15, 2008.   As set forth more fully below, the investment in the Class A Preferred Units automatically converted into Common Stock in the Company on or about January 8, 2007.

75.    Plaintiff Phypers Investment Co., LLC, appearing through its principal Dean P. Phypers, is a Virginia limited liability company.  Plaintiff invested a total of $100,000 in the Company, with said amount having been invested in Class A Preferred Units on or about December 15, 2005.  As set forth more fully below, said investment automatically converted into Common Stock in the Company on or about January 8, 2007.

76.    Plaintiff Brenda Ringwald is an Arizona resident.  Plaintiff invested a total of $50,000 in the Company, with said amount having been invested in the 2005 Series C Subordinated Convertible Debentures on or about October 19, 2005.  As set forth more

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

fully below, said investment automatically converted into Common Stock in the Company on or about January 8, 2007.

77.     Plaintiff Wayne Rish is a Texas resident.   Plaintiff invested a total of $125,524 in the Company, with:  (a) $24,500 having been invested in Class B Preferred Units, with the corresponding number of units held in the Nelson Wayne Rish IRA, of which Plaintiff Wayne Rish is beneficiary, on or about February 14, 2005; (b) $25,000 having been invested in the 2005 Series C Subordinated Convertible Debentures, with the corresponding number of units held in the Nelson Wayne Rish IRA, of which Plaintiff Wayne Rish is beneficiary, on or about April 27, 2006; (c) $50,000 having been invested in the 2006 Series D Subordinated Convertible Debentures, with the corresponding number of units held in the Nelson Wayne Rish IRA, of which Plaintiff Wayne Rish is beneficiary, on or about September 21, 2006; and (d) $26,024 having been invested in Series A Preferred Stock, with the corresponding number of shares held in the Nelson Wayne Rish IRA, of which Plaintiff Wayne Rish is beneficiary, on or about January 3, 2007.  As set forth more fully below, said investments in the Class B Preferred Units, 2005 Series C Subordinated Convertible Debentures, and 2006 Series D Subordinated Convertible Debentures were automatically converted into Common Stock in the Company on or about January 8, 2007.

78.     Plaintiff Bougainvillea Investments, LP, appearing through its principal Plaintiff Wayne Rish, is an Arizona limited partnership.   Plaintiff invested a total of $75,000 in the Company, with:  (a) $50,000 having been invested in Series A Preferred Stock on or about April 16, 2007; and (b) $25,000 having been invested in Common Stock in the Company on or about February 5, 2008.

30

79.     Plaintiff Manny Roohanipur, M.D. is a California resident.  Plaintiff invested a total of $340,000 in the Company, with:  (a) $100,000 having been invested in the 2005 Series C Subordinated Convertible Debentures by Plaintiff Manny Roohanipur, M.D., on behalf of the M. Roohanipur M.D. Pension Trust, of which Plaintiff is trustee, on or about October 19, 2005; (b) $100,000 having been invested in the 2006 Series D Subordinated Convertible Debentures by Plaintiff Manny Roohanipur, M.D., on behalf of the M. Roohanipur M.D. Pension Trust, of which Plaintiff is trustee, on or about June 27, 2006; (c) $100,000 having been invested in Series A Preferred Stock by Plaintiff Manny Roohanipur, M.D., on behalf of the M. Roohanipur M.D. Pension Trust, of which Plaintiff is trustee, on or about April 11, 2007; and (d) $40,000 having been invested in the 2006 Series D Subordinated Convertible Debentures by Plaintiff Manny Roohanipur, M.D., on behalf of the Sean Armani Roohanipur Age 21 Trust, of which Plaintiff is trustee, on or about October 18, 2006.  As set forth more fully below, investments in the 2005 Series C Subordinated Convertible Debentures and 2006 Series D Subordinated Convertible Debentures automatically converted into Common Stock in the Company on or about January 8, 2007.

80.     Plaintiff Manny and Doreen Roohanipur Private Foundation, Inc., appearing through its president Manny Roohanipur, M.D., is a California non-profit foundation. Plaintiff invested a total of $100,000 in the Company, with said amount having been invested in the 2005 Series C Subordinated Convertible Debentures, on or about December 6, 2005. As set forth more fully below, investments in the 2005 Series C Subordinated

Convertible Debentures and 2006 Series D Subordinated Convertible Debentures automatically converted into Common Stock in the Company on or about January 8, 2007.

81.     Plaintiff Roohanipur Family Limited Partnership, appearing through its partner Manny Roohanipur, M.D., is a Nevada domestic limited partnership.   Plaintiff invested a total of $500,000 in the Company, with: (a) $100,000 having been invested in the 2005 Series C Subordinated Convertible Debentures on or about October 28, 2005; (b) $100,000 having been invested in the 2006 Series D Subordinated Convertible Debentures on or about June 27, 2006; (c) $100,000 having been invested in Common Stock on or about November 2, 2007; (d) $100,000 having been invested in Series A Preferred Stock on or about April 11, 2007; and (e) $100,000 having been invested in Series A Preferred Stock on or about November 2, 2007.  As set forth more fully below, investments in the 2005 Series C Subordinated Convertible Debentures and 2006 Series D Subordinated Convertible Debentures automatically converted into Common Stock in the Company on or about January 8, 2007.

82.     Plaintiff Stephen Ross is an Oklahoma resident.  Plaintiff invested a total of $150,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about January 28, 2008.

83.     Plaintiff E. Peter Ruddy is a Florida resident.  Plaintiff invested a total of $55,600 in the Company, with said amount having been invested in the Class B Preferred Units on or about November 1, 2004.  As set forth more fully below, said investment automatically converted into Common Stock in the Company on or about January 8, 2007.

32

84.     Plaintiffs Donald E. Rutten and Irene G. Rutten, are Illinois residents. Plaintiffs invested a total of $100,000 in the Company, with:  (a) $50,000 having been invested in the 2007 Series A Subordinated Debentures, with the corresponding number of units held in the Donald E. Rutten Revocable Trust, of which Plaintiff Donald E. Rutten is trustee, on or about June 22, 2007; and (b) $50,000 having been invested in the 2007 Series A Subordinated Debentures, with the corresponding number of units held in the Donald E. Rutten Revocable Trust, of which Plaintiff Irene G. Rutten is trustee, on or about June 22, 2007.

85.     Plaintiffs Garen D. Sailors and Janice E. Sailors are Arizona residents. Plaintiffs invested a total of $231,000 in the Company, with:  (a) $40,000 having been invested by Plaintiff Garen D. Sailors through First Trust Company of Onaga FBO Garen D. Sailors in the 2005 Series C Subordinated Convertible Debentures on or about November 4, 2005; (b) $13,000 having been invested by Plaintiff Garen D. Sailors through First Trust Company of Onaga FBO Garen D. Sailors in the 2006 Series D Subordinated Convertible Debentures on or about September 10, 2006; (c) $143,000 having been invested by Plaintiff Janice E. Sailors through First Trust Company of Onaga FBO Janice E. Sailors in the 2006 Series D Subordinated Convertible Debentures on or about September 10, 2006; and (d) $35,000 having been invested by Garen D. Sailors and Janice E. Sailors in the 2006 Series D Subordinated Convertible Debentures, with the corresponding number of units held in the Sailors Family Trust, of which Plaintiffs Garen D. Sailors and Janice E. Sailors are trustees, on or about September 10, 2006.  As set forth

more fully below, said investment automatically converted into Common Stock in the Company on or about January 8, 2007.

86.    Plaintiff Hugo Santibanez is an Arizona resident.  Plaintiff invested a total of $200,000 in the Company, with said amount having been invested in Class A Preferred Units in or about 2003 and 2004.  As set forth more fully below, said investment automatically converted into Common Stock in the Company on or about January 8, 2007.

87.    Plaintiffs Donald F. Savage and Kathleen R. Savage are New York residents. Plaintiffs invested a total of $50,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about June 24, 2008.

88.    Plaintiffs Gerald J. Schlaf and Kathleen Schlaf are Michigan residents. Plaintiffs invested a total of $88,100 in the Company, with:  (a) $38,100 having been invested in Series A Preferred Stock by Plaintiffs Gerald J. Schlaf and Kathleen Schlaf, with the corresponding number of units held in the Gerald J. Schlaf Living Trust, of which Plaintiff Gerald J. Schlaf is trustor, on or about May 11, 2007; and (b) $50,000 having been invested in the 2007 Series A Subordinated Debentures by Plaintiff Gerald J. Schlaf, with the corresponding number of units held in an IRA, of which the Gerald J. Schlaf Living Trust is beneficiary, with  Plaintiff Gerald J. Schlaf as trustee of the Gerald J. Schlaf Living Trust, on or about June 26, 2007.  As set forth more fully below, the investment in the 2007 Series A Subordinated Debentures was converted into the 2007 Series C Senior Subordinated Convertible Debentures on or about November 8, 2007.

89.     Plaintiff Don Schneeberger is an Arizona resident.  Plaintiff invested a total of $300,000 in the Company, with:  (a) $50,000 having been invested in the 2006 Series D Subordinated Convertible Debentures on or about June 23, 2006; (b) $200,000 having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about May 1, 2008; and (c) $50,000 having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about May 3, 2008.  As set forth more fully below, investment in the 2006 Series D Subordinated Convertible Debentures automatically converted into Common Stock in the Company on or about January 8, 2007.

90.     Plaintiff Frank W. Sciacca and Karen L. Sciacca are New Mexico residents. Plaintiffs invested a total of $50,000 in the Company, with said amount having been invested in Series A Preferred Stock on or about February 2, 2007.

91.     Plaintiff Marvin Silvey, M.D., is an Arizona resident.  Plaintiff invested a total of $581,400 in the Company, with:  (a) $155,700 having been invested in Common Units on or about November 15, 2004; (b) $200,700 having been invested in Common Units on or about February 11, 2005; (c) $125,000 having been invested in the 2005 Series C Subordinated Convertible Debentures on or about August 11, 2005; and (d) $100,000 having been invested in Series A Preferred Stock on or about March 13, 2007.  As set forth more fully below, said investments, except for the investment in Series A Preferred Stock, were automatically converted into Common Stock in the Company on or about January 8, 2007.

92.     Plaintiff Douglas R. Smith is a Michigan resident.  Plaintiff invested a total of $75,000 in the Company, with:  (a) $50,000 having been invested in the Series A

35

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

Preferred Stock, with the corresponding number of shares held in IRA FBO Douglas R. Smith, on or about April 5, 2007; and (b) $25,000 having been invested in the 2007 Series A Subordinated Debentures on or about July 19, 2007 and subsequently converted into the 2007 Series C Senior Subordinated Convertible Debenture in or around March 2008, with the corresponding number of units held in IRA FBO Douglas R. Smith.

93.     Plaintiff Vincent Spica is a Michigan resident.  Plaintiff invested a total of $75,000 in the Company, with:  (a) $25,000 having been invested in Series A Preferred Stock, with the corresponding number of shares held in the Vincent Spica Living Trust, of which Plaintiff Vincent Spica is grantor and initial trustee, on or about June 22, 2007; (b) $25,000 having been invested in Series A Preferred Stock, with the corresponding number of shares held in IRA FBO Vincent P. Spica, of which Plaintiff Vincent Spica is beneficiary, on or about July 11, 2007; (c) $25,000 having been invested in the 2007 Series C Senior Subordinated Convertible Debentures, with the corresponding number of units held in the  IRA FBO Vincent P. Spica, of which Plaintiff Vincent Spica is beneficiary,  on or about February 8, 2008; and (d) $47,000 having been invested in the 2007 Series C Senior Subordinated Convertible Debentures, with the corresponding number of units held in the IRA FBO Karrie Spica, on or about February 18, 2008.

94.     Plaintiff Rosemarie Staebell is an Iowa resident.  Plaintiff invested a total of $25,000 in the Company, with said amount having been invested in the 2007 Series B Subordinated Debentures with the corresponding number of shares held in the John B. & Rosemarie Staebell Trust, of which Plaintiff Rosemarie Staebell is sole trustee, on or about September 28, 2008.

36

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

95.    Plaintiff Lisa J. Stimmel, D.D.S., is a Colorado resident.   Plaintiff invested a total of $100,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about March 19, 2008.

96.    Plaintiff Hubertus J. H. Sweering is a citizen of the Netherlands.   Plaintiff invested a total of $100,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about April 11, 2008.

97.    Plaintiff Ronald D. Tucker is an Arizona resident.  Plaintiff invested a total of $50,000 in the Company, with:  (a) $25,000 having been invested in Domin-8 Class B Units on or about June 1, 2005; and (b) $25,000 having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about May 2, 2008.  As set forth more fully below, investment in Domin-8 Class B Units were automatically converted into Common Stock in the Company on or about January 8, 2007.

98.    Plaintiff Charles Warner is an Iowa resident.  Plaintiff invested a total of $21,000 in the Company, with said amount having been invested in the 2007 Series B Subordinated Debentures on or about July 9, 2007.

99.    Plaintiff Jack W. Wiley is an Indiana resident.  Plaintiff invested a total of $250,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures on or about January 17, 2008.

100.    Plaintiffs Deborah L. Wilson, M.D., and Vinicio Lluberes, M.D., are Arizona residents.  Plaintiffs invested a total of $207,600 in the Company, with:  (a) $57,600 having been invested by Plaintiffs Deborah L. Wilson, M.D., and Vinicio Lluberes, M.D. in the 2005 Series C Subordinated Convertible Debentures on or about November 30, 2005; (b)

37

1
2
3
4
5
6
7
8
9
10
11
12

mdw
Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

$50,000 having been invested by Plaintiffs Deborah L. Wilson, M.D., in the 2006 Series D Subordinated Convertible Debentures, with the corresponding number of shares held in an account maintained by First Trust Company of Onaga, of which Plaintiffs are beneficiaries, on or about June 30, 2006; and (c) $100,000 having been invested by Plaintiffs Deborah L. Wilson, M.D., and Vinicio Lluberes, M.D.,  in the 2007 Series A Subordinated Debentures on or about  March 7, 2007.  As set forth more fully below, investments in the 2005 Series C Subordinated Convertible Debentures and the 2006 Series D Subordinated Convertible Debentures were automatically converted into Common Stock in the company on or about January 8, 2007.

101.    Plaintiff David Zinn, M.D. is an Alabama resident.  Plaintiff invested a total of $150,000 in the Company, with said amount having been invested in the 2007 Series C Senior Subordinated Convertible Debentures in or about February 2008.

102.    Plaintiff Mark A. Zivin is an Illinois resident.  Plaintiff invested a total of $32,600 in the Company, with:  (a) $7,600 having been invested in Common Units on or about December 2, 2003; and (b) $25,000 having been invested in Class B Preferred Units on or about July 9, 2004.  As set forth more fully below, investments in Common Units and Class B Preferred Units were automatically converted into Common Stock in the Company on or about January 8, 2007.

103.    Plaintiff Margie M. Zivin is an Illinois resident.  Plaintiff invested a total of $25,000 in the Company, with said amount having been invested in Class B Preferred Units on or about December 29, 2004.   As set forth more fully below, said investments

were automatically converted into Common Stock in the Company on or about January 8, 2007.

104.    Defendant Gregory K. McGrath is an Ohio resident.  At all material times, Defendant was a director and officer of Domin-8 Enterprise Solutions, Inc., which engaged in purposeful activities in Arizona at the direction of and / or for the benefit of its directors and officers, including Defendant.

105.    Defendant John A. Ensign is an Ohio resident.   At all material times, Defendant was an officer of Domin-8 Enterprise Solutions, Inc., which engaged in purposeful activities in Arizona at the direction of and / or for the benefit of its directors and officers, including Defendant.

106.    Defendant Daniel P. Buettin is a Florida resident.  At all material times, Defendant was an officer of Domin-8 Enterprise Solutions, Inc., which engaged in purposeful activities in Arizona at the direction of and / or for the benefit of its directors and officers, including Defendant.

107.    Defendant Thomas Thistleton is an Ohio resident.  At all material times, Defendant was an officer of Domin-8 Enterprise Solutions, Inc., which engaged in purposeful activities in Arizona at the direction of and / or for the benefit of its directors and officers, including Defendant.

108.    Defendant Sean D. Curran is an Ohio resident.   At all material times, Defendant was a director and /or officer of Domin-8 Enterprise Solutions, Inc., which engaged in purposeful activities in Arizona at the direction of and / or for the benefit of its directors and officers, including Defendant.

109.   Defendant Charles V. Shamblee III is a North Carolina resident.   At all material times, Defendant was a director of Domin-8 Enterprise Solutions, Inc., which engaged in purposeful activities in Arizona at the direction of and / or for the benefit of its directors and officers, including Defendant.

110.   Defendant Chris A. Lewis is a Florida resident.   Defendant was, during the relevant period, a Board member of Defendant Domin-8 Enterprise Solutions, Inc.  At all material times, Defendant was a director of Domin-8 Enterprise Solutions, Inc., which engaged in purposeful activities in Arizona at the direction of and / or for the benefit of its directors and officers, including Defendant.

111.   Defendant Ronald J. Rapp is a Florida resident.   Defendant was, during the relevant period, a Board member of Defendant Domin-8 Enterprise Solutions, Inc.  At all material times, Defendant was a director of Domin-8 Enterprise Solutions, Inc., which engaged in purposeful activities in Arizona at the direction of and / or for the benefit of its directors and officers, including Defendant.

112.   Defendant Jay Hill is a Florida resident.  At all material times, Defendant was a director of Domin-8 Enterprise Solutions, Inc., which engaged in purposeful activities in Arizona at the direction of and / or for the benefit of its directors and officers, including Defendant.

113.   Defendant J. Robert Routt is an Ohio resident.   At all material times, Defendant was a director of Domin-8 Enterprise Solutions, Inc., which engaged in purposeful activities in Arizona at the direction of and / or for the benefit of its directors and officers, including Defendant.

40

114.    Defendant DeWaay Financial Network, Inc., is an Iowa corporation.  Upon information and belief, Defendant has directly or indirectly engaged in purposeful activities in Arizona in connection with the acts alleged herein.

115.    Defendant DeWaay Financial Network, LLC, is an Iowa limited liability company.  Upon information and belief, Defendant has directly or indirectly engaged in purposeful activities in Arizona in connection with the acts alleged herein.

116.    Defendant DeWaay Capital Management, Inc., is an Iowa corporation.  Upon information and belief, Defendant has directly or indirectly engaged in purposeful activities in Arizona in connection with the acts alleged herein.

117.    Defendant D8 Funding I, LLLP, is an Iowa limited liability limited partnership.  Upon information and belief, Defendant has directly or indirectly engaged in purposeful activities in Arizona in connection with the acts alleged herein.

118.    Defendant D8 Funding Management, LLC, is an Iowa limited liability company.  Upon information and belief, Defendant has directly or indirectly engaged in purposeful activities in Arizona in connection with the acts alleged herein.

119.    Defendant D8 Note Purchase, LLLP, is an Iowa limited liability limited partnership.  Upon information and belief, Defendant has directly or indirectly engaged in purposeful activities in Arizona in connection with the acts alleged herein.

120.    Defendant D8 Note Purchase Management, LLC,  is an Iowa limited liability limited company.   Upon information and belief, Defendant has directly or indirectly engaged in purposeful activities in Arizona in connection with the acts alleged herein.

41

121.    Defendant D8 Acquisition Corp. is a Delaware corporation.  Defendant has directly or indirectly engaged in purposeful activities in Arizona in connection with the acts alleged herein.

122.    Defendant Lawrence Labine is an Arizona resident.  Upon information and belief, at materials times related hereto, Defendant engaged in purposeful activities in Arizona as an independent securities broker, either personally or on behalf of an entity.  If and when it is determined whether Defendant acted on behalf of an entity, as opposed to personally, Plaintiffs will seek leave of the Court to amend the Complaint to set forth the name of said entity.

123.    Defendants John and Jane Does I–X, ABC Corporations I–X, and XYZ Partnerships I–X are individuals, corporations, or partnerships, respectively, or other incorporated or unincorporated associations, whose true names are presently unknown to Plaintiffs, but who are or may be liable to Plaintiffs on their Complaint.  If and when the true names of such fictitious defendants become known, Plaintiffs will seek leave of the Court to amend the Complaint to set forth their true names, capacities, and relationships.

## GENERAL ALLEGATIONS

### Overview

124.    Domin-8 was an established enterprise software application company that provided proprietary, advanced software solutions and related services to the property management industry in the United States and Canada.

125.    Domin-8's primary customers were multi-family residential property owners and managers.

42

126.    Domin-8 also provided products and services to owners and managers of leased commercial and retail real estate.

127.    Between 2002 and 2009, Domin-8 offered debt and equity securities (sometimes collectively referred to as "Securities") to the Investors and requested their approval of certain actions incidental to issuing the Securities.

128.    In connection with offering the Securities and obtaining the approval of Investors, D8's president, Greg McGrath, made numerous trips to Phoenix, Arizona, where a large number of the Investors are concentrated.

129.    Domin-8 also entered into agreements with securities brokers, including Donald DeWaay on behalf of DeWaay Financial Network, Inc. and/or other DeWaay entities, including DeWaay Financial Network, LLC and DeWaay Capital Management, Inc. (collectively, "DeWaay Entities"), and Lawrence Labine ("Labine") to sell the Securities.

130.    DeWaay and Labine were responsible for placing more than seventy percent (70%) of the final debt offerings in Domin-8.

131.    DeWaay and Labine received compensation in the form of warrants for selling the Securities.

132.    The Investors in Arizona and elsewhere invested substantial sums in the Securities with the expectation of making a profit and / or receiving a return on their investments.

133.    The funds generated through the Securities were used to fund numerous acquisitions and otherwise provide working capital for the Company.

43

134.     Domin-8's overly aggressive acquisition strategy, coupled with its failure to meet its projections and control costs, caused the Company to operate at a substantial loss.

135.     Domin-8's directors and officers, including various Defendants, knew or should have known that the Investors would not realize a return on their investments in the Securities because the Company was operating at a substantial loss all the while continuing to increase its debt.

136.     Nonetheless, Domin-8's directors and officers, including various Defendants, approved of the offering of the Securities and the dissemination of false and misleading information regarding the same.

137.     Further, Domin-8's directors and officers, including various Defendants, never took any actions to correct the overly inflated financial projections that had been made to the Investors in connection with the Securities.

138.     Eventually, Domin-8 began to operate more profitably and was poised for success as a result of the acquisition strategy that had been funded by the Investors.

139.     By that time, however, it was overburdened with debt to the point that, upon information and belief, it was no longer viable as a going concern.

140.     Recognizing that the Company was finally in a position to begin operating successfully but for its debt, Domin-8's management, who enjoyed stock options in the Company, approached DeWaay and Labine about making a "stalking horse" bid for Domin-8's assets if it agreed to file bankruptcy.

. . .

44

141.     After purchasing the Company, DeWaay and Labine would operate it under a new name with the assistance of existing management, who were to receive favorable stock options in the new company.

142.     By taking over Domin-8 free and clear of this debt, Domin-8's management, along with DeWaay and Labine, were positioned to continue to operate D8 successfully to the exclusion of the Investors, who had financed the acquisitions and provided the working capital that allowed the Company to begin operating profitably.

143.     In September 2009, various Defendants approved of or participated in the decision to file Chapter 11 bankruptcy on behalf of Domin-8.

144.     At or around the time of the bankruptcy, DeWaay and LaBine formed various entities, including D8 Funding I, LLLP, D8 Funding Management, LLC, D8 Note Purchase, LLLP, D8 Note Purchase Management, LLC, and / or D8 Acquisition Corp. (collectively, "D8 Entities"), for purposes of purchasing Domin-8's assets and raising money from the Investors to fund the same.

145.     The attempt to purchase Domin-8's assets was not successful, as one of Domin-8's competitors emerged from the bankruptcy as the successful bidder.

146.     The failed attempt to purchase the assets through the Sec. 363 sale was to the detriment of the Investors, who have lost all or a substantial portion of their investments as a result of bankruptcy.

**Formation and Early Business**

147.     In January 2002, McGrath founded Domin-8, Inc., a Maryland corporation.

148.     McGrath founded Domin-8, Inc. with the purpose of developing and marketing products and services that would improve the multi-family dwelling unit industry.

149.     As part of a structured conversion, Domin-8 Enterprise Solutions LLC ("Domin-8 LLC"), a Maryland limited liability company, became the parent company of Domin-8 Inc. (collectively, "Domin-8") in May 2002.

150.     Prior to founding Domin-8, McGrath was majority shareholder of WaKul, Inc. ("WaKul"), another Maryland corporation.

151.     At the time that McGrath formed Domin-8, WaKul had approximately $3,000,000 in outstanding accounts payable and no revenue to satisfy payment.

152.     Like Domin-8, WaKul was established to enhance multi-family dwelling unit management through technology.

153.     McGrath, through WaKul, had begun to develop property management software.

154.     WaKul owned all rights to the software, except for the source code.

155.     The software's source code was owned by its developer.

156.     The developer owned the source code because WaKul never paid for it as required by the parties' contract.

157.     The developer subsequently obtained a judgment against WaKul in the amount of $962,000.

158.     Upon formation, Domin-8 purchased all rights to the software, except for the source code, from WaKul for $50,000.

46

159.    Domin-8 also agreed to assume the outstanding judgment against WaKul.

160.    Domin-8 subsequently satisfied the judgment and entered into a mutual release with the developer pursuant to which Domin-8 paid $262,000 to the developer for the rights to the source code.

161.    After acquiring full rights to the software, Domin-8 began to market it under the name "Paradigm."

162.    Domin-8 marketed Paradigm to companies owning multi-family dwelling units.

163.    In addition to marketing Paradigm, Domin-8 offered property management services, such as applicant screening, service activation, and collections.

164.    Domin-8's Vice President of Operations, Tom Thistleton ("Thistleton"), was responsible for coordinating and managing all Domin-8's operations, including implementing, rolling out, and providing customer support for Domin-8's products and services.

165.    McGrath acted as Domin-8's Chief Executive Officer and was on the board of directors.

166.    As of March 2004, Domin-8's board of directors consisted of:  (1) Greg McGrath, who, as stated, was also Chief Executive Officer; (2) Sean D. Curran, who was also Vice President Business Development/General Counsel; (3) Charles V. Shamblee III ("Shamblee"), who was an outside director; and (4) J. Robert Routt, who was also an outside director (collectively, the "2004 Board").

47

167.     These directors and officers would remain in place for approximately the next two years.

168.     At all material times during its existence, Domin-8's officers, including, but not limited to, McGrath, would correspond with potential and existing Investors orally and in writing.

169.     Upon information and belief, the directors were or should have been aware of these correspondences and / or approved the content of the same.

170.     Written correspondence was sent regularly to existing Investors.

171.     As explained in detail below, these written correspondences would regularly make specific representations about the Company and its affairs, particularly with respect to its performance and objectives.

172.     Upon information and belief, Domin-8's directors and officer knew or should have known that the written and oral correspondences made to the Investors about the Company would influence their decision to invest in the Company.

### Initial Securities Offerings by Domin-8 LLC

### Initial Equity Offerings

173.     According to the terms of the Operating Agreement, the initial membership interests in Domin-8 were divided into common units ("Common Units") and Class A Preferred Units ("Class A Preferred Units").

174.     Domin-8's directors and officers indirectly held the overwhelming majority of the company's equity.

48

175.     More specifically, as of December 31, 2003, various directors and officer's spouses and limited liability companies held nearly all of the outstanding Common Units and Class A Preferred Units.

176.     Some of these units were owned by Computron One, LLC ("Computron"), a limited liability company managed by Shamblee.

177.     In 2002 and 2003, Domin-8 had borrowed $450,000 and $50,000, respectively, from Computron.

178.     That debt was collateralized with a priority interest in the source code and other rights to Paradigm.

179.     In or around 2004, Domin-8 began to offer Class B Preferred Units ("Class B Preferred Units").

180.     Domin-8 began to offer the Class B Preferred Units because it needed additional investment monies after its initial 2004 forecasts were substantially off.

181.     Domin-8 originally forecasted losses of $900,000 in the first quarter of 2004 based on selling its products and services to 750,000 multi-family dwelling units by 2007.

182.     At the end of the second quarter of 2004, however, Domin-8 reforecasted losses of $3.9 M based on marketing and selling its products and services to an additional 1.05 M units, or total 1.8 M units, by 2007.

183.     Domin-8 projected an additional investment of up to $2 M, generated through the Class B Preferred Units, to "generate additional potential recurring revenues of over $100 M …."

49

184.     In connection with offering the Class B Preferred Units, McGrath actively targeted Investors in Arizona.

185.     McGrath initially presented the offering to Investors in Arizona on September 23, 2004.

186.     Two other presentations to Investors in Arizona followed on October 19 and 27, 2004.

187.     During these presentations, McGrath represented that "Domin-8 could manage to a cash flow break even at 50,000 units," but "it need[ed] the additional capital to fully realize the market potential."

188.     The import of this representation was that the Class B Preferred Units were a safe and sound investment for the Investors because Domin-8 was already positioned to be at a cash flow break-even point because it had already secured sales of at least 50,000 units.

189.     In a further attempt to entice the Investors to purchase the Class B Preferred Units, McGrath said that "[t]here is a monthly financial review as part of the monthly Board meeting," and that "monthly Board meetings [would continue] until [the company] is cash flow positive."

190.     McGrath also said that Thisteton's former accounting firm, Deloitte, "will review books."

191.     In fact, Deloitte would not begin to review the Company's financials until late 2007 or early 2008.

50

192.     On October 25, 2004, McGrath separately informed the Investors that, "[d]ue to the identification of additional product lines as well as improved pricing, [Domin-8] now estimate[d] the primary and secondary market [sales] to total $1.852b."

193.     This was a substantial increase over the "$750m" in combined sales initially forecasted by the company.

194.     Based on representations and assurances about the Company made in the communications circulated to the Investors and during presentations, certain Investors in Arizona and elsewhere purchased the Common Units, Class A Preferred Units, and Class B Preferred Units.

### Initial Debt Offerings

195.     In addition to equity securities, Domin-8 offered debt securities.

196.     Domin-8 offered the debt securities because the Company was undercapitalized.

197.     According to McGrath, the Company lost at least one potential customer "due to the lack of a strong balance sheet."

198.     McGrath and the Company believed that a stronger balance sheet was necessary to remain competitive and secure customers.

199.     The debt securities would strengthen the Company's balance sheet by generating additional working capital.

### *2005 Series C Subordinated Convertible Debentures*

200.     Series C Subordinated Convertible Debentures were offered to the Investors beginning in 2005 (the "2005 Series C Subordinated Convertible Debentures").

51

201.     The 2005 Series C Subordinated Convertible Debentures were sold in units and included warrants.

202.     The 2005 Series C Subordinated Convertible Debenture offering was purportedly exempt from registration under the Securities Exchange Act of 1933.

203.     McGrath, on behalf of Domin-8, presented the offering to certain Investors in Arizona at a luncheon meeting on March 15, 2005.

204.     During this luncheon, McGrath represented that the 2005 Series C Subordinated Convertible Debentures were not susceptible to the risks commonly associated with private investments.

205.     In particular, McGrath represented that investments in the 2005 Series C Subordinated Convertible Debenture could withstand the risks of private investment because:  (1) Domin-8 had an actual solution to the industry problem that it was trying to solve; (2) that product worked as advertised, as evidenced by customers "actively marketing for Domin-8"; (3) customers were already paying for the solution "at the highest solution cost in the industry"; (4) the market as a whole accepted the solution on a large scale, as evidenced by "Domin-8 having won 7 of 8 competitions"; and (5) the Company already had the financial means to capitalize on the opportunities available in the marketplace.

206.     The import of these representations was that the 2005 Series C Subordinated Convertible Debentures were a sound investment because Domin-8 was already successful and would only become more successful if it had access to the additional working capital that would be generated through the 2005 Series C Convertible Debentures.

52

207.     McGrath projected that Domin-8 would hold a 20% market share over the next four years and forecasted $180,000,000 in revenue from the primary market alone.

208.     McGrath also represented that the "Company structure yield[ed] 70% net margin."

209.     Originally, Domin-8 proposed offering 20 units of the 2005 Series C Subordinated Convertible Debentures at a purchase price of $100,000 per unit for a total offering of $2,000,000.

210.     However, the amount of the 2005 Series C Subordinated Convertible Debenture offering was subsequently increased.

211.     Domin-8 ultimately offered to sell up to 50 units of the 2005 Series C Subordinated Convertible Debentures at a purchase price of $100,000 per unit for a total offering of $5,000,000.

212.     The 2005 Series C Subordinated Convertible Debentures matured upon the earliest of:  (1) 12 months after the date of issuance, unless extended; (2) a merger or consolidation of Domin-8; (3) the closing of a subsequent equity offering; or (4) an event of default.

213.     In the event of a subsequent equity offering that yielded gross proceeds to Domin-8 of at least $7,500,000 prior to the payment and satisfaction of the 2005 Series C Subordinated Convertible Debentures, each Investor could, at their sole option, convert their unpaid principal and interest into equity in the Company at a price equal to 80% of the equity offering.

53

214.     The warrants received by all Investors gave them the right to purchase an aggregate of 357,723 common units of Domin-8.  The warrants expired seven years after their date of issuance and were to be exercised at a price equal to 80% of the price of the equity security sold in connection with a subsequent equity offering or for $8.23 in the event that a subsequent equity offering did not occur.

215.     The 2005 Series C Subordinated Debenture offering was originally set to expire by October 31, 2005.

216.     As part of its efforts to sell units of the 2005 Series C Subordinated Debentures before the offering expired, Domin-8,  through McGrath,  issued a statement that "the upside is enormous," particularly in light of the anticipated acquisition of an industry competitor that would substantially increase Domin-8's sales and market share.

217.     McGrath projected that the acquisition could yield revenue of $55,000,000 and a projected net of $34,000,000 over a three-year period.

218.     McGrath estimated that, "[a]t a conservative multiple of 15, value [would] approach[ ] $500,000,000."

219.     McGrath requested the presence of certain Investors in Arizona at a presentation by McGrath on October 11, 2005, to discuss Domin-8's business affairs and the 2005 Series C Subordinated Debenture.

220.     Certain Investors in Arizona were informed that the 2005 Series C Subordinated Debentures would likely be the last opportunity to invest in Domin-8 because the Company would be seeking outside financing in the future.

54

221.     Certain Investors in Arizona attended McGrath's presentation on October 11, 2005.

222.     On November 3, 2005, McGrath circulated a confidential memorandum updating Domin-8's previous projections in light of three acquisitions that were expected to close by the end of the year.

223.     McGrath projected that the acquisitions could yield "revenue of $95,000,000 and net of $50,000,000" over a four-to-five year period.

224.     McGrath estimated that, "[a]t a conservative multiple of 15, value [would] approach[ ] $1,500,000,000."

225.     The projected income statement provided by McGrath further stated that the net income per year would increase to $1,256,894.00 in 2006, to $11,554,042.00 in 2007, to $22,691,104 in 2008, and to $41,082,084.00 in 2009.

226.     Upon information and belief, these projections were known to the 2004 Board and disseminated by McGrath with its approval.

227.     On November 17, 2005, McGrath held another presentation in Arizona that was attended by certain Investors in Arizona.

228.     Regarding the 2005 Series C Subordinated Debentures, McGrath again represented that "the upside is enormous" because Domin-8 had negotiated the acquisition of three competitors, which would further increase Domin-8's sales and market share.

229.     Certain Investors in Arizona and elsewhere purchased the 2005 Series C Subordinated Debentures.

55

230.        Domin-8 eventually completed two industry acquisitions, AC Software, Inc. ("ACS"), and PMAS, LLC ("PMAS"), in 2005 for $5,356,000 and $1,800,000, respectively.

231.        Domin-8 LLC finished 2005 with cash and other current assets of $720,000, Revenue of $727,000, and EBITDA of negative $5.7 M.

232.        Upon information and belief, due to lack of funds, Domin-8 extended the maturity date on the debt owed to Computron by issuing common units in the company.

### *2006 Series D Subordinated Convertible Debentures*

233.        For 2006, Domin-8 originally forecasted Revenue of $8.12 M and EBITDA of negative $1.25 M.

234.        Based on an anticipated acquisition ("Property Boss"), however, Domin-8 revised its forecast to be EBITDA positive beginning in the 4th quarter.

235.        Domin-8 forecasted being EBITDA positive even sooner if another acquisition ("AMSI") closed as expected.   This acquisition would lead to "initial annualized revenues in the $15 M range and EBITDA in the $3 M range."

236.        Domin-8 communicated these forecasts to the Investors.

237.        On March 8, 2006, Domin-8, through McGrath, informed the Investors that the Company expected to generate "over $7m in revenue" in 2006 based on the PMAS acquisition alone.

238.        McGrath also informed the Investors that the Company would "grow revenues from the combined Domin-8/ACS business from $2.7 M in 2005 to $4.7 M [in 2006], prior to any additional acquisitions."

56

239.     At the same time, however, McGrath explained that the funds generated by another debt offering (the "2006 Series D Subordinated Convertible Debentures") were needed to provide the capital "to make the next acquisition."

240.     More specifically, Domin-8 intended "to make several smaller acquisitions of companies and next target one of [its] three largest competitors."

241.     Domin-8 expected for those transactions to be completed within one year, which would "lead [the company] to a commanding market share lead."

242.     In actuality, Domin-8 never had any intention of waiting to grow revenues from the first acquisition before targeting other acquisitions, which is why the Company immediately needed funds from the 2006 Series D Subordinated Convertible Debenture to finance the next round of acquisitions.

243.     McGrath also informed the Investors that the funds from the 2006 Series D Subordinated Convertible Debentures would be used to make interest payments on the 2005 Series C Subordinated Convertible Debentures.

244.     The 2006 Series D Subordinated Convertible Debentures were sold in units and included warrants.

245.     Domin-8 offered to sell up to 60 units of the 2006 Series D Subordinated Convertible Debentures at a purchase price of $100,000 per unit for a total offering of $6,000,000.

246.     The 2006 Series D Subordinated Convertible Debenture offering was purportedly exempt from registration under the Securities Exchange Act of 1933.

57

247.     The 2006 Series D Subordinated Convertible Debentures matured upon the earliest of:  (1) 12 months after the date of issuance, unless extended; (2) a merger or consolidation of Domin-8; (3) the closing of a subsequent equity offering; or (4) an event of default.

248.     In the event of closing a subsequent equity offering that yielded gross proceeds to Domin-8 of at least $7,500,000 prior to the payment and satisfaction of the 2006 Series D Subordinated Convertible Debentures, each Investor could, at their sole option, convert their unpaid principal and interest into equity in the Company of the same class at a price equal to 85% of the equity offering.

249.     The warrants received by all Investors gave them the right to purchase an aggregate of 217,323 common units of Domin-8.  The warrants expired seven years after their date of issuance and were to be exercised at a price equal to 85% of the price of the equity security sold in connection with the subsequent equity offering or for $8.34 in the event that a subsequent equity offering did not occur.

250.     The 2006 Series D Subordinated Debenture offering was originally set to expire by June 29, 2006.

251.     To entice the Investors to participate in the 2006 Series D Subordinated Convertible Debenture offering, McGrath advised that Domin-8 was currently negotiating with several institutional firms for an equity investment in the amount of $18 to $20 M.

252.     The equity investment would allow the Investors to convert the 2006 Series D Convertible Debentures into equity securities at favorable rates.

58

253.     On April 12, 2006, Domin-8, through McGrath, provided the Investors with additional revenue projections based on two additional acquisitions that the Company had negotiated.

254.     McGrath informed the Investors that the acquisition of LogicBuilt SV, LLC ("LogicBuilt"), would increase revenue by "$600,000 - $700,000 … over the next 12 months."

255.     McGrath also informed the Investors that, when another negotiated acquisition was completed ("Property View Solutions"), an additional "$800,000 - $900,000 in revenue [would be generated] over the next 12 months."

256.     Combined, McGrath projected that "Domin-8 [would] have projected forward 12-month revenues of $8.4m with four-year out revenues on the 1.1m units being over $40m" and "[would] also climb into the number-four market-share position in the industry."

257.     McGrath also informed the Investors that Domin-8 had initiated acquisition discussions with Property Boss and AMSI, which would be acquired using the funds from the anticipated equity investment.

258.     Acquisition of the two companies would make "Domin-8 LLC the holder of the largest market share in the industry."

259.     As Domin-8 completed acquisitions, it sought to control expenses by reducing overhead where possible.

260.     As of May 22, 2006, McGrath estimated that recent staff and space reductions would save Domin-8 approximately $72,000 annually.

59

261.     At the same time, Domin-8, through McGrath, provided the Investors with an updated financial forecast.

262.     McGrath informed the Investors that it expected to be "EBITDA profitable in the 4th quarter without additional acquisitions …." based on the additional sales made through ACS and PMAS.

263.     Even though Domin-8 did not have the means to finance the acquisitions without the 2006 Series D Subordinated Convertible Debentures, McGrath expressed the Company's intention to continue to target numerous acquisitions over the next several months.

264.     McGrath also updated the prior month's forecasts for the Investors, particularly as they related to the negotiated acquisitions.

265.     McGrath reiterated again that the LogicBuilt acquisition would add "$600,000 - $700,000 in revenue over the next 12 months," and that the Property View Solutions acquisition was now expected to add "$900,000 - $1,000,000 in revenue over the next 12 months," rather than the "$800,000 - $900,000 originally expected."

266.     According to McGrath, "[u]pon the closing of these two transactions, Domin-8 [would] have projected forward 12-month revenues of $8.6m with four-year out revenues on the 1.1m units being over $40m."

267.     On June 5, 2006, Domin-8, through McGrath, informed the Investors that the LogicBuilt acquisition had closed as anticipated and would "be accretive by over $400,000 year one," as opposed to the $600,000 - $700,000 that was projected just two months earlier.

60

268.     Regarding the Property Boss and AMSI acquisitions, McGrath projected first year revenues of "$1,000,000" from Property Boss and "[a]nnualized revenue [that] would be over $28,000,000 and EBITDA over $10,000,000" from AMSI.

269.     McGrath also said that, with those acquisitions, Domin-8 "would climb to arguably the leading market share position."

270.     In addition to increasing revenues through the existing sales of the acquisitions, Domin-8 expected to increase revenues through the sale value-added services.

271.     McGrath projected that value-added services "would increase annual revenues by approximately $2,400,000 over a partial year," as "against annual existing revenues of $3,500,000 for these assets in the same period."  This was "an increase of 68% in a weighted nine month timeframe."

272.     McGrath informed the Investors that Domin-8 expected to "increase annualized revenue from $800,000 in 2005 to a current expectation of $8,000,000."

273.     As part of its efforts to sell units of the 2006 Series D Convertible Subordinated Debentures before the offering expired, Domin-8, through McGrath, issued a statement on June 9, 2006, that the Company expected to close a round of equity financing as contemplated by the private placement memoranda for both the 2005 Series C and 2006 Series D Subordinated Debentures.

274.     In the statement, McGrath also said that "there w[ould] be no further opportunities for individual investors to invest in the company" after the 2006 Series D Subordinated Debenture offering expired because "[a]ny future capital requirements will be provided by institutional investors."

61

275.     Only three days later, Domin-8, again through McGrath, informed the Investors directly that the equity financing was imminent, and that "[the company] would expect to never again need outside investment except for credit facilities after the [equity financing] closing."

276.     McGrath's representation was intended to induce the Investors to purchase the 2006 Series D Convertible Subordinated Debentures, as evidenced by his statement that "[the Company] wanted to notify you that to be certain of participating we must receive the investment on or before June 29."

277.     On July 17, 2006, Domin-8, through McGrath, informed the Investors that the 2006 Series D Convertible Subordinated Debenture offering was fully subscribed due to the anticipated equity financing allowing for the AMSI acquisition.

278.     McGrath, however, said that Domin-8 would over-subscribe the 2006 Series D Convertible Subordinated Debenture offering to allow Investors to continue to participate before the anticipated equity financing was completed.

279.     McGrath also updated the Investors as to the status of the Property Boss and AMSI acquisitions.

280.     McGrath reiterated that the Property Boss acquisition, which was expected to close in September, was anticipated to yield $1 M in revenues.

281.     McGrath also informed the Investors that the AMSI acquisition would not close as expected because it had been acquired by another company.

282.     McGrath, however, said that Domin-8 would "begin formal discussions" with the company that had acquired it.

62

283.     McGrath also informed the Investors about other anticipated acquisitions and their effect on revenues.

284.     McGrath said that Domin-8 was in "final negotiations" to acquire Winning Edge Software, which was expected to have first year revenues of "approximately $600,000 with a significant upside potential."

285.     With respect to value-added services, McGrath said that Domin-8 was exceeding expectations.

286.     According to McGrath, value-added services would "add approximately $1,400,000 in additional revenue to the company" in the coming three months.

287.     If the company was able to reach its "stretch target for year end," "$4,000,000 in recurring revenue [would be added] to an initial base of $4,400,000 in a weighted 7 months of selling."

288.     McGrath said that "[a]nnualizing this figure suggest[ed] that [the Company's] goal of increasing revenue over 100% in the first 12 months of operations of an acquired company [would be] highly achievable and [would] most likely be exceeded."

289.     Finally, McGrath informed the Investors that Domin-8 had further reduced the staff of the companies that it acquired, resulting in a total recurring savings in the second quarter in the amount of $650,000 annually.

290.     On August 14, 2006, Domin-8, through McGrath, informed the Investors that the Company had increased its "stretch target" for value-added services, which could result in "$4,500,000 in recurring revenue [being added] to an initial base of $4,400,000 in a weighted 7 months of selling."

63

291.     McGrath also reiterated again that the Property Boss and AMSI acquisitions would yield an additional $1 M and $7 M in revenues, respectively.

292.     On August 14, 2006, McGrath informed the Investors that Domin-8 had signed a term sheet with an institutional investor to provide the equity financing that would be used for the acquisitions.

293.     McGrath represented that the equity investment was expected to close in 60 days, and that additional documentation would be sent to the Investors over the course of the next 45 days.

294.     McGrath also identified another acquisition, Rent Right, which he forecasted to generate "approximately $1,200,000 with a significant upside potential."

295.     McGrath informed the Investors that Domin-8 had reduced its operating expenses, which was expected to "lead to savings in 2007 of over $750,000."

296.     Pending closing, Domin-8, through McGrath, continued to solicit Investors to participate in the 2006 Series D Convertible Subordinated Debenture offering.

297.     The Investors were again informed that they would only have one more opportunity to invest in Domin-8 before the equity financing was used to complete the next four acquisitions.

298.     On September 7, 2006, McGrath held another presentation in Phoenix with certain Investors in Arizona.

299.     To encourage the Investors to participate in the 2006 Series D Convertible Subordinated Debenture offering, Investors invited to the presentation were told that

64

Domin-8 was positioning itself to go public, or, alternatively, to be purchased by another company.

300.    In either event, the Investors would likely benefit from being able to convert the debentures and / or exercising the warrants.

301.    To reinforce the notion that Domin-8 was going to be poised to go public, the Investors were also given Domin-8's projected income statements based on anticipated acquisitions.

302.    The projected income statements reflected positively on the financial state of the Company.

303.    Specifically, they reflected Domin-8 having its EBITDA increase from negative $2,563,260 in 2006 to $20,863,669 in 2007, to $45,342,444 in 2008, to $69,301,891 in 2009, to $98,751,566 in 2010.

304.    Domin-8 gave these aggressive EBITDA projections to the Investors even though its 2006 projections were approximately $5.5 M less than projected just one year earlier.

305.    Throughout the remainder of 2006, Domin-8, through McGrath, continued to tout the projected revenues of its anticipated acquisitions.

306.    On September 18, 2006, McGrath informed the Investors that Winning Edge had more sales than the Company originally expected.

307.    McGrath again projected first year revenues for Winning Edge in an amount of "$600,000 with a significant upside potential."

Y:\Clients\MH-01\Domin 8\Pleadings\Complaint (FINAL 02).doc          2337.000

308.     The Winning Edge acquisition was expected "to close at the end of November, tied to [the] equity financing."

309.     McGrath also identified another acquisition, TCG Technologies, which he projected would generate "approximately $4,000,000 with a significant upside potential."

310.     McGrath informed the Investors that "the negotiations resulted in further savings that [would] double [the $750,000 reduction in costs] over the next 24 months based upon forecast volume."

311.     Certain Investors in Arizona and elsewhere purchased the 2006 Series D Subordinated Debentures based on Domin-8 projections and representations.

312.     Although Domin-8 largely based its projections on the acquisitions, only one acquisition was actually completed in 2006.

313.     Domin-8 acquired LogicBuilt on May 31, 2006, for 88,365 common units of Domin-8, which were valued at $44,182.

314.     Domin-8 ultimately did not acquire the other companies in 2006 that it had informed the Investors would increase the Company's revenues as projected.

315.     As of November 2006, the 2004 Board remained in place, except that Ralph Clark had replaced J. Robert Routt earlier in the year (the "2006 Board").

316.     Upon information and belief, the 2004 and 2006 Boards were aware of and / or approved of the financial projections made by McGrath to the Investors throughout 2004 and 2006.

317.     Upon information and belief, the 2004 and 2006 Boards were aware of and / or approved of the 2006 Series D Subordinated Convertible Debenture offering.

66

318.     During a presentation held by McGrath in Arizona in November 2006, certain Investors were provided with materials providing that Domin-8's customer base consisted of "850,000 residential apartments."

319.     This number was approximately 1 M units less than the original unit projections originally re-forecasted by the company in 2004 and well in excess of the 50,000 units that McGrath had originally represented was the threshold for the Company operating at a cash flow break even point in the same year.

320.     In addition, projections for gross profits continued to be aggressive, even though the Company was falling far short of its gross profit projections from just one year earlier.

321.     Specifically, in September 2006, the company projected gross profits of approximately $3 M for 2006.

322.     This is substantially below the nearly $10 M in gross profits projected for 2006 by the Company back in 2005.

323.     Regardless, the Company continued to project exponential growth for the years that followed.

324.     For example, whereas the Company just one year earlier projected gross profits of approximately $88 M in 2009, it now projected gross profits of $118.5 M in 2009.

. . .

. . .

. . .

Y:\Clients\MH-01\Domin 8\Pleadings\Complaint (FINAL 02).doc                2337.000

## Conversion of All Initial Securities Offerings
## Into Common Stock in Domin-8

325.   While Domin-8 was continuing to over-subscribe the 2006 Series D Convertible Subordinated Debentures, it decided to seek equity financing from a different institutional investor.

326.   On September 18, 2006, McGrath informed the Investors that GunnAllen Financial, Inc. ("GunnAllen"), would be the institutional investor that would provide the equity financing.

327.   Domin-8 purportedly sought equity financing from GunnAllen because it "result[ed] in existing investors owning 42% more of Domin-8 then [sic] [they] would have in the [other] transaction."

328.   McGrath stated that the Company was assigned a $38.2 M pre-money valuation.

329.   McGrath also stated that the Company "[was] able to negotiate keeping a 60% majority on the Board and maintaining [its] LLC status until it [would be] required for an IPO, if [the Company] determine[d] that [was] the best exist strategy for the company."

330.   Only a month-and-a-half after informing the Investors that the Company would maintain its LLC status, McGrath informed the Investors that the Company had to convert into a C-Corporation and convert all outstanding securities into common stock ("Common Stock") in the C-corporation as part of the GunnAllen investment (the "Exchange Offer").

. . .

331.     McGrath also informed the Investors that the pre-money valuation was now "almost $48 M," instead of $38.2 M.

332.     Upon information and belief, these statements were approved of and / or known to the 2006 Board and disseminated by McGrath with its approval.

333.     The Exchange Offer, which required the approval of the Investors, had to be completed by November 15, 2006.

334.     On November 1, 2006, Domin-8, through McGrath, provided the Investors with additional information regarding the equity financing from GunnAllen.

335.     McGrath recommended that the Investors approve the Exchange Offer because Domin-8 would "have to significantly reorganize … solely to survive" if it did not receive additional capital through the equity financing from GunnAllen.

336.     Despite supposedly needing the additional capital just "to survive," McGrath informed the Investors that it intended to use the additional capital to acquire even more competitors.

337.     According to McGrath, the additional capital would be used "to grow the Company beyond what [the] most aggressive projections from last year suggested."

338.     McGrath also said that the additional capital would "allow [Domin-8] to become the leading company in the property management software industry, as [it] expect[ed] to close the scheduled acquisitions over the next 90 days."

339.     Upon information and belief, these statements were also approved of and / or known to the 2006 Board and disseminated by McGrath with its approval.

340.     The Exchange Offer was subsequently completed successfully.

69

341.      After the Exchange Offer was completed, Domin-8 became a Delaware corporation.

342.      As contemplated by the Exchange Offer, the Investors in Domin-8 tendered their respective unit ownership interests for shares of Common Stock.

343.      Investors who held warrants for unit interests in Domin-8 as a result of having invested in the 2005 Series C and 2006 Series D Subordinated Convertible Debentures also exchanged their respective warrant interests for warrants to purchase Common Stock.

344.      Upon completion of the Exchange Offer, the aggregate number of warrants issued in connection with the 2005 Series C and 2006 Series D Subordinated Convertible Debentures were increased to 446,860 and 255,556, respectively.  The exercise price was adjusted to $3.05 and $3.21 per share in accordance with their terms, again respectively.

345.      Certain Investors in Arizona and elsewhere had their equity and debt securities in Domin-8 converted into Common Stock.

### Subsequent Securities Offerings By Domin-8

### Equity Offerings

346.      As part of the Exchange Offer, Domin-8 offered new securities to the Investors in the form of Series A Preferred Stock (the "Series A Preferred Stock") and Common Stock.

347.      The Series A Preferred Stock ranked senior to all classes of Common Stock, but voted together as a single class.

348.     Holders of the Series A Preferred Stock were entitled to cast the number of votes equal to the number of shares of Common Stock that were issuable upon conversion.

349.     Upon conversion, each share of the Series A Preferred Stock was converted into the number of shares of Common Stock equal to the original issue price of shares of Series A Preferred Stock, plus any accrued dividend as of the time of conversion, divided by the conversion price described in the Certificate of Incorporation.

350.     Holders of the Series A Preferred Stock also were entitled to elect a director to the board of the Company, making the total number of directors five instead of four.

351.     In the event that the Company issued a certain number of shares of Series A Preferred Stock, holders of those shares were entitled to elect an additional director, increasing the total number of directors to six.

352.     As of January 9, 2007, GunnAllen estimated that over 75% of the Series A Preferred Stock offering had been subscribed, with a full subscription expected by the end of the month.

353.     At or around the same time that the company was actively subscribing the Series A Preferred Stock offering, McGrath informed the Investors that the Company "successfully closed on the first $25M of the GunnAllen financing."

354.     By the end of April 2007, the Series A Preferred Stock offering in the amount of $20,000,000 was expected to be oversubscribed by a full 30%.

355.     Based on the representations and assurances about the Company made in the communications circulated to the Investors and during presentations, certain Investors in Arizona and elsewhere purchased the Series A Preferred Stock, as well as Common Stock.

71

356.     Holders of the Series A Preferred Stock elected Chris Lewis as a director on the Board.

357.     All other directors from the 2006 Board remained (collectively, with Chris Lewis, the "2007 Board").

358.     Although McGrath had previously informed the Investors that the institutional investment from GunnAllen would be used to fund future acquisitions, funds generated through the Series A Preferred Stock offering were also being used to fund the acquisitions.

359.     Upon information and belief, funds generated from the sale of Common Stock were also being used to pursue additional acquisitions.

360.     At the time, however, Domin-8 already had substantial debt from previous acquisitions.

361.     Subsequent to December 31, 2006, Domin-8 had to renegotiate the original promissory notes for the initial acquisition it made in 2005, which was purchased for $4,820,000 in promissory notes and $536,000 in cash.

362.     Domin-8 had to renegotiate these notes, even though the funds generated from the 2005 Series C and 2006 Series D Subordinated Convertible Debentures were supposed to finance this and the other acquisitions that the Company had made.

363.     The funds generated from the 2005 Series C and 2006 Series D Subordinated Convertible Debentures alone greatly exceeded the cost of the three acquisitions that Domin-8 had completed through December 31, 2006.

72

mdw
Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

364.     When Domin-8 Enterprise, Inc. decided to use the funds generated from the institutional investment and the Series A Preferred Stock and Common Stock to pursue additional acquisitions, it knew or should have known that it was already overburdened with debt and operating at a loss.

365.     Upon information and belief, the 2006 Board was or should have been aware and / or approved of the use of the funds in the prescribed manner.

### Debt Offerings

### *2007 Series A and Series B Subordinated Debentures*

366.     As of January 2007, Domin-8 already held the second largest market share of software providers to the apartment industry.

367.     Although Domin-8 knew or should have known that it was already overburdened with debt and operating at a substantial loss, it continued to pursue industry acquisitions aggressively.

368.     Domin-8 completed the Winning Edge and Rent Right acquisitions in early 2007.

369.     On January 9, 2007, Domin-8, through McGrath, informed the Investors that the value-added services that the Company expected to sell to Winning Edge and Rent Right customers would generate "over $50,000,000 in five years."

370.     McGrath also stated that the Winning Edge and Rent Right acquisitions would "[a]dd additional revenue of an initial $1,100,000 and a forecast [of] $2,500,000+ for 2007" and "[p]rovide an expected $1,200,000 Ebitda contribution to Domin-8 in 2007."

73

371.     Another acquisition, Property Automation, was also expected after the second 25% of the institutional financing from GunnAllen closed.

372.     On January 9, 2007, Domin-8, through McGrath, informed the Investors that "[u]pon receipt of the final 50% of the funds [the Company] [would] make the final acquisitions contemplated with the financing."

373.     Despite informing the Investors only four months earlier that the institutional financing would be used "to grow the Company ….," Domin-8 ultimately did not have the financial resources to complete the acquisitions.

374.     Because Domin-8 Enterprise did not have the financial resources to complete the acquisitions, it, along with GunnAllen, offered a round of debentures (the "2007 Series A Subordinated Debentures").

375.     In May 2007, Domin-8, through McGrath, represented to the Investors that the Company "expect[ed] th[e] debt offering to go very quickly," and that the Company "prefer[red] to reward … existing shareholders with th[e] lucrative monthly paying investment …."

376.     Upon information and belief, Domin-8, through McGrath, also continued to hold out the prospect of an IPO or buy-out to encourage Investors to participate in the offering.

377.     Domin-8 offered to sell 70 units of the 2007 Series A Subordinated Debentures at a purchase price of $100,000 per unit for a total offering of $7,000,000.

378.     The 2007 Series A Subordinated Debentures were redeemable in whole or in part at the option of the Company under certain circumstances at a redemption price equal

74

to 102% through June 30, 2008, 101% through June 30, 2009, or 100% after June 30, 2009, of the outstanding principal amount of the debentures, plus accrued interest thereon through the date of redemption.

379.    The maturity date of the 2007 Series A Subordinated Debentures was June 30, 2010.

380.    Investors who purchased the 2007 Series A Subordinated Debentures also received warrants to purchase Common Stock in Domin-8.

381.    Each unit purchased entitled the Investor to purchase up to 1,200 shares of common stock, at $0.001 par value per share, for each year that the 2007 Series A Subordinated Debenture was outstanding to a maximum of 3,600 shares.   The exercise price for each warrant was $4.19 per share.

382.    Another round of debentures soon followed (the "2007 Series B Subordinated Debentures").

383.    Domin-8 offered to sell 50 units of the 2007 Series B Subordinated Debentures at a purchase price of $100,000 per unit for a total offering of $5,000,000.

384.    The 2007 Series B Subordinated Debentures were redeemable, in whole or in part, at Domin-8's option at any time at a redemption price equal to 100% of the outstanding principal amount of the debentures, plus accrued interest thereon to the date of redemption.

385.    The maturity date of the 2007 Series B Subordinated Debentures was December 31, 2010.

386.     Like the Investors who purchased the 2007 Series A Subordinated Debentures, Investors who purchased the 2007 Series B Subordinated Debentures also received warrants to purchase Common Stock in Domin-8.  The exercise price for each warrant was $4.61 per share.

387.     Each unit purchased entitled the Investor to purchase up to 52 shares of common stock, at $0.001 par value per share, for each month that the 2007 Series B Subordinated Debenture was outstanding to a maximum of 2,184 shares.

388.     The 2007 Series A and Series B Subordinated Debenture offerings were purportedly exempt from registration under the Securities Exchange Act of 1933.

389.     At or around the time that it began offering the 2007 Series A and Series B Subordinated Debentures, Domin-8 approached DeWaay, a securities broker-dealer, about the possibility of his clients investing in Domin-8.

390.     DeWaay admittedly was intrigued by Domin-8's business plan and the opportunities available in the property management software industry.

391.     DeWaay signed a selling agreement with Domin-8, pursuant to which he sold the 2007 Series A and Series B Subordinated Debentures to certain Investors.

392.     As part of its own efforts to sell the 2007 Series A and Series B Subordinated Debentures, the company, through McGrath, gave at least two separate presentations to Investors in Arizona on June 6 and August 30, 2007.

393.     Investors invited to the presentation were again told that Domin-8 was positioning itself to go public, or, alternatively, to be purchased by another company.

Y:\Clients\MH-01\Domin 8\Pleadings\Complaint (FINAL 02).doc                    2337.000

394.      Certain Investors in Arizona attended McGrath's presentations on June 6 and August 30, 2007.

395.      Based on the representations and assurance about the Company made in the communications circulated to the Investors and during the presentations, certain Investors in Arizona and elsewhere purchased the 2007 Series A and Series B Subordinated Debentures from Domin-8, GunnAllen, DeWaay, and other broker-dealers.

396.      Domin-8 ultimately raised $6 M and $1.9 M in funds through the 2007 Series A and Series B Subordinated Debentures, respectively.

397.      Two additional acquisitions, TCG Technologies and Spectra, followed after Domin-8 began offering the 2007 Series A and Series B Subordinated Debentures.

398.      Prior to making the Spectra acquisition, the 2007 Board received a confidential memorandum forecasting financial projections for the acquired company.

399.      Upon information and belief, similar memoranda had been prepared and circulated to the boards in connection with other acquisitions.

400.      Revenues for the first six months of 2007 grew, but were still far short of McGrath's inflated prior projections based on the acquisitions and sale of value-added services.

401.      At a board meeting in July 2007, the 2007 Board was presented with revised forecasts for the Company.

402.      Among other things, the revised forecasts adjusted EBITDA downward to negative $1,446,818 from negative $1,291,670.

77

403.     Not even one year earlier, however, the Company, through McGrath, had given projections to the Investors showing EBITDA of $20,863,669 for 2007.

404.     This information did or should have been put the 2007 Board, McGrath, and other officers in attendance at the meeting on notice that the Company was not performing as expected, particularly in light of its aggressive acquisition strategy.

405.     Nonetheless, Domin-8, through McGrath, informed the Investors on October 18, 2007, that revenues for the first six months were $4.491 M, as compared to $1.277 M for the same period in 2006.

406.     Upon information and belief, the Company's selective communication of this information was intended to leave the Investors with the impression that the acquisition strategy was working as expected when that was not actually the case.

407.     To bolster this impression, McGrath also informed the Investors on October 18, 2007, that operating losses had supposedly improved over the same period in the prior year.

408.     Upon information and belief, this information was disseminated by McGrath to the Investors with the knowledge and approval of the 2007 Board.

409.     Only seven months later, however, the Investors would learn from McGrath that unaudited revenues for 2007 were ultimately just $9.5 M (audited revenues were actually $7.9 M), as compared to $3.2 M for 2006, and that operating costs had grown by a staggering $5.1 M to $11.7 M.

410.     Gross profits increased minimally by approximately $1.2 M during 2007.

Y:\Clients\MH-01\Domin 8\Pleadings\Complaint (FINAL 02).doc                                    2337.000

411.     This gross profit figure was less than the $1,751,782 gross profit figure that was presented to the 2007 Board during a board meeting in October 2007 (the "October 2007 Board Meeting").

412.     During the October 2007 Board Meeting, the 2007 Board was also presented with revenue projections for 2008.

413.     The projections forecasted revenues in the amount of $25 M for 2008.

414.     Factors besides soaring operating costs were also affecting the Company's finances.

415.     In 2007, the Company repaid a note of $50,000 that had been made by an entity controlled by McGrath.

416.     Upon information and belief, the $50,000 note evidenced the Company's indebtedness to WaKul for the rights to Paradigm.

417.     In 2007, the Company also repaid the outstanding debt to Shamblee's limited liability company, Computron, in full.

418.     By November 2007, Ronald Rapp had replaced Charles V. Shamblee III, who had been serving on the 2007 Board.

419.     All other directors on the 2007 Board remained in place (the "2008 Board").

420.     In the fall of 2007, the Company hired Daniel Buettin ("Buettin") as Chief Financial Officer and John Ensign as Chief Legal Officer.

421.     According to Buettin, "one of [his] goals … was to engage new auditors to partner with [the company] for the years ahead and to immediately improve on the quality of financial reporting."

422.     John Ensign reported directly to Buettin as Chief Legal Officer.

***2007 Series C Senior Subordinated Convertible Debentures***

423.     On October 18, 2007, Domin-8, through McGrath, informed the Investors that the Company was seeking outside financing in the amount of $7 M, which would be secured by senior notes (the "Senior Notes").

424.     The $7 M would be used to refinance certain promissory note obligations that Domin-8 had assumed in connection with the numerous acquisitions.

425.     McGrath also advised that yet another round of debentures would be forthcoming (the "2007 Series C Senior Subordinated Convertible Debentures").

426.     Holders of the majority of the Series A Preferred Stock and the 2007 Series A and Series B Subordinated Debentures had to vote to approve the Senior Notes and the 2007 Series C Senior Subordinated Convertible Debentures.

427.     Holders of the majority of the Series A Preferred Stock and the 2007 Series A and Series B Subordinated Debentures voted to approve the Senior Notes and the 2007 Series C Senior Subordinated Debentures.

428.     Domin-8 offered to sell units of the 2007 Series C Senior Subordinated Convertible Debentures at a purchase price of $50,000 per unit for a total offering of $10 M.

429.     The 2007 Series C Senior Subordinated Convertible Debentures could not be pre-paid or redeemed prior to their maturity, except in connection with a "liquidity event."

430.     The maturity date of the 2007 Series C Senior Subordinated Convertible Debentures was December 31, 2012.

431.     The 2007 Series C Senior Subordinated Convertible Debenture offering was purportedly exempt from registration under the Securities Exchange Act of 1933.

432.     The 2007 Series C Senior Subordinated Convertible Debentures could be converted into Common Stock in Domin-8 in the event of a "liquidity event," as defined in the Company's Certificate of Incorporation.

433.     Domin-8 gave holders of the 2007 Series A and Series B Subordinated Debentures the right to convert the face value of those debentures into the 2007 Series C Senior Subordinated Convertible Debentures in a cashless transaction.

434.     Funds generated from the 2007 Series C Senior Subordinated Convertible Debentures were supposed to be used primarily to fund working capital needs and secondarily to consummate the remaining acquisitions.

435.     At the time when Domin-8 began offering the 2007 Series C Senior Subordinate Convertible Debentures, however, the Company had already achieved its goal of attaining the leading market share position among property management enterprise software vendors serving multi-family residential property managers.

436.     Despite attaining a leading market share position through the acquisitions, Domin-8 was still falling far short of its forecasted projections.

437.     Nonetheless, Domin-8, through McGrath, informed the Investors on November 1, 2007, that "[t]he Company [was] on target in 2007 to meet its projected organic growth goals."

. . .

. . .

81

438.     Upon information and belief, this statement was inaccurate or was misleading because it omitted material information with respect to the Company's growth goals based on acquisitions.

439.     More specifically, McGrath touted that "[t]he completion of five strategic acquisitions … resulted in an increase in the Company's user base by approximately 5,250,000 units," but he failed to explain to the Investors that this did not correlate with increased profits for the Company, particularly in light of the soaring costs associated with those acquisitions.

440.     Only one month after communicating this information to the Investors, Domin-8 held a board meeting (the "December 2007 Board Meeting") to discuss the state of the company's business affairs, including its finances.

441.     At the December 2007 Board Meeting, it was revealed that Domin-8 had only closed roughly 300,000 units for its background screening services.

442.     This was far less than the Company had originally projected based on the acquisitions.

443.     For the month of November 2007 alone, Domin-8 had fallen approximately 50,000 units short of its projections.

444.     During that same meeting, it was also revealed that the Company's "rapid" acquisition strategy was not translating into industry name recognition for the Company.

445.     The acquisition strategy also was not improving the Company's overall finances as had been expected and repeatedly represented to the Investors.

82

446.     Whereas the Company had projected positive cash flows for 2007 just two years earlier, it actually had negative cash flows in 2007.

447.     Additionally, the Company now did not expect to be operating cash flow positive until the third quarter of 2008, even though it previously informed the Investors that it expected to be operating cash flow positive in 2007.

448.     Finally, a review of the Company's finances also revealed "significant cleanup of prior accounting entries" and "reconciliations in nearly all areas."

449.     In connection with reviewing the Company's finances, the 2007 Board also discussed the "[c]osts of equity and debt offerings."

450.     The information from this meeting or other board meetings was not publically disseminated to the Investors.

451.     Upon information and belief, the 2007 Board and McGrath were aware of the state of the company's finances prior to the December 2007 Board Meeting and at the time when they approved and solicited investments in the Series A Preferred Stock, the 2007 Series A and Series B Subordinated Debentures, and the 2007 Series C Senior Subordinated Convertible Debentures.

452.     In fact, approximately two months before the December 2007 Board Meeting, McGrath had actually informed the Investors that "[the company] believe[d] [it would] achieve positive cash flow from operations within the next 9 -12 months."

453.     Domin-8, whether through McGrath or another director or officer, did not disclose the true state of Domin-8's finances to the Investors when it had asked for them to

83

approve the Senior Notes and the 2007 Series C Senior Subordinated Convertible Debentures.

454.     On January 30, 2008, Domin-8, through McGrath, gave a presentation to Investors in Arizona to discuss Domin-8's business affairs and the 2007 Series C Senior Subordinated Convertible Debentures.

455.     Certain Investors in Arizona attended McGrath's presentation on January 30, 2008.

456.     McGrath told the Investors invited to the presentation that Domin-8 was positioning itself to go public, or, alternatively, to be purchased by another company, by the end of 2009 or early 2010.

457.     McGrath also told the Investors that, if this happened, they could expect their shares of stock to rise from $3.81 per share to $55-$60 per share.

458.     This statement was recklessly calculated or intended to entice the Investors to convert the 2007 Series A and Series B Subordinated Debentures into the 2007 Series C Senior Subordinated Convertible Debentures and / or purchase the 2007 Series C Senior Subordinated Convertible Debentures.

459.     Specifically, the ability to convert the 2007 Series C Senior Subordinated Convertible Debentures into Common Stock would result in a windfall to the Investors, who would be able to own shares of Common Stock at a fraction of the IPO price.

460.     McGrath also said again that the 2007 Series C Senior Subordinated Convertible Debentures would be the final opportunity to invest in Domin-8 before it went public or was sold to another company.

84

461.     McGrath had made this same representation to the Investors on at least two prior occasions in connection with other offerings.

462.     Based on the representations and assurances in the communications circulated to the Investors and during presentations, certain Investors in Arizona and elsewhere purchased the 2007 Series C Senior Subordinated Convertible Debentures from Domin-8, GunnAllen, DeWaay, and other broker-dealers.

463.     As of March 2008, most of the units of the 2007 Series C Senior Subordinated Convertible Debentures had been sold.

464.     Investors were informed that only a small number of units remained, with the balance expected to be sold by the end of March 2008.

465.     Domin-8 subsequently increased the total offering from $10 M to $12 M.

466.     To accommodate the increased offering, the deadline for purchasing the 2007 Series C Senior Subordinated Convertible Debentures was extended until May 30, 2008.

467.     McGrath held another presentation to Investors in Arizona on April 30, 2008, during which he discussed the 2007 Series C Senior Subordinated Convertible Debentures.

468.     Domin-8 ultimately raised $11,185,650 through the 2007 Series C Senior Subordinated Convertible Debentures.

**Subordination of the 2007 Series A and Series B Subordinated
Debentures and 2007 Series C Subordinated Convertible Debentures**

469.     Between January 2007 and May 2008, Domin-8 Enterprise Inc. had raised more than $40 M through the debt and equity offerings (i.e., Series A Preferred Stock,

85

2007 Series A and Series B Subordinated Debentures, and the 2007 Series C Senior Subordinated Convertible Debentures).

470.     Excluding the competitor that Domin-8 had previously acquired for common units valued at $44,182, however, the combined purchase price of all other acquisitions was only $12.72 M.

471.     Despite Domin-8 having funds that exceeded the costs of the acquisitions many times over, it never paid for the acquisitions in full.

472.     As a consequence, Buettin had to renegotiate the promissory notes (the "Seller Notes") in 2007 and again in April 2008 when Domin-8 did not have the funds to finish paying the notes.

473.     As of May 2008, Domin-8 still had approximately $7 M in outstanding promissory notes in connection with the prior acquisitions.

474.     Although Domin-8 had originally intended to retire this debt with the Senior Notes, that financing did not come through as expected.

475.     Consequently, Domin-8 purportedly had to divert funds from the 2007 Series C Senior Subordinated Convertible Debentures to continue to pay the Seller Notes that it was unable to retire with the $7 M in funds from the Senior Notes.

476.     In May 2008, Domin-8, through McGrath, advised that the company was going to have to seek outside financing to pay the Seller Notes.

477.     The outside financing required the Investors to subordinate each class of debentures to the senior note in an amount up to $15 M (the "Senior Note Offering").

86

478.     In accordance with Domin-8's Certificate of Incorporation, McGrath requested that holders of the majority of the Series A Preferred Stock and the 2007 Series A and Series B Subordinated Debentures vote to approve the Senior Note Offering.

479.     In addition, McGrath requested that the holders approve other measures as well.

480.     Holders were also asked to approve:   (1) certain amendments to the Certificate of Incorporation, including an amendment permitting the Company to increase the authorized number of shares of Common Stock; (2) a 2007 stock option plan granting certain employees and non-employees the option to purchase Common Stock; and (3) a 2008 equity compensation and long-term incentive plan providing for additional stock options to employees and management.

481.     Respectively, the holders were asked to approve these measures because:  (1) the authorized number of shares of Common Stock had to be increased to accommodate the potential conversion of outstanding warrants, options, and convertible debentures into Common Stock; (2) the Board of Directors had already approved the 2007 stock option plan a year earlier in connection with the Exchange Offer and granted options pursuant to the plan, but had never obtained the holders' approval; and (3) the Board of Directors had granted additional stock options as an incentive to management under the 2008 plan.

482.     Domin-8 informed the Investors that its actions were directed towards its goal of taking the company public.

483.     The majority of holders, including certain Investors, approved the Senior Note Offering and the other measures.

87

484.     In May 2008, the Company also held another board meeting (the "May 2008 Board Meeting").

485.     During the May 2008 Board Meeting, the 2008 Board discussed projected revenues for 2008.

486.     Projected total revenues fell approximately $1.5 M short of those projected at the December 2007 Board Meeting only five months earlier.

487.     Projected total revenues for 2008 were adjusted accordingly from $27.9 M to approximately $19.4 M.

488.     These adjusted projected revenues were approximately $31 M and $62.3 M less than the Company had projected in 2005 and 2006, respectively.

489.     During the May 2008 Board Meeting, the 2008 Board also discussed revenue projections for the acquisitions.

490.     PMAS, which McGrath had previously represented was expected to generate "over $7 M in revenue" in 2006 alone, was projected to generate only $630,951 in revenue in 2008.

491.     Similarly, LogicBuilt was originally projected to increase revenue by "$600,000 - $700,000 …," but as of May 2008, was only projected to generate revenues of $101,040.

492.     The same was also true for Winning Edge, which was expected to have first year revenues of "approximately $600,000 with a significant upside potential," but, in fact, was only expected to generate revenues of $104,254 in 2008.

88

493.     Upon information and belief, this was not the first time that the Company's directors and officers had been presented with actual and projected revenues for the acquisitions.

494.     Despite knowing or should having known that the acquisitions were falling far short of projections and were increasing operating costs significantly, the Company's directors and officers continued to hold out the Company as a sound investment and champion its future growth prospects.

495.     If communicated to the Investors, this information would have affected their vote to approve the measures, including the Senior Note Offering and the 2007 Series C Senior Subordinated Convertible Debenture offering.

**Domin-8 Enterprise Inc.'s Finances Do Not Improve**

496.     In mid-2008, Domin-8 began informing the Investors that "significant revenue growth" was expected in the second half of 2008.

497.     Domin-8 also informed the Investors that "[the Company] [would] achieve a positive cash flow from … operations on a quarterly basis by early 2009."

498.     Between 2006 and 2008, however, Domin-8's revenues and profits had grown substantially less than expected or even previously reported.

499.     In 2006 and 2007, respectively, the Company's gross profits were negative $1.1 M and $1.2 M according to McGrath in a communication to the Investors from May 13, 2008.

500.     In 2005, however, the Company gave projections to the Investors showing gross profits of roughly $9.9 M and $25.6 M for 2006 and 2007, respectively.

89

501.     Similarly, in 2006, the Company gave projections to the Investors showing gross profits of roughly $3 M and $32.7 M for these same years.

502.     In addition to misstating its gross profits, Domin-8 had grossly underestimated its operating costs.

503.     Although McGrath informed the Investors on May 13, 2008, that the Company had "planned and expected" for "infrastructure and overhead costs [to grow] to $11.7 million in 2007 from $6.6 million in 2006," the quarterly cost figures for 2007 discussed during the December 2007 Board Meeting reflected operating costs totaling only $6.235 M.

504.     In 2007, these soaring costs caused the Company to suffer an adjusted operating loss of $8.8 M according to Buettin and Thistleon in a communication to the Investors from April 3. 2009.

505.     This loss was not consistent with the roughly $11.5 M in net profits that McGrath had projected for the Company only three years earlier.

506.     Because the Company's figures were falling far short of projections and operating costs were soaring, Domin-8 was desperately in need of additional money.

### *2008 Series D Subordinated Debenture*

507.     On June 25, 2008, the 2008 Board held a meeting to discuss the current state of the Company's finances and another proposed debt offering.

508.     After discussing the Company's finances and the terms of the proposed debt offering with McGrath, Buettin, and others, the 2008 Board unanimously approved the debt offering.

90

509.     The debt offering, which was intended to provide the Company with additional capital, was originally to be led by GunnAllen.

510.     On June 30, 2008, Buettin informed the Investors that the Company's financials for 2006 and 2007 had to be restated.

511.     On August 20, 2008, Domin-8, through McGrath and Buettin, informed the Investors that there would be another debt offering (the "2008 Series D Subordinated Debenture").

512.     The 2008 Series D Subordinated Debentures held a superior lien on substantially all of the assets of the Company and its subsidiaries, subject only to the Senior Note Offering.

513.     To this end, the 2008 Series D Subordinated Debentures were senior to the 2007 Series A and Series B Subordinated Debentures and the 2007 Series C Subordinated Convertible Debentures.

514.     Domin-8 offered to sell 240 units of the 2008 Series D Subordinated Debentures at a purchase price of $50,000 per unit for a total offering of $12 M, with an over-allotment option to sell up to an additional $3 M in units.

515.     The 2008 Series D Senior Subordinated Debentures were redeemable, in whole or in part, at Domin-8's option between July 31, 2009 and July 31, 2010 at a redemption price equal to 102%, between August 1, 2010 and July 31, 2011 at 101%, or after August 1, 2011 at 100% of the outstanding principal amount of the 2008 Series D Senior Subordinated Debentures, plus accrued interest thereon to the date of redemption.

516.     The maturity date of the 2008 Series D Subordinated Debenture was in 2013.

91

517.     The Investors who purchased the 2008 Series D Subordinated Debenture also received warrants to purchase Common Stock in Domin-8.

518.     Each unit purchased initially entitled the Investor to purchase up to 857 shares of Common Stock, at $0.001 par value per share at an exercise price of $7.00 per share.

519.     Subsequently, Domin-8 modified the terms of the offering to entitle each Investor to purchase up to 5,084 shares of Common Stock at the exercise price of $2.95.

520.     The maximum aggregate number of warrant shares offered was 1,220,160 at the maximum offering, with an additional 305,040 warrant shares offered for the full amount of the over-allotment option.

521.     The 2008 Series D Subordinated Debenture offering was purportedly exempt from registration under the Securities Exchange Act of 1933.

522.     On September 26, 2008, Domin-8, through McGrath, communicated to the Investors that "completing [the 2008 Series D Subordinated Debenture offering]   [was] essential and critical to the company and [its] ability to execute [its] business plan."

523.     McGrath also explained that the Company "[had] engaged GunnAllen Financial as the lead underwriting firm, and have been joined in the selling group by DeWaay Financial Network …."

524.     At or around this same time, the 2008 Board also began to consider the possibility of filing bankruptcy.

. . .

. . .

92

525.     On October 6, 2008, Domin-8 Enterprise, Inc., through McGrath, gave a presentation to Investors in Arizona to discuss Domin-8 LLC's business affairs and the 2008 Series D Senior Subordinated Debentures.

526.     Certain Investors in Arizona attended McGrath's presentation on October 6, 2008.

527.     Based on the representations and assurances made in the communications to the Investors and during the presentations, certain Investors in Arizona and elsewhere purchased the 2008 Series D Senior Subordinated  Debentures from Domin-8 Enterprise, Inc., GunnAllen, DeWaay, and other broker-dealers.

### Domin-8 Files Bankruptcy and Seeks A Quick Sec. 363 Sale

528.     The issues with the Company's finances persisted throughout the remainder of 2008 and into 2009.

529.     As of the end of 2008, only $5 M had been raised through the 2008 Series D Senior Subordinated Debentures according to a communication from Buettin and Thistleton to the Investors from April 3, 2009.

530.     Upon information and belief, due to the lack of funds being generated through the 2008 Series D Senior Subordinated  Debentures offering, Domin-8 undertook to hire an investment banker for purposes of identifying interested private equity or venture capital sources to potentially acquire the Company.

531.     Upon information and belief, Domin-8 solicited and held discussions with numerous investment banks over a period of ninety days.

93

532.      Upon information and belief, all of them declined the proposed assignment because they did not foresee successfully locating a buyer for the Company.

533.      Upon information and belief, the investment banks suggested restructuring Domin-8's over-weighted capital structure or filing bankruptcy as prerequisites for a potential private equity investor or suitor to bid for the Company's assets.

534.      Upon information and belief, the 2008 Board was or should have been aware and / or approved these discussions with the investment banks.

535.      At or around the same time that Domin-8 was exploring the possibility of a private equity investor or suitor purchasing its assets, it was continuing to offer the 2008 Series D Senior Subordinated Debentures to the Investors.

536.      Upon information and belief, the 2008 Board was or should have been aware of and / or approved the continued offering of the 2008 Series D Senior Subordinated Debentures and, more specifically, was or should have been aware that representations were being made to the Investors to induce them to invest in the 2008 Series D Senior Subordinated Debentures.

537.       Upon information and belief, the 2008 Board approved the continued offering of the 2008 Series D Senior Subordinated Debentures despite knowing that the Company was already overleveraged with debt to the point where it was unable to attract private equity investors or other potential suitors.

538.      Upon information and belief, although the majority of investment banks purportedly would not work with Domin-8 because it was overleveraged with debt and would need to restructure or file bankruptcy before it could be acquired, one investment

bank with whom GunnAllen already had an existing relationship agreed to work with the Company on capital restructuring, bankruptcy filing options, and seeking a potential equity partner or buyer.

539.     Upon information and belief, the investment bank, Hyde Park Capital Partners ("Hyde Park"), analyzed Domin-8's capital options and developed an offering memorandum, which they circulated to potential capital sources around the country based on their knowledge of the capital marketplace and the specific interests of the sources.

540.     Upon information and belief, Domin-8 and Hyde Park contacted and provided preliminary information to sixty-to-eighty interested parties.

541.     While Domin-8 and Hyde Park were purportedly reaching out to parties interested in investing in or acquiring Domin-8, the Company's financial situation continued to worsen.

542.     By early 2009, Domin-8's finances were in such poor condition was the Company was having difficulty paying vendors.

543.     On January 5, 2009, Domin-8 announced that McGrath had resigned as CEO and would be replaced by Thistleton.

544.     McGrath continued to serve on the board of directors, however.

545.     McGrath served on the board with the rest of the 2008 Board, as well as Jay Hill and Jerry Kendall, who replaced Ronald J. Rapp and Chris A Lewis as the directors representing the holders of the Series A Preferred Stock (the "2009 Board").

546.     In February 2009, a few retail brokers, including DeWaay and Labine, who had long been associated with the Company's fundraising efforts, began renewed efforts to

95

mdw

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9600

energize the 2008 Series D Senior Subordinated Debentures offering with other brokers who had been associated with the Company and with their clients.

547.     On April 3, 2009, Domin-8, through Thistleton and Buettin, informed the Investors that "the brokers ha[d] received commitments for more than $2 million in new funding in 2009 and [the Company] ha[d] received approximately $1.5 million of this new funding."

548.     Thistleton and Buettin further informed the Investors that "the brokers responsible for these efforts ha[d] also recently assured [the Company] that they plan to continue to raise at least $1 million per month until the Offering is fully subscribed."

549.     These funds were needed to pay the Seller Notes, which totaled $3.6 M.

550.     These funds were also needed to pay vendors who had not been paid and to pay interest on the outstanding debentures.

551.     In an effort to induce the Investors to purchase the 2008 Series D Subordinated Debentures, the Company supplemented the original private placement memorandum.

552.     The supplement presented unaudited results of operations for the first quarter and characterized them positively in light of the same figures one year earlier.

553.     Overall, this supplement was misleading because, the company was on the verge of bankruptcy and had been so for some time.

554.     Upon information and belief, during a subsequent board meeting in Tampa, attended by one of the Investors, Labine committed to the availability of the funds.

Y:\Clients\MH-01\Domin 8\Pleadings\Complaint (FINAL 02).doc                                    2337.000

555.    In addition, senior management of Domin-8, along with GunnAllen, held a lunch meeting in Arizona with the Investors in May 2009 to discuss the Company's affairs and the 2008 Series D Subordinated Debentures.

556.    The meeting was attended by McGrath, Thistleton, and Buettin.

557.    Certain Investors in Arizona attended the lunch meeting.

558.    Certain Investors in Arizona and elsewhere purchased the 2008 Series D Senior Subordinated  Debentures from Domin-8, GunnAllen, DeWaay, and other broker-dealers after attending the meeting.

559.    At or around the same time that Buettin and Thistleton were touting the importance of the Investors participating in the 2008 Series D Senior Subordinated Debentures, Domin-8 was still trying to locate a potential equity investor or other strategic buyer.

560.    In April 2009, Domin-8 and Hyde Park began to hold discussions with private equity investors and strategic buyers who had received preliminary information about the Company.

561.    Upon information and belief, the 2009 Board was or should have been aware and /or approved of the ongoing attempts to locate a private equity investor and strategic buyer for Domin-8 while the Company continued to offer the 2008 Series D Senior Subordinated Debenture to the Investors.

562.    Upon information and belief, over the following two-to-three months, Domin-8 generated a substantial amount of funds through the 2008 Series D Senior Subordinated  Debentures.

97

563.     Upon information and belief, the overwhelming majority of those investments were placed by Labine as a broker- agent for DeWaay.

564.     Upon information and belief, Domin-8 subsequently reduced its contract with Hyde Park by 50% and ordered it to slow its efforts to locate an equity investor or strategic buyer.

565.     Upon information and belief, the 2009 Board was or should have been aware and/or approved of the reducing the contract with Hyde Park and slowing efforts to locate an equity investor or strategic buyer.

566.     Upon information and belief, just one month later, funding generated through the 2008 Series D Senior Subordinated Debentures inexplicably declined.

567.     Upon information and belief, this caused Domin-8 to direct Hyde Park to increase its efforts to locate an equity investor or strategic buyer.

568.     Upon information and belief, the 2009 Board was or should have been aware and/or approved of Hyde Park increasing its efforts to locate an equity investor or strategic buyer.

569.     Upon information and belief, between the middle of July and end of August, three potential buyers expressed interest in purchasing Domin-8's assets.

570.     Upon information and belief, the purchase was conditioned on Domin-8 filing bankruptcy and allowing the buyer to purchase the assets out of the bankruptcy.

571.     One of the potential buyers of who emerged between the middle of July and the end of August was a group that would later become known as the D8 Entities.

98

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

mdw

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9600

572.    Upon information and belief, the principals of the D8 Entities were DeWaay and Labine, who again had placed the vast majority of the investments in the 2008 Series D Senior Subordinated Debentures and participated in previous debt and equity offerings for the Company.

573.    Upon information and belief, with respect to the 2008 Series D Senior Subordinated Debentures alone, DeWaay and Labine placed approximately $7.8 M, or nearly two-thirds of the original allotment, in investments.

574.    Upon information and belief, the D8 Entities agreed to provide debtor-in-possession financing in exchange for the right to purchase Domin-8's assets out of the bankruptcy.

575.    Upon information and belief, the 2009 Board was or should have been aware and /or approved of the negotiations with D8 Entities, as well as the other buyers who conditioned their investment on the Company filing bankruptcy.

576.    At the time that the 2009 Board approved these negotiations, they were also aware and approved of the ongoing offering of the 2008 Series D Senior Subordinated Debentures to the Investors.

577.    Upon information and belief, in or about August 2009, Buettin met with Labine in California.

578.    Upon information and belief, Buettin and Labine discussed Domin-8 filing bankruptcy.

579.    According to a September 29, 2009 letter from DeWaay, "[i]n the interest of DeWaay's clients, [DeWaay] engaged Domin-8's new management team … to create an

99

option in the bankruptcy process that may help preserve DeWaay's clients investments while not letting them fall prey to other bidders' actions."

580.     A subsequent letter from DeWaay elaborates further, going as far as to state that "[a]fter it became clear Domin-8 was going to file for bankruptcy protection, Domin-8's management team approached [DeWaay] about arranging a "Stalking Horse" bid in the bankruptcy process to purchase the assets of Domin-8."

581.     Upon information and belief, Domin-8's "new management team" included Buettin and Thistleton, both whom assumed more prominent roles after McGrath's resignation as Chief Executive Officer.

582.     Upon information and belief, on September 16, 2009, GunnAllen broker Frankie Demartini proposed a $5.2 M funding source to Domin-8's management that was comprised of investors organized by McGrath.

583.     Upon information and belief, the monies from this source were ready to be wired.

584.     Upon information and belief, Dimartini informed Ensign that the funds were available immediately.

585.     Upon information and belief, Ensign informed Dimartini that this would save the company.

586.     On September 17, 2009, however, Domin-8 filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Ohio.

587.     Upon information and belief, the 2009 Board, with the recommendation of Buettin, Thistleton, and Ensign, made the decision to file bankruptcy.

100

588.    Only four days after Domin-8 filed for bankruptcy, the Company entered into an asset purchase agreement (the "APA") with one or more of the D8 Entities, which were incorporated by DeWaay and / or Labine the same day.

589.    Upon information and belief, the 2009 Board resigned shortly after Domin-8 filed bankruptcy.

590.    Upon information and belief, Buettin, Thistleton, and Ensign were responsible for making all decisions and otherwise managing the Company after the 2009 Board resigned.

591.    Upon information and belief, the 2009 Board was or should have been aware and / or approved of the APA or, alternatively, "new management," including Buettin, Thistleton, and Ensign, were aware and approved of the APA.

592.    Upon information and belief, if the D8 Entities' attempt to purchase the assets of Domin-8 was successful, Domin-8's management would have received favorable stock options and continued employment with the new company.

593.    Only two days after entering into the APA with the D8 Entities, Domin-8's bankruptcy counsel filed a motion seeking the bankruptcy court's approval of the sale of Domin-8's assets to D8 Funding.

594.    Upon information and belief, the 2009 Board was or should have been aware and / or approved of bankruptcy counsel filing the motion seeking the bankruptcy court's approval of the sale of Domin-8's assets to the D8 Entities, or, alternatively, "new management," including Buettin, Thistleton, and Ensign, were aware and approved of

bankruptcy counsel filing the motion seeking the bankruptcy court's approval of the sale of Domin-8's assets to the D8 Entities.

595.     On September 24, 2009, DeWaay stated that he was "committed to reinstating DeWaay investors …."

596.     To carry out protecting the "DeWaay investors," DeWaay and / or LaBine formed one of the D8 Entities, D8 Acquisition Corp. ("D8 Acquisition"), a Delaware corporation, on October 7, 2009.

597.     Upon information and belief, D8 Acquisition was formed for the purpose of generating the funds that the D8 Entities needed to purchase Domin-8's assets under the APA.

598.     According to a private placement memorandum, certain high-ranking executives of Domin-8 would continue to be employed by one or more of the D8 Entities.

599.     Buettin, Thistleton, and Ensign were to continue to serve as officers.

600.     In addition, Thistleton was to serve on the new board of directors.

601.     As officers, Buettin, Thistleton, and Ensign were to receive favorable stock options as they had under Domin-8's existing equity compensation and long-term incentive plans providing for stock options to employees and management.

602.     Upon information and belief, Buettin, Thistleton, and Ensign were all closely involved with the decision to file bankruptcy and sell Domin-8's assets to the D8 Entities.

603.     An auction for Domin-8's assets was eventually held on December 11, 2009.

604.     At the auction, one of the D8 Entities was the prevailing bidder.

605.     That bid, however, was subsequently challenged by RealPage, an industry competitor.

606.     RealPage subsequently purchased Domin-8's assets.

607.     As a consequence of the calculated bankruptcy filing and failed attempt to sell Domin-8's assets to D8 Funding, the Investors have lost all or a substantial portion of their investments in Domin-8.

## CLAIMS

## CLAIM I

### Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

*(By Investors in 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures Against 2007,[2] 2008,[3] and 2009[4] Boards)*

608.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

609.     In connection with offering the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures to the Investors, the 2007,

---

[2]     For purposes of all claims in this Complaint, the Defendants from the 2007 Board include:  (1) Greg McGrath; (2) Sean D. Curran; (3) Charles V. Shamblee III; and (4) Chris Lewis.

[3]     For purposes of all claims in this Complaint, the Defendants from the 2008 Board includes:  (1) Greg McGrath; (2) Sean D. Curran; (3) Ronald Rapp; and (4) Chris Lewis.

[4]     For purposes of all claims in this Complaint, the defendants from the 2009 Board includes:  (1) Greg McGrath; (2) Sean D. Curran; and (3) Jay Hill.

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

2008, and 2009 Boards engaged in acts, practices, and / or courses of conduct that operated as a fraud and deceit upon the Investors.

610.     The 2007, 2008, and 2009 Boards approved the offering and ongoing solicitation of investments in the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures, despite knowing or should having known that the Company would be unable to repay the debt because it had experienced anemic growth relative to its projections over the years, had soaring expenses, and was already overburdened with debt from previous acquisitions and debt offerings.

611.     In fact, the Company's financial state was so dire that the 2008 Board actually began discussing filing bankruptcy at or around the same time that the Company began offering the 2008 Series D Senior Subordinated Debentures.

612.     Upon information and belief, the 2009 Board also was or should have been aware and / or approved of the offering and ongoing solicitation of investments in the 2008 Series D Senior Subordinated Debentures after it was determined that the Company would file bankruptcy, and "management" had approached DeWaay about the "stalking horse" bid.  Further, the 2009 Board rejected the proposed $5.2 M in funding, which could have obviated the bankruptcy filing.

613.     Moreover, upon information and belief, the 2007, 2008, and 2009 Boards were or should have been aware and / or approved of the information about the Company's financial affairs, including projections and other figures, that was communicated to the Investors in connection with the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures, even though that information was

104

selectively communicated and taken out of context in relation to the Company's finances as a whole.

614.     The 2007, 2008, and 2009 Boards also knew or should have known that the funds generated by prior Securities had all or in part not been used as represented, which ultimately impaired the Company's ability to repay the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures.

615.     The 2007, 2008, and 2009 Boards knew or should have known the information that was communicated to the Investors was inaccurate and / or reasonably uncertain, and that additional information regarding the true state of the Company's financial affairs needed to be communicated to the Investors when statements were made about the Company's projections and other financial figures.

616.     The 2007, 2008, and 2009 Boards were reckless in taking these acts and making these omissions because they knew or should have known that the offering and solicitation of investments in the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures and failure to disclose information and the circumstances surrounding the offerings fully would cause the Investors to participate in the offerings without full knowledge or an understanding of the risks involved.

617.     The 2007, 2008, and 2009 Boards were further reckless because they were privy to Domin-8's financials and other information that showed that the Company would be unable to repay the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures and may not survive even with the infusion of additional funds.

618.     Alternatively, the 2007, 2008, and 2009 Boards' conduct of approving and offering the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures, as well as their failure to fully disclose information and circumstances surrounding the offering and solicitation of such investments, was intended to entice the Investors to invest substantial sums of money in the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures.

619.     Because the 2007, 2008 and 2009 Boards' approval of the offering and solicitation of the investments was recklessly calculated or intended to induce the Investors to purchase the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures, their acts and omissions were material to the Investors.

620.     Investors relied on the 2007, 2008, and 2009 Boards' reckless or intentional acts and omissions by purchasing the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures.

621.     The Investors did not and could not have reasonably discovered these acts and omissions until a reasonable time after the Company filed bankruptcy.

622.     But for the 2007, 2008, and 2009 Boards approving the offering and solicitation of the investments and the selective dissemination of information about the Company and its finances in connection with the same, the Investors would not have purchased the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures.

623.     The acts and omissions of the 2007, 2008, and 2009 Boards caused losses to Investors in the 2007 Series C Subordinated Convertible Debentures and 2008 Series D

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

106

Senior Subordinated Debentures because the Investors paid for debt securities that were essentially worthless since the Company was insolvent or near insolvent at the time of issuance.

624.     Further, the acts and omissions of the 2007, 2008, and 2009 Boards resulted in the loss of the Investors' investments by inducing investments in the Company that increased the Company's debt, which was a substantial factor contributing to the bankruptcy.

625.     The acts and omissions also caused the Investors in the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures to incur losses because the investments subordinated their debt and caused them to assume an inferior lien position in the event of nonpayment.

626.     The 2007, 2008, and 2009 Boards are jointly and severally liable for these losses to the Investors.

## CLAIM II

### Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

### (By Investors in the 2007 Series A and Series B Subordinated Debentures Against 2007 Board)

627.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

628.     In connection with the 2007 Series A and Series B Subordinated Debentures, the 2007 Board engaged in acts, practices, and / or courses of conduct that operated as a fraud and deceit upon the Investors.

107

629.     The 2007 Board approved the offering and ongoing solicitation of investments in the 2007 Series A and Series B Subordinated Debentures, despite knowing or should having known that the Company would be unable to re-pay the debt because it had experienced anemic growth relative to its projections over the years, had soaring expenses, and was already overburdened with debt from previous acquisitions and debt offerings.

630.     Upon information and belief, the 2007 Board was or should have been aware and / or approved of the information about the Company's financial affairs, including projections and other figures, that was communicated to the Investors in connection with the 2007 Series A and Series B Subordinated Debentures, even though that information was selectively communicated and taken out of context in relation to the Company's finances as a whole.

631.     Moreover, the 2007 Board also knew or should have known that the funds generated by prior Securities had all or in part not been used as represented, which ultimately impaired the Company's ability to repay the 2007 Series A and Series B Subordinated Debentures.

632.     The 2007 Board knew or should have known the information that was communicated to the Investors was inaccurate and / or reasonably uncertain, and that additional information regarding the true state of the Company's financial affairs needed to be communicated to the Investors when statements were made about the Company's projections and other financial figures.

108

633.     The 2007 Board was reckless in taking these acts and making these omissions because they knew or should have known that the offering and solicitation of investments in the 2007 Series A and Series B Subordinated Debentures and failure to disclose information and the circumstances surrounding the offerings fully would cause the Investors to participate in the offerings without full knowledge or an understanding of the risks involved.

634.     The 2007 Board was further reckless because they were privy to Domin-8's financials and other information that showed that the Company would be unable to repay the 2007 Series A and Series B Subordinated Debentures and may not survive even with the infusion of additional funds.

635.     Alternatively, the 2007 Board's conduct of approving and offering the 2007 Series A and Series B Subordinated Debentures, as well as their failure to fully disclose information and circumstances surrounding the offering and solicitation of such investments, was intended to entice the Investors to invest substantial sums of money in the 2007 Series A and Series B Subordinated Debentures.

636.     Because the 2007 Board's approval of the offering and solicitation of the investments was recklessly calculated or intended to induce the Investors to purchase the 2007 Series A and Series B Subordinated Debentures, their acts and omissions were material to the Investors.

637.     Investors relied on the 2007 Board's reckless or intentional acts and omissions by purchasing the 2007 Series A and Series B Subordinated Debentures.

638.     The Investors did not and could not have reasonably discovered these acts and omissions until a reasonable time after the Company filed bankruptcy.

639.     But for the 2007 Board approving the offering and solicitation of the investments and the selective dissemination of information about the Company and its finances, the Investors would not have purchased the 2007 Series A and Series B Subordinated Debentures.

640.     The acts and omissions of the 2007 Board resulted in the loss of the Investors' investments in the 2007 Series A and Series B Subordinated Debentures because the Investors paid for debt securities that were essentially worthless since the Company was insolvent or near insolvent at the time of issuance.

641.     Further, the acts and omissions of the 2007 Board resulted in the loss of the Investors' investments by inducing investments in the Company that increased the Company's debt, which was a substantial factor contributing to the bankruptcy.

642.     The acts and omissions also caused the Investors in the 2007 Series A and Series B Subordinated Debentures to incur losses because they subordinated their debt and assumed an inferior lien position in the event of nonpayment.

643.     The 2007 Board is jointly and severally liable for these losses to the Investors.

. . .

. . .

. . .

. . .

110

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

mdw

mack drucker & watson

Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

# CLAIM III

## Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5
## of the Securities Exchange Act of 1934

### (By Investors in Series A Preferred Stock and
### Common Stock Against the 2007 Board)

644.    The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

645.    In connection with offering the Series A Preferred Stock and Common Stock, the 2007 Board engaged in acts, practices, and / or courses of conduct that operated as a fraud and deceit upon the Investors.

646.    The 2007 Board approved the offering and ongoing solicitation of investments in the Series A Preferred Stock and Common Stock, despite knowing or should having known that the Company would be unable to re-pay the debt because it had experienced anemic growth relative to its projections over the years, had soaring expenses, and was already overburdened with debt from previous acquisitions and debt offerings.

647.    Upon information and belief, the 2007 Board was or should have been aware and / or approved of the information about the Company's financial affairs, including projections and other figures, that was communicated to the Investors in connection with the Series A Preferred Stock and Common Stock, even though that information was selectively communicated and taken out of context in relation to the Company's finances as a whole.

648.    Moreover, the 2007 Board also knew or should have known that the funds generated by prior Securities had all or in part not been used as represented, which

111

1    ultimately impaired the Company's ability to pay a return on the Series A Preferred Stock

2    and Common Stock.

3        649.    The 2007 Board knew or should have known the information that was

4

5    communicated to the Investors was inaccurate and / or reasonably uncertain, and that

6    additional information regarding the true state of the Company's financial affairs needed to

7

8    be communicated to the Investors when statements were made about the Company's

9    projections and other financial figures.

10        650.    The 2007 Board was reckless in taking these acts and making these

11

12   omissions because they knew or should have known that the offering and solicitation of

13   investments in the Series A Preferred Stock and Common Stock and failure to disclose

14   information and the circumstances surrounding the offerings fully would cause the

15

16   Investors to participate in the offerings without full knowledge or an understanding of the

17   risks involved.

18        651.    The 2007 Board was further reckless because they were privy to Domin-8's

19

20   financials and other information that showed that the Company would be unable to pay a

21   return on the investments in the Series A Preferred Stock and Common Stock, and that the

22   Company may not survive even with the infusion of additional funds.

23

24        652.    Alternatively, the 2007 Board's conduct of approving and offering the Series

25   A Preferred Stock and Common Stock, as well as their failure to fully disclose information

26   and circumstances surrounding the offering and solicitation of such investments, was

27

28   intended to entice the Investors to invest substantial sums of money in the Series A

Preferred Stock and Common Stock.

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

112

653.     Because the 2007 Board's approval of the offering and solicitation of the investments was recklessly calculated or intended to induce the Investors to purchase the Series A Preferred Stock and Common Stock, their acts and omissions were material to the Investors.

654.     Investors relied on the 2007 Board's reckless or intentional acts and omissions by purchasing the Series A Preferred Stock and Common Stock.

655.     The Investors did not and could not have reasonably discovered these acts and omissions until a reasonable time after the Company filed bankruptcy.

656.     But for the 2007 Board approving the offering and solicitation of the investments and the selective dissemination of information about the Company and its finances, the Investors would not have purchased the Series A Preferred Stock and Common Stock.

657.     The acts and omissions of the 2007 Board resulted in the loss of the Investors' investments in the Series A Preferred Stock and Common Stock because the Investors paid for equity securities that were essentially worthless since, unbeknownst to the Investors, the Company was insolvent or near insolvent at the time of issuance.

658.     Further, the acts and omissions of the 2007 Board resulted in the loss of the Investors' investments by causing them to approve measures that increased the Company's debt, which was a substantial factor contributing to the bankruptcy.

659.     The 2007 Board is jointly and severally liable for these losses to the Investors.

# CLAIM IV

## Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

### (By Investors in Domin-8 LLC Who Exchanged Debt and Equity Securities in Domin-8 LLC for Common Stock in Domin-8 Inc., Against the 2006 Board[5])

660.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

661.     In connection with the Exchange Offer, the 2006 Board engaged in acts, practices, and / or courses of conduct that operated as a fraud and deceit upon the Investors.

662.     The 2006 Board approved and recommended the Exchange Offer that converted all debt and equity securities in Domin-8 LLC into Common Stock in Domin-8 Inc., despite knowing or should having known that the Company would be unable to re-pay the debt because it had experienced anemic growth relative to its projections over the years, had soaring expenses, and was already overburdened with debt from previous acquisitions and debt offerings.

663.     Upon information and belief, the 2006 Board was or should have been aware and / or approved of the information about the Company's financial affairs, including projections and other figures, that was communicated to the Investors in connection with the Exchange Offer, even though that information was selectively communicated and taken out of context in relation to the Company's finances as a whole.

---

[5]     For purposes of all claims in this Complaint, the Defendants from the 2006 Board include:  (1) Greg McGrath; (2) Sean D. Curran; and (3) Charles V. Shamblee III.

114

664.     Moreover, the 2006 Board also knew or should have known that the funds generated by prior Securities had all or in part not been used as represented, which ultimately impaired the Company's ability to pay a return on the Series A Preferred Stock and Common Stock.

665.     The 2006 Board knew or should have known the information that was communicated to the Investors was inaccurate and / or reasonably uncertain, and that additional information regarding the true state of the Company's financial affairs needed to be communicated to the Investors when statements were made about the Company's projections and other financial figures.

666.     The 2006 Board was reckless in taking these acts and making these omissions because they knew or should have known that their approval and recommendation of the Exchange Offer and failure to disclose information and the circumstances surrounding the same fully would cause the Investors to participate without full knowledge or an understanding of the risks involved.

667.     The 2006 Board was further reckless because they were privy to Domin-8's financials and other information that showed that the Company would be unable to pay a return on equity investments and may not survive even if the Exchange Offer was approved.

668.     Alternatively, the 2006 Board's conduct of approving and recommending the Exchange Offer, as well as their failure to fully disclose information and circumstances surrounding the offering and solicitation of such investments, was intended to entice the Investors to approve the Exchange Offer.

115

669.     Because the 2006 Board's approval of the offering and solicitation of the investments was recklessly calculated or intended to induce the Investors to approve the Exchange Offer and exchange their investments in Domin-8 LLC into Common Stock in Domin-8 Enterprise Solutions Inc., their acts and omissions were material to the Investors.

670.     Investors relied on the 2006 Board's reckless or intentional acts and omissions by approving the Exchange Offer and exchanging their investments in Domin-8 LLC into Common Stock in Domin-8 Enterprise Solutions Inc.

671.     The Investors did not and could not have reasonably discovered these acts and omissions until a reasonable time after the Company filed bankruptcy.

672.     But for the 2006 Board approving and recommending the Exchange Offer and the selective dissemination of information about the Company and its finances, the Investors would not have approved the Exchange Offer and exchanged their investments in Domin-8 LLC into Common Stock in Domin-8 Enterprise Solutions Inc.

673.     The acts and omissions of the 2006 Board resulted in the loss of the Investors' investments through the Exchange Offer because the Investors exchanged their debt and equity securities in Domin-8 LLC for Common Stock in Domin-8 Inc., which was essentially worthless since, unbeknownst to the Investors, the Company was insolvent or near insolvent at the time of the exchange.

674.     Additionally, the Investors in debt securities in Domin-8 LLC incurred losses because, had they not approved the Exchange Offer and exchanged their debt securities in Domin-8 LLC for equity securities in Domin-8 Inc., they would have retained positions as creditors that were superior to their positions as equity holders after the exchange.

116

675.     The 2006 Board is jointly and severally liable for these losses to the Investors.

## CLAIM V

### Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

### (By Investors in the 2006 Series D Subordinated Convertible Debentures Against the 2004 Board[6])

676.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

677.     In connection with the 2006 Series D Subordinated Convertible Debentures, the 2004 Board engaged in acts, practices, and / or courses of conduct that operated as a fraud and deceit upon the Investors.

678.     The 2004 Board approved the offering and ongoing solicitation of investments in the 2006 Series D Subordinated Convertible Debentures, despite knowing or should having known that the Company would be unable to re-pay the debt because it had experienced anemic growth relative to its projections over the years, had soaring expenses, and was already overburdened with debt from previous acquisitions and debt offerings.

679.     Upon information and belief, the 2004 Board was or should have been aware and / or approved of the information about the Company's financial affairs, including projections and other figures, that was communicated to the Investors in connection with

---

[6]     For purposes of all claims in this Complaint, the Defendants from the 2004 Board consists of:  (1) Greg McGrath; (2) Sean D. Curran; (3) Charles V. Shamblee III; and (4) J. Robert Routt.  T

117

the 2006 Series D Subordinated Convertible Debentures, even though that information was selectively communicated and taken out of context in relation to the Company's finances as a whole.

680.    Moreover, the 2004 Board also knew or should have known that the funds generated by prior Securities had all or in part not been used as represented, which ultimately impaired the Company's ability to repay the 2006 Series D Subordinated Convertible Debentures.

681.    The 2004 Board knew or should have known the information that was communicated to the Investors was inaccurate and / or reasonably uncertain, and that additional information regarding the true state of the Company's financial affairs needed to be communicated to the Investors when statements were made about the Company's projections and other financial figures.

682.    The 2004 Board was reckless in taking these acts and making these omissions because they knew or should have known that the offering and solicitation of investments in the 2006 Series D Subordinated Convertible Debentures and failure to disclose information and the circumstances surrounding the offering fully would cause the Investors to participate in the offerings without full knowledge or an understanding of the risks involved.

683.    The 2004 Board was further reckless because they were privy to Domin-8's financials and other information that showed that the Company would be unable to repay the 2006 Series D Subordinated Convertible Debentures and may not survive even with the infusion of additional funds.

Y:\Clients\MH-01\Domin 8\Pleadings\Complaint (FINAL 02).doc                    2337.000

684.       Alternatively, the 2004 Board's conduct of approving and offering the 2006 Series D Subordinated Convertible Debentures, as well as their failure to fully disclose information and circumstances surrounding the offering and solicitation of such investments, was intended to entice the Investors to invest substantial sums of money in the 2006 Series D Subordinated Convertible Debentures.

685.       Because the 2004 Board's approval of the offering and solicitation of the investments was recklessly calculated or intended to induce the Investors to purchase the 2006 Series D Subordinated Convertible Debentures, their acts and omissions were material to the Investors.

686.       Investors relied on the 2004 Board's reckless or intentional acts and omissions by purchasing the 2006 Series D Subordinated Convertible Debentures.

687.       The Investors did not and could not have reasonably discovered these acts and omissions until a reasonable time after the Company filed bankruptcy.

688.       But for the 2004 Board approving the offering and solicitation of the investments and the selective dissemination of information about the company and its finances, the Investors would not have purchased the 2006 Series D Subordinated Convertible Debentures.

689.       The acts and omissions of the 2004 Board resulted in the loss of the Investors' investments in the 2006 Series D Subordinated Convertible Debentures because the Investors paid for debt securities that were essentially worthless since the Company was insolvent or near insolvent at the time of issuance.

690.     Further, the acts and omissions of the 2004 Board resulted in the loss of the Investors' investments by inducing investments in the Company that increased the Company's debt, which was a substantial factor contributing to the bankruptcy.

691.     The acts and omissions also caused the Investors in the 2006 Series D Subordinated Convertible Debentures to incur losses because they subordinated their debt and assumed an inferior lien position in the event of nonpayment.

692.     The 2004 Board is jointly and severally liable for these losses to the Investors.

## CLAIM VI

### Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

### (By Investors in 2007 Series C Subordinated Convertible Debentures and 2008 Series D Subordinated Debenture Against McGrath)

693.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

694.     In connection with offering the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures to the Investors, McGrath engaged in acts, practices, and / or courses of conduct that operated as a fraud and deceit upon the Investors.

695.     McGrath made specific representations to the Investors about the Company's projections and other financial figures.

696.     McGrath communicated this information selectively and in isolation of the Company's finances as a whole and the circumstances surrounding the offerings.

120

697.     McGrath made these representations and omissions, despite knowing or should having known that the Company would be unable to repay the debt because it had experienced anemic growth relative to its projections over the years, had soaring expenses, and was already overburdened with debt from previous acquisitions and debt offerings.

698.     In particular, McGrath did not communicate or fully disclose information about the Company's finances and the circumstances surrounding the offerings relative to the acquisition strategy, which was placing a tremendous financial strain on the Company.

699.     McGrath also did not disclose that funds generated through the prior offerings had not been used to pay for the acquisitions, as evidenced by the Seller Notes, or, alternatively, that the funds could not be used as such because they had to be used to absorb increased operating costs from the acquisitions.

700.     In addition, McGrath never corrected projections that were communicated to the Investors to reflect the most current, update-to-date financial information available to the Company.

701.     McGrath also represented to the Investors that the Company would be poised for an IPO or a buy-out in two-to-three years' time to lead them to believe that the 2007 Series C Subordinated Convertible Debentures were a sound investment and incidental to the Company achieving this goal.

702.     Even more specifically, McGrath represented to Investors in Arizona that their shares of stock would rise from $3.81 per share to $55-$60 per share.

. . .

703.     McGrath further represented to the Investors that the 2007 Series C Senior Subordinated Convertible Debentures would be the final opportunity to invest in Domin-8 before it went public or was sold to another company.

704.     McGrath also knew or should have known that the funds generated by prior Securities had all or in part not been used as represented, which ultimately impaired the Company's ability to repay the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures.

705.     McGrath knew or should have known the information that was communicated to the Investors was inaccurate and / or reasonably uncertain, and that additional information regarding the true state of the Company's financial affairs needed to be communicated to the Investors when statements were made about the Company's projections and other financial figures.

706.     McGrath was reckless because he was privy to Domin-8's financials and other information that showed that the Company would be unable to repay the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures and may not survive even with the infusion of additional funds.

707.     McGrath was further reckless because he knew or should have known that the offering and solicitation of investments in the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures and failure to disclose information and the circumstances surrounding the offerings fully would cause the Investors to participate in the offerings without full knowledge or an understanding of the risks involved.

122

708.     Alternatively, McGrath's conduct of approving and offering the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures, as well as his failure to fully disclose information and circumstances surrounding the offering and solicitation of such investments, was intended to entice the Investors to invest substantial sums of money in the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures.

709.     Because McGrath's representations and omissions were recklessly calculated or intended to induce the Investors to purchase the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures, his representations and omissions were material to the Investors.

710.     Investors relied on McGrath's reckless or intentional representations and omissions by purchasing the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures.

711.     The Investors did not and could not have reasonably discovered these acts and omissions until a reasonable time after the Company filed bankruptcy.

712.     But for McGrath selectively disseminating information about the Company and its finances, the Investors would not have purchased the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures.

713.     The representations and omissions of McGrath resulted in the loss of the Investors' investments in the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures because the Investors paid for debt securities that

were essentially worthless since the company was insolvent or near insolvent at the time of issuance.

714.     Further, the representations and omissions of McGrath resulted in the loss of the Investors' investments by inducing investments in the Company that increased the Company's debt, which was a substantial factor contributing to the bankruptcy.

715.     The representations and omissions also caused the Investors in the 2007 Series C Subordinated Convertible Debentures and 2008 Series D Senior Subordinated Debentures to incur losses because they subordinated their debt and assumed an inferior lien position in the event of nonpayment.

716.     McGrath is liable for these losses to the Investors.

## CLAIM VII

### Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

### (By Investors in the 2007 Series A and Series B Subordinated Debentures Against McGrath)

717.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

718.     In connection with offering the 2007 Series A and Series B Subordinated Debentures to the Investors, McGrath engaged in acts, practices, and / or courses of conduct that operated as a fraud and deceit upon the Investors.

719.     McGrath made specific representations about the Company's projections and omissions about the Company's financial affairs.

124

720.     McGrath communicated this information selectively and in isolation of the Company's finances as a whole and the circumstances surrounding the offerings.

721.     McGrath made these representations and omissions, despite knowing or should having known that the Company would be unable to repay the debt because it had experienced anemic growth relative to its projections over the years, had soaring expenses, and was already overburdened with debt from previous acquisitions and debt offerings.

722.     In particular, McGrath did not communicate or fully disclose information about the Company's finances and the circumstances surrounding the offerings relative to the acquisition strategy, which was placing a tremendous financial strain on the Company.

723.     McGrath also did not disclose that funds generated through the prior offerings had not been used to pay for the acquisitions, as evidenced by the Seller Notes, or, alternatively, that the funds could not be used as such because they had to be used to absorb increased operating costs from the acquisitions.

724.     In addition, McGrath never corrected projections that were communicated to the Investors to reflect the most current, update-to-date financial information available to the Company.

725.     Upon information and belief, McGrath also represented to the Investors that the Company would be poised for an IPO or a buy-out in two-to-three years' time to lead them to believe that the Series A and Series B Subordinated Debentures were sound investments and incidental to the Company achieving this goal.

. . .

Y:\Clients\MH-01\Domin 8\Pleadings\Complaint (FINAL 02).doc                    2337.000

726.     McGrath further represented to the Investors that he "expect[ed] th[e] debt offering to go very quickly," and that the Company "prefer[red] to reward … existing shareholders with th[e] lucrative monthly paying investment …."

727.     McGrath also knew or should have known that the funds generated by prior Securities had all or in part not been used as represented, which ultimately impaired the Company's ability to repay the Series A and Series B Subordinated Debentures.

728.     McGrath knew or should have known the information that was communicated to the Investors was inaccurate and / or reasonably uncertain, and that additional information regarding the true state of the Company's financial affairs needed to be communicated to the Investors when statements were made about the Company's projections and other financial figures.

729.     McGrath was reckless because he was privy to Domin-8's financials and other information that showed that the Company would be unable to repay the Series A and Series B Subordinated Debentures and may not survive even with the infusion of additional funds.

730.     McGrath was further reckless because he knew or should have known that the offering and solicitation of investments in the Series A and Series B Subordinated Debentures and failure to disclose information and the circumstances surrounding the offerings fully would cause the Investors to participate in the offerings without full knowledge or an understanding of the risks involved.

731.     Alternatively, McGrath's conduct of approving and offering the Series A and Series B Subordinated Debentures, as well as his failure to fully disclose information and

126

circumstances surrounding the offering and solicitation of such investments, was intended to entice the Investors to invest substantial sums of money in the Series A and Series B Subordinated Debentures.

732.     Because McGrath's representations and omissions were recklessly calculated or intended to induce the Investors to purchase the Series A and Series B Subordinated Debentures, his representations and omissions were material to the Investors.

733.     Investors relied on McGrath's reckless or intentional representations and omissions by purchasing the Series A and Series B Subordinated Debentures.

734.     The Investors did not and could not have reasonably discovered these acts and omissions until a reasonable time after the Company filed bankruptcy.

735.     But for McGrath selectively disseminating information about the Company and its finances, the Investors would not have purchased the Series A and Series B Subordinated Debentures.

736.     The representations and omissions of McGrath resulted in the loss of the Investors' investments in the Series A and Series B Subordinated Debentures because the Investors paid for debt securities that were essentially worthless since the Company was insolvent or near insolvent at the time of issuance.

737.     Further, the representations and omissions of McGrath resulted in the loss of the Investors' investments by inducing investments in the Company that increased the Company's debt, which was a substantial factor contributing to the bankruptcy.

738.     Additionally, the Investors incurred losses because they would have purchased securities other than the Series A and Series B Subordinated Debentures.

127

739.    The acts and omissions also caused the Investors in the Series A and Series B Subordinated Debentures to incur losses because they subordinated their debt and assumed an inferior lien position in the event of nonpayment.

740.    McGrath is liable for these losses to the Investors.

### CLAIM VIII

### Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

### (By Investors in Series A Preferred Stock and Common Stock Against McGrath)

741.    The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

742.    In connection with offering the Series A Preferred Stock and Common Stock to the Investors, McGrath engaged in acts, practices, and / or courses of conduct that operated as a fraud and deceit upon the Investors.

743.    McGrath made specific representations about the Company's projections and omissions about the Company's financial affairs.

744.    McGrath communicated this information selectively and in isolation of the Company's finances as a whole and the circumstances surrounding the offerings.

745.    McGrath made these representations and omissions, despite knowing or should having known that the Company would be unable to pay a return on the investments because it had experienced anemic growth relative to its projections over the years, had soaring expenses, and was already overburdened with debt from previous acquisitions and debt offerings.

746.     In particular, McGrath did not communicate or fully disclose information about the Company's finances and the circumstances surrounding the offerings relative to the acquisition strategy, which was placing a tremendous financial strain on the Company.

747.     McGrath did not disclose that funds generated through the prior offerings had not been used to pay for the acquisitions, as evidenced by the Seller Notes, or, alternatively, that the funds could not be used as such because they had to be used to absorb increased operating costs from the acquisitions.

748.     In addition, McGrath never corrected projections that were communicated to the Investors to reflect the most current, update-to-date financial information available to the Company.

749.     Upon information and belief, McGrath also represented to the Investors that the Company would be poised for an IPO or a buy-out in two-to-three years' time to lead them to believe that the Series A Preferred Stock and Common Stock were sound investments and incidental to the Company achieving this goal.

750.     McGrath also knew or should have known that the funds generated by prior Securities had all or in part not been used as represented, which ultimately impaired the Company's ability to pay a return on equity investments in the Series A Preferred Stock and Common Stock.

751.     McGrath knew or should have known the information that was communicated to the Investors was inaccurate and / or reasonably uncertain, and that additional information regarding the true state of the Company's financial affairs needed to

be communicated to the Investors when statements were made about the Company's projections and other financial figures.

752.     McGrath was reckless because he was privy to Domin-8's financials and other information that showed that the Company would be unable to pay a return on equity investments the Series A Preferred Stock and Common Stock and may not survive even with the infusion of additional funds.

753.     McGrath was further reckless because he knew or should have known that the offering and solicitation of investments in the Series A Preferred Stock and Common Stock and failure to disclose information and the circumstances surrounding the offerings fully would cause the Investors to participate in the offerings without full knowledge or an understanding of the risks involved.

754.     Alternatively, McGrath's conduct of approving and offering the Series A Preferred Stock and Common Stock, as well as his failure to fully disclose information and circumstances surrounding the offering and solicitation of such investments, was intended to entice the Investors to invest substantial sums of money in the Series A Preferred Stock and Common Stock.

755.     Because McGrath's representations and omissions were recklessly calculated or intended to induce the Investors to purchase the Series A Preferred Stock and Common Stock, his representations and omissions were material to the Investors.

756.     Investors relied on McGrath's reckless or intentional representations and omissions by purchasing the Series A Preferred Stock and Common Stock.

130

757.     The Investors did not and could not have reasonably discovered these acts and omissions until a reasonable time after the Company filed bankruptcy.

758.     But for McGrath selectively disseminating information about the Company and its finances, the Investors would not have purchased the Series A Preferred Stock and Common Stock.

759.     The representations and omissions of McGrath resulted in the loss of the Investors' investments in the Series A Preferred Stock and Common Stock because the Investors paid for debt securities that were essentially worthless since the Company was insolvent or near insolvent at the time of issuance.

760.     Further, the acts and omissions of the 2007 Board resulted in the loss of the Investors' investments by causing them to approve measures that increased the Company's debt, which was a substantial factor contributing to the bankruptcy.

761.     McGrath is liable for these losses to the Investors.

## CLAIM IX

### Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

### (By Investors in Domin-8 LLC Who Exchanged Debt and Equity Securities in Domin-8 LLC for Common Stock in Domin-8 Inc. Against McGrath)

762.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

763.     In connection with offering the Exchange Offer, McGrath engaged in acts, practices, and / or courses of conduct that operated as a fraud and deceit upon the Investors.

131

764.     McGrath made specific representations about the Company's projections and omissions about the Company's financial affairs.

765.     McGrath communicated this information selectively and in isolation of the Company's finances as a whole and the circumstances surroundings the Exchange Offer.

766.     McGrath made these representations and omissions, despite knowing or should having known that the Company would be unable to pay a return on the investments because it had experienced anemic growth relative to its projections over the years, had soaring expenses, and was already overburdened with debt from previous acquisitions and debt offerings.

767.     In particular, McGrath did not communicate or fully disclose information about the Company's finances and the circumstances surrounding the offerings relative to the acquisition strategy, which was placing a tremendous financial strain on the Company.

768.     McGrath did not disclose that funds generated through the prior offerings had not been used to pay for the acquisitions, as evidenced by the Seller Notes, or, alternatively, that the funds could not be used as such because they had to be used to absorb increased operating costs from the acquisitions.

769.     In addition, McGrath never corrected projections that were communicated to the Investors to reflect the most current, update-to-date financial information available to the Company.

770.     Upon information and belief, McGrath also represented to the Investors that the Company would be poised for an IPO or a buy-out in two-to-three years' time to lead them to believe that the Exchange Offer was necessary to achieve this goal.

132

771.     McGrath further represented that the additional capital generated through the Exchange Offer would be used "to grow the Company beyond what [the] most aggressive projections from last year suggested" to lead them to approve the Exchange Offer.

772.     McGrath also knew or should have known that the funds generated by prior Securities had all or in part not been used as represented, which ultimately impaired the Company's ability to pay a return on equity investments in Common Stock.

773.     McGrath knew or should have known the information that was communicated to the Investors was inaccurate and / or reasonably uncertain, and that additional information regarding the true state of the Company's financial affairs needed to be communicated to the Investors when statements were made about the Company's projections and other financial figures.

774.     McGrath was reckless because he was privy to Domin-8's financials and other information that showed that the Company would be unable to pay a return on equity investments in the Series A Preferred Stock and Common Stock and may not survive even if the Exchange Offer was approved.

775.     McGrath was further reckless because he knew or should have known that the offering and solicitation of investments in the Series A Preferred Stock and Common Stock and failure to disclose information and the circumstances surrounding the offerings fully would cause the Investors to participate in the offerings without full knowledge or an understanding of the risks involved.

776.     Alternatively, McGrath's conduct of approving and recommending the Exchange Offer, as well as his failure to fully disclose information and circumstances

133

surrounding the same, was intended to entice the Investors to approve the Exchange Offer and exchange their investments in Domin-8 LLC into Common Stock in Domin-8 Enterprise Solutions Inc.

777.     Because McGrath's representations and omissions were recklessly calculated or intended to induce the Investors to approve the Exchange Offer and exchange their investments in Domin-8 LLC into Common Stock in Domin-8 Enterprise Solutions Inc. his representations and omissions were material to the Investors.

778.     Investors relied on McGrath's reckless acts and omissions by approving the Exchange Offer and exchanging their investments in Domin-8 LLC into Common Stock.

779.     The Investors did not and could not have reasonably discovered these acts and omissions until a reasonable time after the Company filed bankruptcy.

780.     But for McGrath recommending the Exchange Offer and selectively disseminating information about the Company and its finances, the Investors would not have approved the Exchange Offer and exchanged their investments in Domin-8 LLC into Common Stock in Domin-8 Enterprise Solutions Inc.

781.     The acts and omissions of McGrath resulted in the loss of the Investors' investments through the Exchange Offer because the Investors exchanged their debt and equity securities in Domin-8 LLC for Common Stock in Domin-8 Inc., which was essentially worthless since, unbeknownst to the Investors, the Company was insolvent or near insolvent at the time of the exchange.

782.     Additionally, the Investors in debt securities in Domin-8 LLC incurred losses because, had they not approved the Exchange Offer and exchanged their debt securities in

Domin-8 LLC for equity securities in Domin-8 Inc., they would have retained positions as creditors that were superior to their positions as equity holders after the exchange.

783.    McGrath is liable for these losses to the Investors.

## CLAIM X

### Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

### (By Investors in 2006 Series D Subordinated Convertible Debentures Against McGrath)

784.    The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

785.    In connection with offering the 2006 Series D Subordinated Convertible Debentures to the Investors, McGrath engaged in acts, practices, and / or courses of conduct that operated as a fraud and deceit upon the Investors.

786.    McGrath made specific representations about the Company's projections and omissions about the Company's financial affairs.

787.    McGrath communicated this information selectively and in isolation of the Company's finances as a whole and the circumstances surrounding the 2006 Series D Subordinated Convertible Debentures.

788.    McGrath made these representations and omissions, despite knowing or should having known that the Company would be unable to pay a return on the investments because it had experienced anemic growth relative to its projections over the years, had soaring expenses, and was already overburdened with debt from previous acquisitions and debt offerings.

135

789.    In particular, McGrath did not communicate or fully disclose information about the Company's finances and the circumstances surrounding the offerings relative to the acquisition strategy, which was placing a tremendous financial strain on the Company.

790.    McGrath did not disclose that funds generated through the prior offerings had not been used to pay for the acquisitions, as evidenced by the Seller Notes, or, alternatively, that the funds could not be used as such because they had to be used to absorb increased operating costs from the acquisitions.

791.    In addition, McGrath never corrected projections that were communicated to the Investors to reflect the most current, update-to-date financial information available to the Company.

792.    At the same time, McGrath continued to disclose inflated projections based on the recent acquisitions, including Winning Edge and Rent Right, particularly with respect to the substantial revenues generated through the sale of value-added services and the overall effect of the acquisitions on the Company's finances, while informing the Investors that acquisition costs were being reduced.

793.    Upon information and belief, McGrath also represented to the Investors that the Company would be poised for an IPO or a buy-out in two-to-three years' time to lead them to believe that the 2006 Series D Subordinated Convertible Debentures were sound investments and incidental to the Company achieving this goal.

794.    McGrath also knew or should have known that the funds generated by prior Securities had all or in part not been used as represented, which ultimately impaired the Company's ability to pay a return on equity investments in Common Stock.

136

795.     McGrath knew or should have known the information that was communicated to the Investors was inaccurate and / or reasonably uncertain, and that additional information regarding the true state of the Company's financial affairs needed to be communicated to the Investors when statements were made about the Company's projections and other financial figures.

796.     McGrath was reckless because he was privy to Domin-8's financials and other information that showed that the Company would be unable to repay 2006 Series D Subordinated Convertible Debentures and may not survive even with the infusion of additional funds.

797.     McGrath was further reckless because he knew or should have known that the offering and solicitation of investments in the 2006 Series D Subordinated Convertible Debentures and failure to disclose information and the circumstances surrounding the offering fully would cause the Investors to participate in the offerings without full knowledge or an understanding of the risks involved.

798.     Alternatively, McGrath's conduct of approving and offering the 2006 Series D Subordinated Convertible Debentures, as well as his failure to fully disclose information and circumstances surrounding the same, was intended to entice the Investors to purchase the 2006 Series D Subordinated Convertible Debentures.

799.     Because McGrath's representations and omissions were recklessly calculated or intended to induce the Investors to purchase the 2006 Series D Subordinated Convertible Debentures, his representations and omissions were material to the Investors.

137

800.     Investors relied on McGrath's reckless representations and omissions by purchasing the 2006 Series D Subordinated Convertible Debentures.

801.     The Investors did not and could not have reasonably discovered these acts and omissions until a reasonable time after the Company filed bankruptcy.

802.     But for McGrath selectively disseminating information about the Company and its finances, the Investors would not have purchased the 2006 Series D Subordinated Convertible Debentures.

803.     The representations and omissions of McGrath resulted in the loss of the Investors' investments in the 2006 Series D Subordinated Convertible Debentures because the Investors paid for debt securities that were essentially worthless since the Company was insolvent or near insolvent at the time of issuance.

804.     Further, the representations and omissions of McGrath resulted in the loss of the Investors' investments by inducing investments in the Company that increased the Company's debt, which was a substantial factor contributing to the bankruptcy.

805.     McGrath is liable for these losses to the Investors.

. . .

. . .

. . .

. . .

. . .

. . .

138

**CLAIM XI**

**Federal Securities Fraud in Violation of Section 20
of the Securities Exchange Act of 1934**

**(By All Investors[7] in Domin-8, Inc. Against the 2006, 2007, 2008, and 2009 Boards[8]**

806.    The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

807.    McGrath violated Section 10(b) and Rule 10b-5 by recklessly making representations and omissions that were intended to entice the Investors to exchange and / or purchase the Securities.

808.    The Boards directly and / or indirectly retained control over McGrath, who attended board meetings in his capacities as President and as a member of the Boards.

809.    Upon information and belief, the Boards held frequent meetings, especially as the financial condition of the Company worsened.

810.    Upon information and belief, the Boards discussed the financial state of the Company and the communications that McGrath would make on behalf of the Company.

811.    Certain written statements from McGrath containing the misrepresentations and omissions regarding offerings also expressly implicate the Boards.

---

[7]    For purposes of the claims in this Complaint, these include Investors in:  (1) 2008 Series D Senior Subordinated Debentures; (2) 2007 Series C Subordinated Convertible Debentures; (3) 2007 Series A Subordinated Debentures; (4) 2007 Series B Subordinated Debentures; (5) Series A Preferred Stock; (6) Common Stock; (7) 2006 Series D Subordinated Convertible Debentures; and (8) 2005 Series C Subordinated Convertible Debentures.

[8]    For purposes of this claim, the 2006–2009 Boards are collectively referred to as "Boards."

812.     In connection with the Exchange Offer, McGrath stated that "[he] and the full Board recommend that [the Investors] vote to approve the transaction."

813.     Further, at or around the time of the 2007 Series C Subordinated Convertible Debentures, McGrath stated "[o]ur Board of Directors has approved [the Senior Note Offering] unanimously and we ask that you support their decision."

814.     Additionally, the Boards controlled or had the ability to control all representations and omissions attributable to McGrath in connection with the offerings because Domin-8 Enterprise Inc. was a relatively small company with a board consisting of only four-to-five directors at the time that McGrath made the alleged misrepresentations and omissions.

815.     The majority of the directors on the Boards were also officers who participated in the day-to-day business of the Company.

816.     As a consequence of participating in the day-to-day business of the Company, officers knew or should have known the state of the Company's finances and the inaccuracy of McGrath's communications regarding the offerings.

817.     For all of these reasons, the Boards could have controlled the content of McGrath's communications, but failed to do so.

818.     As such, they are control persons within the meaning of Section 20(a) of the Securities Exchange Act of 1934.

819.     The Investors did not and could not have reasonably discovered these acts and omissions of the Boards until a reasonable time after the Company filed bankruptcy.

140

820.     As control persons, the Boards are jointly and severally liable for McGrath's violation(s) of Section 10(b) and Rule 10b-5.

## CLAIM XII

### Federal Securities Fraud in Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

### (By Investors in the 2008 Series D Senior Subordinated Debentures Against Buettin and Thistleton)

821.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

822.     In connection with offering the 2008 Series D Senior Subordinated Debentures to the Investors, Buettin and Thistleon engaged in acts, practices, and / or courses of conduct that operated as a fraud and deceit upon the Investors.

823.     Buettin and Thistleton made specific representations and omissions about the Company's ongoing viability, particularly in light of the funds that were being generated through the 2008 Series D Senior Subordinated Debentures.

824.     Buettin and Thistleton characterized the 2008 Series D Senior Subordinated Debentures as "part of an overall solution as other alternatives would potentially negatively affect the character or terms of [their] investments, whether debt or equity, and would also potentially be dilutive to equity holders," and said that the "support" of the Investors was "definitely require[d] … in making the Offering a success."

825.     At no point, however, did Buettin and Thistleton disclose that the Company had recently contemplated filing bankruptcy.

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

141

826.     Buettin and Thistleton also did not disclose that they had been informed that the majority of investment banks purportedly would not work with Domin-8 because it was overleveraged with debt and would need to restructure or file bankruptcy before it could be acquired.

827.     Buettin and Thistleton knew or should have known the information that was communicated to the Investors was inaccurate and / or reasonably uncertain, and that additional information regarding the true state of the Company's financial affairs needed to be communicated to the Investors when statements were made about the Company's projections and other financial figures.

828.     Buettin and Thistleton were reckless because he was privy to Domin-8's financials and other information that showed that the Company would be unable to repay the 2008 Series D Senior Subordinated Debentures and may not survive even with the infusion of additional funds.

829.     Buettin and Thistleton were further reckless because he knew or should have known that the offering and solicitation of investments in the 2008 Series D Senior Subordinated Debentures and failure to disclose information and the circumstances surrounding the offering fully would cause the Investors to participate in the offerings without full knowledge or an understanding of the risks involved.

830.     Alternatively, Buettin and Thistleton's conduct of approving and offering the 2008 Series D Senior Subordinated Debentures, as well as their failure to fully disclose information and circumstances surrounding the same, was intended to entice the Investors to purchase the 2008 Series D Senior Subordinated Debentures.

831.     Because Buettin and Thistleton's representations and omissions were recklessly calculated to induce and did induce the Investors to purchase the 2008 Series D Senior Subordinated Debentures, their representations and omissions were material to the Investors.

832.     Investors relied on Buettin and Thistleton's reckless representations and omissions by purchasing the 2008 Series D Senior Subordinated Debentures.

833.     The Investors did not and could not have reasonably discovered these acts and omissions until a reasonable time after the Company filed bankruptcy.

834.     But for Buettin and Thistleton selectively disseminating information about the Company and its finances, the Investors would not have purchased the 2008 Series D Senior Subordinated Debentures.

835.     The representations and omissions of the Buettin and Thistleton resulted in the loss of the Investors' investments in the 2008 Series D Senior Subordinated Debentures because the Investors paid for debt securities that were essentially worthless since the Company was insolvent or near insolvent at the time of issuance.

836.     Further, the representations and omissions of Buettin and Thistleton resulted in the loss of the Investors' investments by inducing investments in the Company that increased the Company's debt, which was a substantial factor contributing to the bankruptcy.

837.     The representations and omissions also caused the Investors in the 2008 Series D Senior Subordinated Debentures to incur losses because they subordinated their debt and assumed an inferior lien position in the event of nonpayment.

143

838.     Buettin and Thistleton are jointly and severally liable for these losses to the Investors.

## CLAIM XIII

### Federal Securities Fraud in Violation of Section 20 of the Securities Exchange Act of 1934

### (By Investors in the 2008 Series D Subordinated Debenture Against the 2009 Board)

839.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

840.     Buettin and Thistleton violated Section 10(b) and Rule 10b-5 by recklessly making representations and omissions that were intended to entice the Investors to purchase the 2008 Series D Senior Subordinated Debentures.

841.     The 2009 Board directly and / or indirectly retained control over the 2008 Series D Senior Subordinated Debentures, who were and had been officers of the company.

842.     Upon information and belief, the 2009 Board controlled or had the ability to control all representations and omissions attributable to Buettin and Thistleton in connection with the 2008 Series D Senior Subordinated Debentures.

843.     The 2009 Board controlled or had the ability to control all representations and omissions attributable to Buettin and Thistleton in connection with the offerings because Domin-8 Enterprise Inc. was a relatively small company with a board consisting of only four-to-five directors at the time that Buettin and Thistleton made the alleged misrepresentations and omissions.

144

844.      Upon information and belief, the 2009 Board held frequent meetings, especially as the financial condition of the Company worsened.

845.      Upon information and belief, the 2009 Board discussed the financial state of the Company and the communications that Buettin and Thistleton would make on behalf of the Company.

846.      The majority of the directors on the 2009 Board were also officers who participated in the day-to-day business of the Company.

847.      As a consequence of participating in the day-to-day business of the Company, such officers knew or should have known the state of the Company's finances and the inaccuracy of Buettin and Thistleton's communications regarding the offerings.

848.      Upon information and belief, Buettin and Thistleton attended these meetings as high-ranking executives of the Company who were intimately acquainted with its finances and operations.

849.      The 2009 Board could have controlled the content of Buettin and Thistleton's communications, but failed to do so.

850.      As such, they are control persons within the meaning of Section 20(a) of the Securities Exchange Act of 1934.

851.      The Investors did not and could not have reasonably discovered these acts and omissions of the 2009 Board until a reasonable time after the Company filed bankruptcy.

. . .

852.     As control persons within the meaning of Section 20(a) of the Securities Exchange Act of 1934, the Board is jointly and severally liable for Buettin and Thistleton's violation(s) of Section 10(b) and Rule 10b-5.

## CLAIM XIV

### Federal Securities Fraud in Violation of Section 14(e) of the Securities Exchange Act of 1934

### (By Investors in Domin-8 LLC Who Exchanged Debt and Equity Securities in Domin-8 LLC for Common Stock in Domin-8 Inc. Against McGrath and the 2006 Board)

853.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

854.     In connection with the Exchange Offer, McGrath and the 2006 Board did not disclose material information and otherwise misrepresented information concerning the financial state of the Company, particularly with respect to the acquisitions, the equity investment, and the overall effect of the same on the Company.

855.     This information was material to the Investors, who relied upon it in approving the Exchange Offer through which they tendered their debt and equity securities in exchange for Common Stock in the Company.

856.     The Investors have been damaged as a result of McGrath and the 2006 Board's actions and inactions with respect to the Exchange Offer.

857.     McGrath and the 2006 Board are jointly and severally liable for these damages.

. . .

mdw

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9900

**CLAIM XV**

**Breach of Fiduciary Duty for Nondisclosure**

**(By Investors in Domin-8 LLC Who Exchanged Debt and Equity
Securities in Domin-8 LLC for Common Stock in Domin-8 Inc.
Against McGrath and the 2006 Board)**

858.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

859.     McGrath and the 2006 Board were under a fiduciary duty to disclose fully and fairly all material information within their control when requesting approval of the Exchange Offer.

860.     McGrath and the 2006 Board breached this duty by selectively communicating information about the Company's finances and failing to disclose other information that was material to the Investors in connection with the Exchange Offer.

861.     McGrath did not communicate or fully disclose information about the Company's finances and the circumstances surrounding the Exchange Offer relative to the acquisition strategy, which was placing a tremendous financial strain on the Company.

862.     McGrath also did not disclose that funds generated through the prior offerings had not been used to pay for the acquisitions, as evidenced by the Seller Notes, or, alternatively, that the funds could not be used as such because they had to be used to absorb increased operating costs from the acquisitions.

863.     In addition, McGrath never corrected projections that were communicated to the Investors to reflect the most current, update-to-date financial information available to the Company.

147

864.     Upon information and belief, McGrath also represented to the Investors that the Company would be poised for an IPO or a buy-out in two-to-three years' time to lead them to believe that the Exchange Offer was necessary to achieve this goal.

865.     McGrath further represented that the additional capital generated through the Exchange Offer would be used "to grow the Company beyond what [the] most aggressive projections from last year suggested" to lead them to approve the Exchange Offer.

866.     Similarly, in approving and recommending the Exchange Offer that converted all debt and equity securities in Domin-8 LLC into Common Stock in Domin-8 Inc., the 2006 Board did not disclose that the Company had experienced anemic growth relative to its projections over the years, had soaring expenses, and was already overburdened with debt from existing obligations and prior debt offerings.

867.     Upon information and belief, the 2006 Board was also aware or should have been aware and / or approved of the information about the Company's financial affairs, including projections and other figures, that was communicated to the Investors in connection with the Exchange Offer, even though that information was selectively communicated and taken out of context in relation to the Company's finances as a whole.

868.     The information that McGrath and the 2006 Board communicated selectively and did not disclose to the Investors was material because there was a substantial likelihood that the Investors would consider it important when deciding whether to approve the Exchange Offer.  In addition, the information impacted the information that had been made available to the Investors.

869.     These measures subordinated the Investors' interests in the event of bankruptcy, particularly to the extent that they held debt securities in Domin-8 LLC.

870.     Further, these measures resulted in the loss of the Investors' investments through the Exchange Offer because the Investors exchanged their debt and equity securities in Domin-8 LLC for Common Stock in Domin-8 Inc., which was essentially worthless since, unbeknownst to the Investors, the Company was insolvent or near insolvent at the time of the exchange.

871.     McGrath and the 2006 Board's breach of their fiduciary duty to disclose information fully and fairly has damaged the Investors.

872.     McGrath and the 2006 Board are jointly and severally liable for these damages.

873.     The Investors have standing to pursue these damages directly because the acts alleged caused injury to them as Investors, not to the Company itself.

874.     The Investors did not and could not have reasonably discovered these violations until a reasonable time after the bankruptcy filing in September 2009 because McGrath and the 2006 Board, through McGrath's representations and omissions, led the Investors away from the truth regarding the Company's finances and were entrusted by the Investors to exercise competence and act in good faith as fiduciaries.

. . .

. . .

. . .

149

## CLAIM XVI

### Breach of Fiduciary Duty for Nondisclosure

### (By Investors in Series A Preferred Stock and the 2007 Series A and Series B Subordinated Debentures Against McGrath and the 2007 Board)

875.      The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

876.      McGrath and the 2007 Board were under a fiduciary duty to disclose fully and fairly all material information within their control when it requested approval of the Senior Notes and the 2007 Series C Subordinated Convertible Debentures.

877.      This duty was owed both to debt and equity holders because, upon information and belief, the Company was insolvent or in the zone of insolvency at all material times when making the offerings and withholding other material information about the state of the Company's business and financial affairs.

878.      McGrath and the 2007 Board breached this duty by selectively communicating information about the Company's finances and failing to disclose other information that was material to the Investors in connection with approving the Senior Notes and the 2007 Series C Subordinated Convertible Debentures.

879.      In particular, McGrath and the 2007 Board did not disclose the facts and circumstances surrounding the use of funds generated through prior debt and equity offerings, including their use to pay soaring operating costs from the acquisitions.

880.      Further, McGrath and the 2007 Board did not fully disclose the state of the Company's finances, particularly in light of projections.

881.     The information that McGrath and the 2007 Board communicated selectively and did not disclose to the Investors was material because there was a substantial likelihood that the Investors would consider it important when deciding whether to approve the Senior Notes and the 2007 Series C Subordinated Convertible Debentures.  In addition, the information impacted the information that had been made available to the Investors.

882.     Had the Investors known the true state of the Company's financial affairs, they would not have approved the Senior Notes and the 2007 Series C Subordinated Convertible Debentures.

883.     These measures subordinated the Investors' interests in the event of nonpayment and / or bankruptcy.  In addition, they increased the Company's overall debt, which eventually necessitated the bankruptcy filing.

884.     McGrath and the 2007 Board's breach of their fiduciary duty to disclose information fully and fairly has damaged the Investors.

885.     McGrath and the 2007 Board are jointly and severally liable for these damages.

886.     The Investors have standing to pursue these damages directly because the acts alleged caused injury to them as Investors, not to the Company itself.

887.     The Investors did not and could not have reasonably discovered these violations until a reasonable time after the bankruptcy filing in September 2009 because McGrath and the 2007 Board, through McGrath's representations and omissions and the 2007 Board's actions and inactions, led the Investors away from the truth regarding the

Company's finances and were entrusted by the Investors to exercise competence and act in good faith as fiduciaries.

## CLAIM XVII

### Breach of Fiduciary Duty for Nondisclosure

### (By All Investors Against McGrath and 2004[9]–2009 Boards)

888.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

889.     McGrath and the Boards were under a fiduciary duty to disclose fully and fairly all material information within their control when describing the facts and circumstances surrounding the subject offerings, particularly with respect to the state of the Company's business and financial affairs.

890.     This duty was owed both to debt and equity holders because, upon information and belief, the Company was insolvent or in the zone of insolvency at all material times when making the offerings and withholding other material information about the state of the Company's business and financial affairs.

891.     Additionally, to the extent that the Securities were convertible debentures, they were hybrid debt-equity securities that triggered fiduciary duties.

892.     McGrath and the Boards breached this duty by selectively communicating information about the Company's finances and failing to disclose other information that was material to the Investors in connection with subject offerings.

---

[9]     For purposes of all claims in this Complaint, the Defendants from the 2004 and 2005 Boards include:  (1) Greg McGrath; (2) Sean D. Curran; (3) Charles V. Shamblee III; and (4) J. Robert Routt.

893.     The information that McGrath and the Boards communicated selectively and did not disclose to the Investors was material because there was a substantial likelihood that the Investors would consider it important when deciding whether to invest in the subject offerings.  In addition, the lack of disclosure impacted the information that had been made available to the Investors.

894.     Had the Investors known the true state of the Company's financial affairs, they would not have invested in the subject offerings.

895.     These investments subordinated the Investors' interests in the event of nonpayment and / or bankruptcy.  In addition, they increased the Company's overall debt, which eventually necessitated the bankruptcy filing.

896.     McGrath and the Boards' breach of their fiduciary duty to disclose information fully and fairly has damaged the Investors.

897.     McGrath and the Boards are jointly and severally liable for these damages.

898.     The Investors have standing to pursue these damages directly because the acts alleged caused injury to them as Investors, not to the Company itself.

899.     The Investors did not and could not have reasonably discovered these violations until a reasonable time after the bankruptcy filing in September 2009 because McGrath and the Boards, through McGrath's representations and omissions and the Boards' actions and inactions, led the Investors away from the truth regarding the Company's finances and were entrusted by the Investors to exercise competence and act in good faith as fiduciaries.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

mdw
Mack drucker & watson
Attorneys at Law
3300 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/776-9000

**CLAIM XVIII**

**Breach of Fiduciary Duty for Nondisclosure**

**(By Investors in 2008 Series D Senior Subordinated Debentures
Against Buettin and Thistleton)**

900.     Buettin and Thistleton were under a fiduciary duty to disclose fully and fairly all material information within their control when describing the facts and circumstances surrounding the 2008 Series D Senior Subordinated Debentures, particularly with respect to the state of the Company's business and financial affairs.

901.     This duty was owed to Investors in the 2008 Series D Senior Subordinated Debentures as debt holders because, upon information and belief, the Company was insolvent or in the zone of insolvency at all material times when they made representations about the offering and withheld other material information about the state of the Company's business and financial affairs.

902.     Buettin and Thistleton breached this duty by selectively communicating information about the Company's finances and failing to disclose other information that was material to the Investors in connection with the 2008 Series D Senior Subordinated Debentures.

903.     The information that Buettin and Thistleton communicated selectively and did not disclose to the Investors was material because there was a substantial likelihood that the Investors would consider it important when deciding whether to invest in the subject offerings.  In addition, the lack of disclosure impacted the information that had been made available to the Investors.

154

904.     Had the Investors known the true state of the Company's financial affairs, including that the Company had been contemplating bankruptcy, had been informed by investment banks that bankruptcy was necessary, and had approached DeWaay about purchasing the Company's assets, they would not have invested in the 2008 Series D Senior Subordinated Debentures.

905.     These investments subordinated the Investors' interests in the event of nonpayment and / or bankruptcy.  In addition, they increased the Company's overall debt, which eventually necessitated the bankruptcy filing.

906.     Buettin and Thistleton's breach of their fiduciary duty to disclose information fully and fairly has damaged the Investors.

907.     Buettin and Thistleton are jointly and severally liable for these damages.

908.     The Investors have standing to pursue these damages directly because the acts alleged caused injury to them as Investors, not to the Company itself.

909.     The Investors did not and could not have reasonably discovered these violations until a reasonable time after the bankruptcy filing in September 2009 because Buettin and Thistleton led the Investors away from the truth regarding the Company's finances and were entrusted by the Investors to exercise competence and act in good faith as fiduciaries.

. . .

. . .

. . .

mdw

Mack drucker & watson
Attorneys at Law
3200 North Central Avenue, Suite 1200
Phoenix, Arizona 85012
602/778-9600

155

**CLAIM XIX**

**Breach of Fiduciary Duty for Disloyalty and Bad Faith**

**(By All Investors Against McGrath)**

910.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

911.     As an officer of the Company, McGrath owed a duty to act with loyalty and in good faith when managing the Company.

912.     McGrath breached this duty by making representations about the Company's finances in the form of inaccurate and / or misleading projections and incorrect statements about the Company's financial and business affairs.

913.     When taking these actions, McGrath elevated his own interests above the interests of the Company, particularly to the extent that he stood to benefit from the growth of the Company directly through the exercise of warrants and stock options without the risks of investing in the Company and indirectly through the substantial interests held by his wife and family members, or he intentionally acted with a purpose other than that of advancing the best interests of the corporation.

914.     McGrath also consciously or intentionally disregarded his responsibilities as President, which required him to correct inaccurate statements.

915.     McGrath's breach of his fiduciary duty through these actions caused injury to all debt and equity holders in the Company, who were owed equal fiduciary duties because, upon information and belief, the Company was insolvent or in the zone of insolvency at all material times.

156

916.     McGrath is liable for these damages.

917.     The Investors have standing to pursue these damages directly because the acts alleged caused injury to them as Investors, not to the Company itself.

918.     The Investors did not and could not have reasonably discovered these violations until a reasonable time after the bankruptcy filing in September 2009 because McGrath, through his representations and omissions, led the Investors away from the truth regarding the Company's finances and was entrusted by the Investors to exercise competence and act in good faith as a fiduciary.

## CLAIM XX

### Breach of Fiduciary Duty for Disloyalty and Bad Faith

### (By All Investors Against 2004-2009 Boards)

919.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

920.     The Boards had a fiduciary duty to act with loyalty and in good faith when managing the Company.

921.     The Boards breached this fiduciary duty when they approved the subject debt and equity offerings, including the Common Units, Class A Units, Class B Units, 2005 Series C Subordinated Convertible Debentures, 2006 Series D Subordinated Convertible Debentures, Common Stock in Domin-8 Inc., Series A Preferred Stock, the 2007 Series A and Series B Subordinated Debentures, the 2007 Series C Subordinated Convertible Debentures, and the 2008 Series D Senior Subordinated Debentures.

157

922.     Upon information and belief, the Boards also breached this duty when they approved the financial projections and information disseminated in connection with the subject offerings, which they knew or should have known were inaccurate and / or reasonably misleading, and did not stop McGrath from making representations related to the same in connection with the subject debt and equity offerings.

923.     When taking these actions, the Boards elevated their own interests above the interests of the Company, particularly to the extent that they stood to benefit from the growth of the Company through the exercise of warrants and stock options without the risks of investing in the Company, or intentionally acted with a purpose other than that of advancing the best interests of the corporation.

924.     The Boards also consciously or intentionally disregarded their responsibilities because they did not stop McGrath from making representations regarding the Company's finances and business affairs, which they knew or should have known were inaccurate in light of the financial state of the Company and its performance in relation to projections, and did not take measures to correct the same.

925.     Further, the Boards' failure to exercise proper oversight with respect to McGrath's representations was sustained and systematic so as to amount to bad faith.

926.     The Boards' breach of their fiduciary duty through these actions caused injury to all debt and equity holders in the Company, who were owed equal fiduciary duties because, upon information and belief, the Company was insolvent or in the zone of insolvency at all material times.

927.     The Boards are jointly and severally liable for these damages.

158

928.     The Investors have standing to pursue these damages directly because the acts alleged caused injury to them as Investors, not to the Company itself.

929.     The Investors did not and could not have reasonably discovered these violations until a reasonable time after the bankruptcy filing in September 2009 because the Boards, through McGrath's representations and omissions and their own actions and inactions, led the Investors away from the truth regarding the Company's finances and were entrusted by the Investors to exercise competence and act in good faith as fiduciaries.

## CLAIM XXI

### Breach of Fiduciary Duty for Disloyalty and Bad Faith

### (By All Investors Against Buettin, Thistleton, and Ensign)

930.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

931.     As directors and officers, Buettin, Thistleton, and Ensign had a fiduciary duty to act with loyalty and in good faith when managing the Company.

932.     They breached this duty when they, upon information, individually and / or collectively approached DeWaay about purchasing the Company's assets, and did not advocate for filing bankruptcy sooner, despite having been informed by investment banks that it was necessary and having considered the possibility at least one year earlier.

933.     When taking these actions, Buettin, Thistleton, and Ensign elevated their own interests above the interests of the Company, particularly to the extent that they stood to benefit from the D8 Entities' purchase of the assets through their roles with the new

159

company or intentionally acted with a purpose other than that of advancing the best interests of the corporation.

934.     Buettin, Thistleton, and Ensign also consciously or intentionally disregarded their responsibilities because they did not take measures to correct these breaches.

935.     Buettin, Thistleton, and Ensign's breach of their fiduciary duty through these actions caused injury to all debt and equity holders in the Company, who were owed equal fiduciary duties because, upon information and belief, the Company was insolvent or in the zone of insolvency at all material times.

936.     Buettin, Thistleton, and Ensign are jointly and severally liable for these damages.

937.     The Investors have standing to pursue these damages directly because the acts alleged caused injury to them as Investors, not to the Company itself.

938.     The Investors did not and could not have reasonably discovered these violations until a reasonable time after the bankruptcy filing in September 2009 because Buettin, Thistleton, and Ensign led the Investors away from the truth regarding the Company's finances and were entrusted by the Investors to exercise competence and act in good faith as fiduciaries.

## CLAIM XXII

### Aiding and Abetting Breach of Fiduciary Duty

### (By All Investors Against DeWaay Entities, D8 Entities, and Labine)

939.     The Investors incorporate by reference, as though fully set forth herein, each and every preceding allegation of this Complaint.

160

940.     The directors and officers of the Company, including McGrath, Buettin, Thistleton, Ensign, and the Boards, owed fiduciary duties to the Investors.

941.     The directors and officers of the Company breached these fiduciary duties by taking the acts alleged herein, with the assistance of DeWaay and Labine.

942.     Upon information and belief, DeWaay and Labine, on behalf of the D8 Entities, and Labine, as an independent securities broker, participated in the breach of these duties, particularly to the extent that they participated in the sale of the subject offerings, which had been approved and recommended by the directors and officers of the Company, and subsequently attempted to purchase the assets of the Company if it agreed to file bankruptcy, which it did.

943.     DeWaay and Labine's participation in these activities has damaged the Investors, who have lost all or a substantial portion of their investments in the subject offerings as a consequence of participating in the offerings and the Company filing bankruptcy.

944.     The DeWaay Entities, D8 Entities, and Labine are liable for these damages and may be held jointly and severally liable for the same if it is determined that they knowingly aided and abetted the breach of the fiduciary duty.

945.     The Investors have standing to pursue these damages directly because the acts alleged caused injury to them as Investors, not to the Company itself.

946.     The Investors did not and could not have reasonably discovered these violations until a reasonable time after the bankruptcy filing in September 2009 because the Company's directors and officers led the Investors away from the truth regarding the

161

Company's finances and entrusted the  by the Investors to exercise competence and act in good faith as fiduciaries.

**WHEREFORE**, Plaintiff Investors respectfully request judgment in their favor as follows:

a)      Awarding Plaintiffs actual damages, plus any consequential damages, in an amount to be determined at trial;

b)      Awarding Plaintiffs their attorneys' fees and costs incurred in this lawsuit to the extent they are available under the law;

c)      Awarding Plaintiffs such other and further relief that this Court deems just and proper; and

d)      Awarding pre-judgment and post-judgment interest on all amounts awarded to Plaintiffs from the earliest dates allowed by law.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial with respect to their Complaint.

DATED this **14th** day of June 2011.

**MACK DRUCKER & WATSON, P.L.C.**

By */S/ Dax R. Watson*
Dax R. Watson
Gregory M. Monaco
*Attorneys for Plaintiffs*

. . .

. . .

Y:\Clients\MH-01\Domin 8\Pleadings\Complaint (FINAL 02).doc                    2337.000

1    **ORIGINAL** of the foregoing filed via
2  the Court's electronic filing system this
   **14<u>th</u>**  day of June 2011.
3

4

5

6  /S/ Berlinda Corpora
7  _____
8

9

10

11

12



13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

163